# Exhibit A



K# 10072758

# Publishing Agreement

### SIMON & SCHUSTER, INC.
1230 Avenue of the Americas
New York, New York 10020
(212) 698-7000

*Atria Books*

AGREEMENT dated October 20, 2003 between **SIMON & SCHUSTER, INC.** (the "Publisher"), 1230 Avenue of the Americas, New York, New York 10020, and

**VICKIE M. STRINGER** (the "Author"), whose agent is The Vines Agency, Attention: James C. Vines, 648 Broadway, Suite 901, New York, New York 10012.

In consideration of the premises hereinafter set forth, Publisher and Author hereby agree with respect to a work tentatively entitled:

**IMAGINE THIS ("Book 1") and
UNTITLED WORK ("Book 2")**

**(jointly**, the "Work").

## I. Rights Granted

### The Grant and the Territory

1.      Author grants to Publisher during the full term of copyright and any renewal or extensions thereof:

(a) the exclusive right to publish the Work including the right to exercise or license the rights set forth in Paragraph 2 in the English language throughout the United States, its territories and possessions (which include but are not limited to all U.S. military installations), the Philippine Republic and Canada, and the non-exclusive right to publish the Work including the right to exercise or license the rights set forth in Paragraph 2 in the English language throughout the rest of the world except within the British Commonwealth as defined by the Publisher at the date of this Agreement; and

(b) the non-exclusive right to sell or authorize others to sell Publisher's English language edition of the Work in Australia if no other English language edition is for sale in Australia within 30 days after first publication of the Work, in accordance with the provisions of the Australian Copyright Amendment Act of 1991. The Author shall advise the Publisher immediately following Author's disposition of Australian rights in the Work; and

(c) the non-exclusive right to sell or authorize others to sell Publisher's English language edition(s) of the Work in any territory within the British Commonwealth provided that at the time Publisher exercises this right such territory is, under its applicable law (whether in force as of the date of this Agreement or effective thereafter) an open market with respect to the sale of such edition(s).

**Subsidiary Rights**

2.      (a) The Publisher shall have the right, in the territories set forth in Paragraph 1, to exercise the following rights in the Work or to license such rights upon such terms as Publisher deems advisable **(subject to certain rights of approval reserved by the Author)**: book club rights; anthology/permission rights **(provided that no one selection will exceed approximately 10% of the length of the Work)**; second serial rights (*i.e.* publication after first publication in book form, **subject to any limitation required under any prior disposition of first periodical rights**); abridgment/condensation and digest rights **(after publication of the first trade edition)**; large print rights; reprint and special edition rights; electronic text rights as defined in Paragraph 34(a); audio rights as defined in Paragraph 34(b); and first serial rights (*i.e.*, publication before first publication in book form). **Author will have the right to approve any abbreviated version of the Work to be published by the licensee of digest rights, unless such rights are licensed to *Readers' Digest*. Publisher will consult with the Author on its exercise of large print rights and hardcover reprint rights.**

        (b) Any grant of first or second serial rights shall specifically prohibit the licensee from reproducing all or a substantial portion of the Work.

        (c) Publisher may license others free of charge to publish the Work in Braille or other forms for the handicapped.

        (d) Publisher may authorize copyright and permissions clearance organizations to act in full or in part on its behalf **(but shall not directly charge the Author for service of such organizations)** and Publisher shall account to the Author for royalties received from such organizations designated as arising from reproduction of the Work.

        (e) The party who controls motion picture, dramatic and television rights is authorized to publish and to license others to publish, in any form, excerpts, summaries and serializations, none to exceed 7,500 words in length, of motion picture, television, stage and other dramatizations based upon the Work for use in advertising and promotion of any such dramatization, and not for resale. The party who authorizes such publication shall take all steps necessary to protect the copyright in the Work.

        (f) The Publisher shall notify the Author promptly after each disposition of rights, but inadvertent failure to do so will not be deemed a breach of this Agreement. The Publisher shall provide the Author with copies of any license agreements relating to the Work on Author's request therefor.

        (g) Publisher shall have the right, **with the approval of the Author, such approval not unreasonably to be withheld or delayed,** to license the rights set forth in subparagraph (a) above to Publisher's parent, subsidiaries, affiliates and divisions, provided that the terms for such license are no less favorable to the Author than the terms which Publisher in its reasonable judgment would accept from an unrelated third party licensee for the same rights.

        (h) The Author has not granted and will not grant to any person (except to the Publisher), permission, authority, right or license for publication or distribution of the Work in the open English language market, in a paperback edition **except simultaneously with the publication of the first United States paperback edition or 24 months after delivery and acceptance of the Work, whichever shall be sooner. The Publisher shall consult with the Author about the timing of the Publisher's first publication of the Work.**

**Option**

3.     (a) The Author grants the Publisher an exclusive option to acquire the Author's next (*i.e.*, written after the Work) full-length work **of fiction** for publication on mutually satisfactory terms. If, within **45** days following submission of **a full and complete outline for** such work to the Publisher, **which submission shall not occur until after delivery and acceptance of the complete manuscript for the Work,** Publisher and Author are unable in good faith to agree upon terms for publication, the Author shall be free thereafter to **sell or license** such next work to an other publisher, provided, however, that the Publisher shall retain the first option to acquire the work on terms no less favorable to the Author than those offered by any other publisher. During the exclusive period of this option, Author shall not submit such next work to other publishers, nor seek offers from or negotiate with others with respect thereto.

        (b) In the event that the Author's next work **of fiction** is a short work (*i.e.*, a work of less than traditional book length, intended for the general trade market), the Author also grants the Publisher an exclusive option to acquire the Author's next (*i.e.*, written after the Work) short work **of fiction** for publication on mutually satisfactory terms. If, within **30** days following submission of the final manuscript of such work to the Publisher, **which submission shall not occur until after delivery and acceptance of the complete manuscript for the Work,** Publisher and Author are unable in good faith to agree upon terms for publication, the Author shall be free thereafter to **sell or license** such work to another publisher, provided, however, that the Publisher shall retain the first option to acquire said short work on terms no less favorable to the Author than those offered by any other publisher. During the exclusive period of this option, Author shall not submit such work to other publishers, nor seek offers from or negotiate with others with respect thereto.

## II. Manuscript Delivery

### Delivery of the Manuscript, Related Materials and Permissions

4.     (a) The Author shall deliver to the Publisher one copy of the complete, legible, typewritten manuscript of **Book 1** in the English language (double-spaced, properly margined), satisfactory to the Publisher in length, content and form, on or before October 1, 2003, and shall deliver to the Publisher one copy of the complete, legible, typewritten manuscript of **Book 2** in the English language (double-spaced, properly margined), satisfactory to the Publisher in length, content and form, on or before June 10, 2004. Book 1 shall be 75,000-90,000 words in length and is described as follows: a sequel to *Let That Be the Reason,* the story of a woman who becomes a major player in the male-dominated underworld of drug dealing, the sex trade, and fencing. Book 1 contains the story from the point that Carmen, the protagonist, is facing seven years of incarceration and separation from her son. Book 2 shall be 75,000-90,000 words in length and will be a work of fiction on a subject to be mutually agreed by Author and Publisher. The Author shall also **use reasonable efforts to** deliver diskettes or other electronic format specified by Publisher containing the Work, **but a failure to do so shall not be considered a breach of this Agreement.**

        (b) As part of the complete manuscript, the Author shall, at Author's expense, furnish to Publisher photographs, drawings, charts, maps, illustrations, appendix, bibliography and other related material (herein "related materials") necessary in Publisher's **and Author's mutual** opinion for publication of the Work, all in content and form satisfactory to Publisher. ~~If the Publisher decides there is to be an index in the Work the Publisher will be responsible for preparation of the index and shall charge such cost against the Author's royalty account.~~

(c) If permission from others is **legally** required for publication of any material contained in the Work or for exercise of any of the rights conferred by this Agreement, Author shall obtain such permissions at Author's expense, in form acceptable to Publisher, and shall deliver such permissions to the Publisher as part of the complete manuscript of the Work. Permissions shall cover all territories, rights and editions covered by this Agreement.

(d) If the Author fails to deliver the related materials or required permissions, Publisher shall have the right, but not the obligation, to obtain the same and in such event the **reasonable** cost of such preparation shall be borne by the Author as follows: (i) Author shall pay such costs upon receipt of an invoice from the Publisher; (ii) Publisher may withhold a portion of any advances payable to the Author under this Agreement and deduct such costs from said advances; or (iii) at Publisher's option, Publisher may charge such cost to Author's royalty account, provided however that if the advance payable to the Author under this Agreement is unearned one year after publication of the Work, then Author will reimburse Publisher for such costs upon receipt of an invoice from Publisher.

### III.    Payments to the Author

### Advance

5.     (a) Publisher shall pay Author, as an advance against all amounts accruing to Author under this Agreement, the sum of $275,000, payable as follows:

> $75,000 on signing of this Agreement;
>
> $50,000 on delivery and acceptance of the complete manuscript for Book 1, as satisfactory to the Publisher;
>
> $50,000 on Publisher's first publication of Book 1, or 12 months after acceptance of the complete manuscript, whichever is earlier;
>
> $50,000 on delivery and acceptance of the complete manuscript for Book 2, as satisfactory to the Publisher; and
>
> $50,000 on Publisher's first publication of Book 2, or 12 months after acceptance of the complete manuscript, whichever is earlier.

**(b) In the event that net sales of Book 1 or Book 2 reach 140,000 copies within 12 months after first publication thereof, then Publisher shall pay the Author an additional advance against royalties of $10,000, payable within 30 days after Publisher determines that such sales levels were achieved; and in the event that net sales of Book 1 or Book 2 reach 150,000 copies within 12 months after first publication thereof, then Publisher shall pay the Author a further additional advance against royalties of $10,000, payable within 30 days after Publisher determines that such sales levels were achieved. In no event will additional advances payable under this subparagraph (b) exceed a maximum total of $20,000 (combined, for both Books). As used in this paragraph, "net sales" means gross sales less actual returns and a reasonable reserve for returns.**

### Royalties

6.     The Publisher shall pay the Author royalties on all copies of the Work sold by the Publisher, less returns, as follows:

(a) if published as a hardcover edition, 10% of the catalog retail price on the first 5,000 copies sold, 12½% of the catalog retail price on the next 5,000 copies sold, and 15% of the catalog retail price on all copies sold thereafter, subject to the exceptions set forth below;

(b) if published as a trade paperback edition, 7½% of the catalog retail price on all copies sold, subject to the exceptions set forth below;

(c) if published as a mass-market paperback edition, 8% of the catalog retail price on the first 150,000 copies sold, and 10% of the catalog retail price on all copies sold thereafter, subject to the exceptions set forth below;

(d) if published as an electronic text (e-book) edition, 15% of the catalog retail price on all copies sold, except that on special discount sales (as defined in Paragraph 34(d)), the royalty shall be 15% of the net amount actually received from such sales;

(e) if published as an audio edition, 5% of the catalog retail price on the first 10,000 copies sold, 6% of the catalog retail price on the next 10,000 copies sold, and 7% of the catalog retail price on all copies sold thereafter, subject to the exceptions set forth below;

(f) if published as a large print edition, 10% of the net amount actually received from such sales, subject to the exceptions set forth below;

(g) if published as a low-cost hardcover edition, 10% of the net amount actually received from such sales, subject to the exceptions set forth below;

(h) on copies of the hardcover and trade paperback editions sold for export to third parties or outside the United States by Publisher or its affiliates, royalties shall be calculated on the net amount actually received from such sales. On copies of the mass-market paperback, large print, low-cost hardcover and calendar editions sold for export to third parties or outside the United States by Publisher or its affiliates, the royalty shall be 5% of the net amount actually received from such sales. On copies of the audio edition sold for export to third parties or outside the United States by Publisher or its affiliates, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(i) on mail order sales and other direct response sales, the royalty shall be 5% of the net amount actually received from such sales, except that on mail order sales and other direct response sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(j) on special discount sales (as defined in Paragraph 34(d)), the royalty shall be **10%** of the net amount actually received from such sales, except that on special discount sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(k) on copies sold to book clubs on a royalty-inclusive basis, the royalty shall be 5% of the net amount actually received from such sales, except that on copies of the audio edition sold to book clubs on a royalty-inclusive basis, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(l) on remainder-in-place sales (as defined in Paragraph 34(e)) and remainder sales, the royalty shall be 5% of the net amount actually received from such sales, except that on remainder-in-place sales and remainder sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales, and except that no royalty shall be payable on copies of the Work sold at a discount of 85% or more from the catalog retail price;

(m) on any revised edition of the Work, royalties will be computed separately from the number of copies sold of prior editions. If individuals other than Author revise any edition of the Work and are entitled to royalties on such edition, then Author shall receive royalties on such edition at rates to be negotiated in good faith.

**Proceeds on License of Subsidiary Rights**

7.      The Publisher shall pay the Author 50% of the proceeds received by Publisher from the sale or license of subsidiary rights, except as follows:

| Type of Right | Author's Share | Publisher's Share |
|---|---|---|
| first serial rights | 90% | 10% |

In calculating the proceeds on disposition of the subsidiary rights, Publisher may deduct from the gross amount received any third party agent's commission which may be paid for services rendered in connection with such disposition, and any bank fees or other monetary transfer charges incurred by the Publisher in connection with or by reason of such sale or disposition.

**Special Royalty Provisions**

8.      With respect to each edition of the Work published hereunder, the following shall be applicable:

(a) no royalty shall be payable on copies damaged or destroyed or on copies furnished gratis for review, publicity, promotion, sample or similar purposes;

(b) no royalty shall be payable on sales by Publisher to its parent, subsidiaries, affiliates, or related divisions for resale, but any resale thereby shall be deemed a sale by Publisher subject to the applicable royalty herein provided;

(c) in some instances Publisher prints on the jackets and/or covers of its books a suggested cover price that is higher than its catalog retail price. In such instances, where the royalty is based on the retail price, the catalog retail price, not the suggested cover price, shall be the basis for the computation. The difference between the two prices enables the retailer to recoup its freight costs;

(d) when the Publisher in its sole discretion determines that copies of the Work are not readily salable at regular prices within a reasonable time, the Publisher may remainder copies of the Work (**but not earlier than 12 months from the publication date unless it is a remainder-in-place, which may occur at any time**) or dispose of such copies as surplus at the best price obtainable. Publisher shall make no remainder sale (other than a remainder-in-place sale) without first offering copies to the Author at the estimated remainder price, provided, however, that inadvertent failure to offer such copies to the Author will not be deemed a material breach of this Agreement;

(e) any advance royalties or other sums paid to or on behalf of the Author under this Agreement, and any amounts due from the Author to the Publisher **under this Agreement**, may be applied in reduction of any amounts payable to the Author under this Agreement;

(f) in the event of any overpayment by Publisher to Author, Publisher may, in addition to any other remedies available to it, recoup such overpayment from any sums due to Author under this Agreement or any other agreement between Author and Publisher. **An unearned advance shall not be deemed an overpayment;**

(g) any amounts payable to the Author hereunder shall be subject to such reasonable reserve for returns of copies of the Work as the Publisher shall establish in its reasonable discretion. **Following the fourth full accounting period after publication, Publisher's reserve for returns shall not exceed 20% of the total copies theretofore shipped and not returned, except that (i) after each subsequent substantial printing, the reserve may be reasonably increased above 20% for four additional accounting periods, (ii) Publisher may maintain a reserve in excess of 20% which reserve is equal to the actual percentage of returns in the preceding period, and (iii) Publisher may maintain a higher reserve for any period preceding or during which it is expected that the Work will be or is out of print or is remaindered. Reserves shall be maintained separately with respect to each edition (hardcover, paperback, etc.);**

(h) if the Publisher exercises rights for which royalties are not specifically set forth in this Agreement, then royalties shall be paid to the Author at rates to be negotiated in good faith by the Author and Publisher.

## Royalty Statements

9.     (a) Publisher shall render royalty statements and make accounting and royalty and other payments to the Author (i) in February for the preceding period April 1 to September 30, and (ii) in August for the preceding period October 1 to March 31. Publisher may from time to time change such accounting periods provided no longer than six months elapses between any two accountings to the Author. If for any royalty period the current period total activity in the Author's account for the Work is less than $100, Publisher may defer the rendering of payment until such royalty period as the cumulative activity since the last statement exceeds such amount.

(b) Royalty statements shall state the number of copies sold and returned during the period covered and the reserve for returns being held by the Publisher. If the Author so requests in writing, the Publisher shall, within 60 days after its receipt of such request, advise the Author in available detail of the number of copies printed, sold, and given away during the current period covered by the last royalty statement rendered to the Author, as well as the approximate number of salable copies on hand at the end of said period.

(c) Statements rendered hereunder shall be final and binding upon the Author unless objected to in writing, setting forth the specific objections thereto and the basis for such objections, within **three** years after the date **Publisher renders** the statement.

(d) **When the Publisher has disposed of any subsidiary rights in the Work, any proportionate share of the proceeds due to the Author in accordance with Paragraph 7, less any unearned advances and after the Publisher's allowances for reserve for returns, shall be paid at the time the next succeeding royalty statement is rendered; provided, however that with respect to any advances actually received by Publisher in connection with the disposition of U.S. mass market paperback rights or book club rights, if the Author makes a written request for immediate payment after such a disposition, the Publisher shall pay the Author's share of such advance received by Publisher (after such deductions) within 30 days after receiving such written request.**

(e) **The Publisher shall create a General Royalty Account to which will be credited all earnings and against which will be charged all payments to or on behalf of the Author under this Agreement. Notwithstanding anything to the contrary in the foregoing, in the event of termination of this Agreement with respect to Book 1 or Book 2, the advance payable on signing hereof shall be deemed allocated $37,500 to Book 1 and $37,500 to Book 2.**

7

**Examination of Publisher's Books and Records**

10.    The Author or the Author's representative may, upon written request not more than once each year, conduct a reasonable examination of the books and records of the Publisher insofar as they relate to the Work for the period of **three** years immediately preceding such examination. Such examination shall be on Publisher's premises at a time convenient to Publisher, but no later than 90 days after Author's request therefor, and shall be at Author's expense **unless errors of accounting amount to 5% or more of the total amount accrued to the Author shall be found to the Author's disadvantage, in which case the reasonable cost of the examination shall be borne by the Publisher.**

## IV.    Failure to Deliver the Manuscript; Acceptance of the Manuscript

**Failure to Deliver the Manuscript**

11.    Timely delivery of the Work, satisfactory to the Publisher in length, content and form, is essential to the Publisher and is of the essence of this Agreement. If Author fails to deliver the complete manuscript of **Book 1 or Book 2**, satisfactory to the Publisher in length, content and form, within **30 days of** the time specified, the Publisher shall have the option to give the Author a notice in writing terminating this Agreement **with respect to said Book**, and in such event the Publisher may then recover and the Author shall repay **within 60 days after the date of such notice** all amounts advanced to the Author **with respect to said Book.** In the event that the Author completes a manuscript for **Book 1 or Book 2** after termination of this Agreement pursuant to the preceding sentence, then the Publisher shall have the option, exercisable within 30 days after receipt of said manuscript, to acquire **said Book** on the same terms and conditions as provided in this Agreement.

**Extension of Time to Deliver**

12.    Publisher may in its discretion extend for such period as in its judgment is appropriate, or refuse to extend, Author's time to deliver the complete manuscript. Any extension of the delivery date must be in writing signed by the Publisher. In determining whether to grant such extension and/or the length thereof, Publisher may consider such factors as Publisher deems relevant, including without limitation, Author illness and the changing marketability of the Work.

**Acceptance of Manuscript**

13.    (a) The Publisher shall not be obligated to accept or publish **Book 1 or Book 2** if in its sole judgment **said Book** is not acceptable to it. If the Author delivers a manuscript of **Book 1 or Book 2** within the time specified, in what the Author represents to be its complete and final form, the Publisher shall, within **60** days after its receipt thereof, determine whether **said Book** is acceptable to it. In lieu thereof, Publisher may request in writing that Author make revisions, changes or supplements ("revisions") thereto. If Publisher requests one or more revisions in the manuscript as submitted or as thereafter revised, Publisher's time to determine the acceptability thereof shall be extended for a period of 60 days after resubmission by the Author, or 60 days after Publisher's receipt of written notice by Author that no further revisions will be made. Author will make revisions as promptly as possible after Publisher's request therefor. No request for revisions shall be deemed to obligate Publisher to accept the final revision or to constitute a conditional acceptance thereof. If the Publisher in its sole discretion determines to submit the manuscript of **Book 1 or Book 2** to a legal review, the Author shall cooperate with the Publisher or Publisher's counsel in such review and notwithstanding anything to the contrary in this Agreement the time for Publisher to accept or reject **said Book** shall be extended to 30 days after completion of the legal review.

(b) Acceptance of the manuscript shall be made by written notice signed by an authorized signatory of the Publisher. Payment of an advance installment, payable by express provision hereof upon acceptance of the manuscript, shall constitute written notice of acceptance unless such payment is accompanied by a notice to the contrary.

(c) If the Publisher fails to accept the complete manuscript or revised complete manuscript **of Book 1 or Book 2** within the time periods provided in subparagraph (a) above, the Author shall thereafter have the right to notify Publisher in writing that unless the manuscript is accepted or written request for revisions provided within 15 business days after the delivery of such notice, the manuscript will be deemed unacceptable and this Agreement shall terminate **with respect to said Book** in accordance with the provisions of subparagraph (d) below.

(d) If the complete manuscript or revised complete manuscript **of Book 1 or Book 2** delivered by the Author is not, in Publisher's sole judgment, acceptable to the Publisher, the Author shall repay all sums advanced to the Author hereunder **with respect to said Book in accordance with the provisions of subparagraph (e) below** and upon such repayment this Agreement shall terminate **with respect to said Book**.

(e) In the event of termination of this Agreement **with respect to Book 1 or Book 2** because the complete manuscript or revised complete manuscript is unacceptable to the Publisher, the Author or the Author's duly authorized representative shall make every effort to sell **said Book** elsewhere, and the Author shall be obligated to repay all sums advanced hereunder **with respect to said Book**; but **for a period of 12 months after termination of this Agreement** such obligation shall be limited to repayment from the first (and all) proceeds of any contracts with others concerning the **rights in said Book granted to the Publisher under this Agreement** including, without limitation, rights listed in Paragraph 2 above. Author hereby transfers and assigns to Publisher, as security for the repayment of any advances which may become repayable pursuant to this paragraph, any and all monies which may hereafter become due or owing to Author from other persons or entities as a result of **the rights granted to the Publisher under this Agreement in said Book**, and Author hereby authorizes Publisher to apply such monies as and when received in liquidation of Author's obligation to repay such advances, until such obligation shall have been fully paid. Author hereby authorizes such other person or entity to give full force and effect to this assignment, and hereby releases and discharges such other person or entity from any and all liability to Author for any and all payment or payments made to Publisher pursuant to this paragraph. **At the end of the 12-month period any sums that have not been repaid shall become immediately due and payable to the Publisher.**

## V. Production and Publication of the Work

### Correction of Proofs

14.    Publisher shall furnish Author with one set of galleys or other first proofs and, at its option, subsequent proofs, and the Author shall return each set of proofs with Author's corrections to the Publisher within 21 days of receipt thereof. The Publisher also shall proofread the proofs. If the Author shall fail to return the corrected proofs within the 21-day period herein specified, the Publisher may publish the Work without the Author's approval of the proofs - provided, however, that if, because of illness or any other factor beyond the Author's control, the Author informs the Publisher that Author is unable so to return the corrected proofs, Author's time for correcting such proofs shall be extended for another 21-day period, and after that period the Publisher may publish the Work without the Author's approval of the proofs.

**Cost of Author's Alterations**

15.    If, in the correction of proofs, the Author requests changes from the text of the manuscript, the Author shall bear the cost of such changes, **other than the cost of correcting printer's errors,** over 15% of the original cost of composition, as follows: (a) Author shall pay such costs upon receipt of an invoice from the Publisher; (b) Publisher may withhold a portion of any advances payable to the Author under this Agreement and deduct such costs from said advances; or (c) at Publisher's option, Publisher may charge such cost to Author's royalty account, provided however that if the advance payable to the Author under this Agreement is unearned **18 months** after publication of the Work, then the Author will reimburse Publisher for such costs upon receipt of an invoice from Publisher. At Author's request Publisher shall submit an itemized statement of such charges and shall make available corrected proofs for the Author's inspection at the Publisher's office.

**Publication**

16.    (a) The Publisher shall publish **each of Book 1 and Book 2** in book form within 18 months after acceptance of the manuscript therefor. Publication shall be in any edition and under any imprint of Publisher or its affiliates that Publisher elects.

       (b) Publisher shall have the right to use the name, pseudonym, **approved** portrait and **approved** picture of and **approved** biographical material concerning Author in and on the Work, in the advertising, publicity and promotion thereof, and in connection with any rights granted hereunder, **but not to endorse any product or service.** Author shall furnish Publisher, free of charge, original photographs of Author which Publisher may use for such purposes without additional payment to or permission from any third party.

       (c) The title of the Work as set forth on page 1 may **only** be changed by mutual agreement of the Author and the Publisher.

       (d) The format, imprint, style of printing and binding, and all matters relating to the manufacture, sale, distribution and promotion of the Work shall be determined at the sole discretion of the Publisher. **The Publisher shall consult with the Author on the cover artwork for the Work. The Author shall have approval over the cover copy for the Work, such approval not to be unreasonably withheld or delayed.**

       (e) The Publisher may publish and authorize others to publish extracts of the Work containing not more than one chapter for promotion of the Work, without compensation therefor. If compensation is received it shall be shared equally by Author and Publisher.

       (f) **The Publisher will not include any advertisements in its edition of the Work or authorize others to do so without the Author's written approval, other than advertisements for the Publisher's own publications. No advertisements other than for other books by the Author will be placed inside the front cover.**

**Copyright**

17.    (a) The Publisher shall identify the Author as the owner of the copyright in the Work and **shall** register such copyright in the United States in the name of the Author.

       (b) The Publisher shall identify the Author as the owner of the © copyright in the audio edition of the Work. The Publisher shall be identified as the owner of the (P) copyright in the audio edition of the Work. Author hereby assigns, and Publisher shall own, all right, title and interest in and to the audio edition of the Work and all additions to, alterations of or revisions of the audio edition, and all drafts, notes, scripts, voice recordings and musical recordings related thereto, **but not the verbatim text of the Work.**

(c) The Publisher shall print in each copy of each edition of the Work published by it any notice required to comply with the applicable copyright laws of the United States and the provisions of the Universal Copyright Convention and the Berne Copyright Convention.

(d) Any agreements made by the Author or by the Publisher to dispose of any rights in the Work shall require the licensee or grantee to take all necessary and appropriate steps to protect the copyright in the Work. Whichever party controls first serial rights in the Work will use best efforts to require any licensee of such rights to include an acknowledgement accompanying the published excerpt stating that the excerpt is from an upcoming work to be published by the Publisher and setting forth the title of the Work, Author and Publisher by name.

(e) The Publisher may take such steps as it deems appropriate to copyright the Work in countries other than the United States, but the Publisher shall be under no obligation to procure copyright in any such countries, and shall not be liable to the Author for any acts or omissions by it in connection therewith. The Author may copyright the Work in any foreign country if the Publisher fails to take steps to obtain such a copyright within 30 days after receiving a written request from the Author to do so.

(f) Author hereby appoints Publisher to be Author's attorney-in-fact to execute and to file any and all documents necessary to record in the Copyright Office the assignment of exclusive rights made to Publisher hereunder.


### No Obligation to Publish

18.     Notwithstanding anything contained herein to the contrary, the Publisher shall not be obligated to publish **Book 1 or Book 2** if, **in the reasonable judgment of its own or outside counsel,** whether before or after acceptance thereof, **said Book** contains libelous or obscene material, or its publication may violate the right of privacy, common law or statutory copyright, or any other right of any person or entity. In such event, **unless Author makes changes required by Publisher's legal counsel in such counsel's reasonable judgment,** Publisher shall be entitled on demand to the return of all monies advanced to the Author hereunder **with respect to said Book,** and to terminate this Agreement **with respect to said Book.** Notwithstanding any request by Publisher for change or substantiation, nothing in this Agreement shall be deemed to impose upon the Publisher any duty of independent investigation or to relieve the Author of any of the obligations assumed by Author hereunder, including, without limitation, the ongoing validity of Author's warranties and representations which shall apply to all material in the Work, whether or not changed at the request of Publisher's legal counsel.


### Delays in Publication

19.     (a) The Publisher, in its sole and absolute discretion, shall have the right to reschedule publication of **Book 1 and/or Book 2** beyond the time set forth in Paragraph 16(a) for a reasonable time. If publication of **Book 1 or Book 2** is delayed in the absence of excusable circumstances the Author's sole and exclusive remedy shall be to give the Publisher a notice in writing, stating that if the Publisher fails to publish **said Book** within **90** days after the date of such notice, then all of the Publisher's rights in and to **said Book** shall terminate at the end of such **90**-day period; and if, in such event, the Publisher shall fail to publish **said Book** within such **90**-day period, all of the Publisher's rights in and to **said Book** shall terminate and revert to the Author, and the Author shall be entitled, as liquidated damages and in lieu of all damages and remedies, legal or equitable, to retain all payments theretofore made to Author under this Agreement **with respect to said Book and to receive any unpaid advances for said Book under Paragraph 5(a) above.**

(b) If publication is delayed beyond the time set forth in Paragraph 16(a) because of acts or conditions beyond the control of the Publisher or its suppliers or contractors, including (by way of illustration and not by way of limitation) war, shortages of material, strikes, riots, civil

commotions, fire or flood, the publication date shall be extended to a date **following removal of the cause of the delay but in no event longer than** six months following removal of the cause of the delay.

### Out of Print Termination

20.    If, at any time after the expiration of **one year** from the publication date **of Book 1 or Book 2**, the Publisher allows all of its **United States** editions of **said Book** to go out of print and such status continues in effect for six months after the Author has **given Publisher written notice ("Reversion Notice")** to put **said Book** back into print, and if there is no English language reprint edition authorized by Publisher available or contracted for **within such six-month period, provided that such contract requires publication within nine months**, then the Author may by a notice in writing terminate this Agreement **with respect to said Book** subject to any licenses previously granted by Publisher (and any renewals or extensions thereof) and Publisher's right to continue to share in the proceeds therefrom. In the event of such termination the Author shall have the right to purchase any available plates or film of **said Book** at cost, and/or any remaining copies or sheets of **said Book** at cost. If the Author does not purchase such plates, film, copies or sheets, then the Publisher may dispose of them at any price and retain the proceeds of such sale, **subject to payment to the Author of appropriate royalties.** The Publisher is under no obligation to retain any such plates, film, copies or sheets. **Neither Book hereunder** shall be deemed out of print as long as it is available from the Publisher in any edition, including electronic text editions. If, **however, six months after Author's Reversion Notice for Book 1 or Book 2, said Book** is only available from the Publisher in an electronic text edition or by means of print-on-demand technology, the Author may by notice in writing terminate this Agreement **with respect to said Book** provided in the prior 12 months sales of all editions of **said Book** were 150 copies or less. **Upon termination of this agreement the Publisher will provide the Author with copies of any licenses still in effect on Author's request therefor.**

## VI.    Other Rights, Undertakings and Obligations

### Author's Rights

21.    All rights not expressly granted by the Author to the Publisher are reserved to the Author **for Author's own use and disposition.** The Author shall not exercise or dispose of any reserved rights in such a way as substantially to destroy, detract from, impair or frustrate the value of any rights granted herein to the Publisher, nor shall the Author publish or permit to be published **for a period of two years after publication of the Work (or one year if it is a sequel or prequel)** any ~~book or other writing~~ **novel** based substantially on subject matter, material, characters or incidents in the Work without the written consent of the Publisher **which consent shall not be unreasonably withheld.**

### Author's Agent

22.    **All sums of money due the Author under this Agreement shall be paid to the Author's agent, The Vines Agency, Inc., 648 Broadway, Suite 901, New York, New York 10012, Attention: James C. Vines, which is an agency coupled with an interest, and receipt of said agent shall be a good and valid discharge of the obligation thereof; and the agent is hereby empowered by the Author to act on the Author's behalf in all matters arising from and pertaining to this agreement. It is agreed between the Author and the Author's agent that the Author hereby irrevocably assigns and transfers to said agent and said agent shall retain a sum equal to 15% of the gross monies accruing to the Author under this Agreement, prior to deductions from or charges against any such monies for any reason whatsoever. Nothing in the foregoing shall be construed to obligate Publisher to make any payments to said agent with respect to such 15% sum, and Publisher's sole obligation shall be to remit to said agent all money due the Author, if any, after deducting therefrom any**

deductions or charges permitted under this agreement. The Author irrevocably and exclusively grants to said agent the right to negotiate all subsidiary rights in the Work not granted herein. The provisions of this paragraph shall survive the expiration and/or termination of this agreement, and shall not be modified other than by mutual consent in writing of the Author and agent. Agent's Federal Tax I.D. #: 13-3851046.

**Representation by Single Author**

23.    **Deleted.**

**Author's Warranties**

24.    Author warrants and represents that:

(a) Author is the sole author and proprietor of the Work;

(b) Author has full power and authority to make this Agreement and to grant the rights granted herein, and Author has not previously assigned, transferred or otherwise encumbered the same; and neither the Author nor the Author has any prior agreement, commitment or other arrangement, oral or written, to write or participate in writing any other book-length work and will enter into no such agreement, commitment or other arrangement until after delivery and acceptance of the Work;

(c) the Work has not been previously published;

(d) the Work is not in the public domain;

(e) the Work does not infringe any statutory or common law copyright or any proprietary right of any third party;

(f) the Work does not invade the right of privacy of any third person, or contain any matter libelous or otherwise in contravention of the rights of any third person; and, if the Work is not a work of fiction, all statements in the Work asserted as facts are true or based upon reasonable research for accuracy;

(g) the Work is not, **to the best of the Author's knowledge,** obscene and contains no matter the publication or sale whereof otherwise violates any federal or state statute or regulation thereunder, nor is it in any other manner unlawful, and nothing contained in the Work shall be injurious to the health of the user;

(h) the Work will be the Author's next work (whether under the Author's name or otherwise), and that Author will not publish or authorize publication of **(but may contract for)** any other full-length work of which the Author is an author or co-author until six months after publication of the Work.

Each of the foregoing warranties and representations shall survive the termination of this Agreement.

Each of the foregoing warranties and representations is true on the date of the execution of this Agreement and shall be true on the date of publication of the Work, and at all intervening times. The Publisher may rely on the truth of said warranties and representations in dealings with any third party in connection with the exercise or disposition of any rights in the Work. The Publisher shall be under no obligation to make an independent investigation to determine whether the foregoing warranties and representations are true and correct; and any independent investigation by or for the Publisher, or its failure to investigate, shall not constitute a defense to the Author in any action based upon a breach of any of the foregoing warranties.

**Indemnity**

25.    (a) The Author shall indemnify and hold the Publisher harmless against any loss, liability, damage, cost or expense (including reasonable attorneys' fees **but excluding the cost of Publisher's in-house attorneys**) arising out of or for the purpose of avoiding any suit, proceeding, claim or demand or the settlement thereof, which may be brought or made against the Publisher by reason of the publication, sale, or distribution of, or disposition of rights in respect to the Work, based on the contents of the Work, except in connection with matters involving solely controversies arising out of or based on commercial transactions between the Publisher and its customers. **The Publisher shall have the right, subject to the approval of the Author, such approval not to be unreasonably withheld, to settle such suit, proceeding, claim or demand on such terms as it deems advisable. If within such time as the situation may allow, the Publisher shall request the Author to consent to the proposed settlement, and the Author shall neglect or decline to do so, the Author shall upon written notice by the Publisher immediately undertake to continue the defense at Author's sole expense and shall provide the Publisher with security in the form of a surety company bond in the amount as shall under all circumstances be in the Publisher's opinion adequate. In the event the Author fails to so assume the defense, and to furnish such bond, the Publisher shall have the right to settle such matter upon terms Publisher thinks advisable or in its discretion to continue the defense thereof, and the Author's indemnity shall be applicable in either such event, provided, however, that nothing herein contained shall prohibit the Publisher from settling any such claim, suit, action or proceeding against it at its own cost and expense.**

(b) Prompt notice of any suit, proceeding, claim or demand brought or made against the Publisher or Author shall be given to the Author or Publisher respectively.

(c) Whenever any suit, claim or demand as to which Author's indemnity applies is instituted, the Publisher may withhold payments due to the Author under this Agreement, or any other agreement between the Author and the Publisher **and may apply the payments so withheld to Author's indemnity obligations hereunder. If a claim or demand shall not result in a suit or proceeding within one year after it is first asserted, Publisher shall not continue to withhold funds based on such claim or demand, but may in the future should a suit or proceeding be commenced:**

(d) Author shall be insured under **any** Publisher's liability policy which covers claims for libel and other forms of defamation, invasion of privacy or publicity and infringement of copyright or trademark arising from publication of the Work, to the extent such policy is valid and collectible. In connection with such coverage, with respect to all judgments, settlements and costs of defense, including **reasonable outside** attorneys' fees and other costs of claims covered by the policy, the Publisher and the Author shall share equally **all costs not paid by the insurance company, provided however, that Author's share of such costs will not exceed Author's total earnings with respect to the Work. For purposes of this Paragraph, "Author's total earnings" shall mean all advances paid or payable to the Author with respect to the Work plus all further sums earned by Author from Publisher's sales and licenses of the Work.** Publisher shall retain counsel to represent Publisher and Author in any proceeding brought with respect to all such claims and shall control the defense of such claims, and Author shall cooperate fully with Publisher and said counsel in such defense. Notwithstanding the foregoing, Author shall be solely responsible for the cost of counsel separately retained by the Author for any reason and for judgments, settlements and costs of defense, including all **reasonable outside** attorneys' fees, attributable to a willful or reckless breach of this Agreement by Author, and for any **all costs not paid by the insurance company in any claim involving** a finding of any copyright infringement **or in the settlement of such a claim which Publisher in its good faith judgment determines is necessary to avoid such a finding. Nothing herein shall limit the Author's liability with respect to claims which are not covered by insurance or with respect to costs which exceed the limits of the insurance policy.**

(e) If any suit, claim or demand is brought or made as to which Author's indemnity applies which is not covered by Publisher's liability policy, the Publisher may elect (i) to undertake the defense thereof, or (ii) to notify the Author to undertake the defense. If the Publisher does so notify the Author, the Author shall undertake such defense; and in such cases the Publisher may, at its option, join in the defense. In all the foregoing events the cost and expense of any defense shall be borne by the Author.

### Revised Editions

26.    **Deleted.**

### Tie-In Editions

27.    Author shall use **reasonable good faith** efforts to obtain for Publisher the right to publish tie-in editions in connection with any motion picture, television or other dramatic versions of the Work, and to use the title, artwork, photographs, and other material related to any such version and appropriate identification and credits therefrom in Publisher's editions of the Work.

### Care of Property

28.    Publisher shall not be responsible for loss or damage to any property of Author in Publisher's possession or that of its independent contractors or to anyone to whom delivery is made with Author's consent. Author shall retain copies of any such property and, in the case of photographs, the negative for each photograph furnished.

### Breach by Publisher

29.    Except as otherwise specifically provided in this Agreement, if the Publisher shall commit a material breach of this Agreement and shall fail to remedy the breach within 60 days after receiving a written notice from the Author requesting the Publisher to remedy such breach, the Author may by a notice in writing (a) revoke the Publisher's right to publish the Work, if it has not been published at such time; (b) require the Publisher to cease further publication of the Work, if it has been published at such time; and (c) revoke the grant to the Publisher of such of the subsidiary rights as the Publisher has not already exercised or disposed of. In such event the Author shall have the right to purchase any available plates or film of the Work at cost, and/or remaining copies or sheets of the Work already printed at the Publisher's manufacturing cost. If the Author does not purchase such plates, film, copies or sheets, the Publisher may dispose of them at any price and retain the proceeds of such sale, **subject to the payment to the Author of appropriate royalties.** The Publisher is under no obligation to retain any such plates, film, copies or sheets. Any right of the Author pursuant to Paragraph 10 shall survive such termination.

### Free Copies for Author, Purchases by Author

30.    (a) The Publisher shall present the Author with 50 free copies of each edition of **Book 1 and Book 2** published by the Publisher, upon publication, except as provided in (b) below. The Author shall have the right to purchase additional copies for Author's own use, and not for resale, at a 50% discount from the catalog retail price. If the Author wishes to purchase copies of the Work for resale, Author shall negotiate the terms of such purchase with Publisher's Special Sales Department, it being understood that any resale of the Work by Author shall be outside regular trade channels.

(b) The Publisher will at Author's request present the Author with two free copies of **Book 1 and Book 2** produced by means of print-on-demand technology, and will at Author's request present the Author with one free copy of the e-book edition of **Book 1 and Book 2**.

### Publisher's Trademarks

31.     Nothing in this Agreement (including but not limited to the rights of Author to purchase books and plates on termination) shall give Author any right in or to any trademark, trade name, logo, imprint or other identification now or hereafter used by Publisher, nor shall Author use any such identification during the term of this Agreement or thereafter, except that Author may dispose of copies of the Work purchased hereunder notwithstanding that such identification may appear thereon when purchased.

### Third Party Copyright Infringement

32.     If during the existence of this Agreement the copyright, or any other right in respect to the Work, is infringed upon or violated, the Publisher may, at its own cost and expense, take such legal action, in the Author's and/or Author's name if necessary, as may be required to restrain such infringement and to seek damages therefor. The Publisher shall not be liable to the Author for the Publisher's failure to take such legal steps. If the Publisher does not bring such an action, the Author may do so in Author's own name and at Author's own cost and expense. Money damages recovered for an infringement shall be applied first toward the repayment of the expense of bringing and maintaining the action, and thereafter the balance shall be divided equally between the Author and Publisher.

### Execution of Documents

33.     Each party hereto shall, upon request of the other, execute such documents as may be reasonably necessary to confirm the rights of the other party in respect of the Work or to carry out the intention of this Agreement.

## VII.   Definitions

### Definitions

34.     As used in this Agreement:

(a)     (i) "Electronic text rights" shall mean the exclusive right to publish, and to authorize others to publish, the text of the Work (including any photographs and illustrations in the Work) in whole or in part, in visual form for reading **by the human eye**, by any **non-dramatic** electronic, electromagnetic or other means of storage, retrieval, distribution or transmission now known or hereafter devised, but excluding any other text rights provided for herein (an "electronic edition"). In the exercise of the electronic text rights, the Publisher shall not add any textual, visual or other material to the Work, delete any material from or otherwise edit the Work, or couple any electronic edition of the Work with other works without the **written** approval of the Author, such approval not unreasonably to be withheld or delayed. Any license of electronic text rights in the Work shall provide that any additions to, deletions from, or other editing of the text of the Work by the licensee, and the coupling of any electronic edition of the Work with other works, shall be subject to the **written** approval of the Author, such approval not unreasonably to be withheld or delayed.

(ii) "Electronic adaptation rights" shall mean the exclusive right to adapt and publish, and to authorize others to adapt and publish, the Work or any portion thereof for one or more "electronic versions." As used herein, an "electronic version" shall mean an adaptation of

the Work incorporating elements from sources other than the text of the Work including without limitation still photographs and illustrations, video footage, sound and other text, for publication by any electronic, electromagnetic or other means of storage, retrieval, distribution or transmission now known or hereafter devised, but excluding electronic text rights, audio rights, motion picture rights and television rights (provided that the exercise of any of the foregoing rights, if reserved by the Author or licensed to a third party, shall not preclude the exercise of the electronic adaptation rights). **Electronic adaptation rights are reserved to the Author. The Publisher shall have the first opportunity to acquire electronic adaptation rights on mutually satisfactory terms. If the Author and Publisher are unable in good faith to agree on terms for Publisher's acquisition of such rights within 30 days after they commence negotiations with respect thereto, then the Author shall be free thereafter to offer all or some of such rights to other parties, provided, however, that prior to entering into a commitment for such rights, the Author will advise Publisher of all material terms of such proposed commitment and the Publisher shall have ten days to acquire such rights on terms no less favorable to the Author than those offered by any other party. If the Publisher does not acquire such rights, Author may proceed to sell or license them to another party, provided, however, that the Author shall re-submit to Publisher, on the terms and conditions set forth herein, any offer Author is prepared to accept that is less favorable to the Author than the last offer rejected by the Publisher. If the Publisher does not license such rights, if the Author or a licensee of the Author wishes to use all or part of the text of the Work in an electronic version, the Publisher shall promptly authorize such use on reasonable terms and conditions, provided in the Publisher's reasonable judgment such text is not the predominant feature of such electronic version.**

(b) "audio rights" shall mean the exclusive right to use or adapt, and to authorize others to use or adapt, the Work or any portion thereof as the basis for one or more non-dramatic audio recordings through any method of recording or transmission now known or hereafter devised, including, without limitation, copying or recording by phonographic, magnetic, laser, electronic or any other means and whether on phonograph records, audio cassettes, audio discs or any other human or machine-readable medium and the broadcast or transmission thereof, but excluding all uses encompassed in motion picture, dramatic, television, radio and allied rights. **If the Publisher publishes its own audio edition of the Work, the Author will have the first opportunity to perform the voice recording services therefor, on terms and at a time and place which will be mutually agreed in good faith. If for any reason the parties are unable to agree, or if the Publisher in its sole discretion determines to engage an alternate reader, the Publisher will consult with the Author on such decision and on the person to be engaged. The Publisher will use its best efforts to cause the foregoing provision to be included in any sublicense of the audio rights made by the Publisher.**

(c) a "sale," "disposition" or "grant" of rights shall include an assignment, transfer or license of the rights referred to or of any interest or option relating to such rights.

(d) "special discount sales" shall mean sales made in the United States outside regular trade channels at a discount of more than 50% from the catalog retail price, except that for audio editions of the Work "special discount sales" shall mean sales at a discount of more than 55% from the catalog retail price. With respect to special discount sales to organizations, Publisher may imprint the trade name, trademark, logo, imprint and/or other identification of such organization on such copies in addition to or in lieu of Publisher's trade name, trademark, logo, imprint and/or other identification;

(e) "remainder-in-place sales" shall mean sales made in the United States in regular trade channels at regular trade discounts, for which a 50% credit to the bookseller is subsequently given by Publisher.

(f) **as used herein, "net amount actually received" shall mean Publisher's gross receipts less (i) returns, (ii) shipping and handling charges, (iii) postage and (iv) excise, sales, use or similar taxes.**

## VIII.  Miscellaneous Provisions

### Assignment

35.    This Agreement shall be binding upon and inure to the benefit of the executors, administrators and assigns of the Author, and upon and to the successors and assigns of the Publisher. The Author shall not assign this Agreement without the prior written consent of the Publisher, except that Author may assign sums due and payable to the Author hereunder, provided that such assignment shall not be binding upon Publisher unless and until Publisher shall have given written acknowledgement of its receipt thereof and such assignment shall not in any event affect Publisher's rights or Author's obligations hereunder. **The Publisher shall not assign this agreement without the written consent of the Author, such consent not unreasonably to be withheld, except that the Publisher may assign this agreement without the consent of the Author to a parent, affiliate or subsidiary company or to a purchaser of all or substantially all of its assets or in connection with a reorganization.** Any purported assignment **by Author or Publisher** in violation of this provision shall be void.

### Effectiveness

36.    This Agreement shall be binding upon the Publisher only when it has been signed by the Author and by an authorized officer of the Publisher.

### Jurisdiction

37.    Exclusive jurisdiction for the determination of any dispute solely between or among parties to this Agreement is hereby vested in the federal and state courts sitting in New York County, New York, to which each party irrevocably submits. In addition to service of process by any other means provided at the time by law, each party consents to service of process on him, her or it, as the case may be, by certified mail, first class postage prepaid, return receipt requested, or by overnight courier service provided a signed receipt is obtained, in each case addressed (i) to the party to be served at the address to which notices may be given pursuant to Paragraph 38 of this Agreement or (ii) to that party's actual residence or place of business, **such service of process not to be addressed in care of the Author's agent**. The refusal to accept process so served, including the failure to claim certified mail in the custody of the Postal Service, shall not invalidate such service if a separate copy of the process is sent by first class mail, postage paid, to the same address.

### Notices

38.    All notices to be given hereunder by either party shall be in writing and shall be sent to the other party at the respective addresses as they are given on page 1 of this Agreement, unless said addresses are changed by either party by a notice in writing to the other party. All notices shall be sent by registered or certified mail or other form of receipted or acknowledged delivery including a fax transmission acknowledged as received by the party to which it is sent. Notices to the Publisher shall be sent to the President **with a copy to the** General Counsel of Publisher **by first class mail with postage paid**.

### Applicable Law

39.    THIS AGREEMENT AND ITS INTERPRETATION SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND ENTIRELY TO BE PERFORMED THEREIN.

## Waivers

40.    No waiver **by either party** of any term or condition of this Agreement, or of any breach of this Agreement or of any part thereof, shall be deemed a waiver of any other term or condition of this Agreement or of any later breach of this Agreement or of any part thereof, nor shall publication or continued publication or payment by the Publisher **or acceptance of payment by the Author** following notice or claim of facts which, if true, would constitute a breach of **this agreement by either party**, constitute or imply any waiver by **such party** of any defenses, rights or remedies of the **other party**. No failure by either party to assert any right under this Agreement shall preclude any later assertion of such right.

## Validity and Enforceability

41.    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions hereof, and any such invalid or unenforceable provision shall be deemed to be severable.

## Singular Shall Include Plural

42.    Wherever required by the context in this Agreement, the singular shall include the plural, and the term "Author" shall include the "Authors" if there are more than one.

## Entire Agreement

43.    This Agreement constitutes the entire understanding of the parties concerning the subject matter hereof, and may not be modified except by an instrument in writing signed by the party to be charged.

## Captions

44.    Captions are for convenience only, and are not to be deemed part of this Agreement.


IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first set forth above.


AUTHOR                                      SIMON & SCHUSTER, INC.


_____                     By_____
Vickie M. Stringer                              AUTHORIZED SIGNATURE

Soc Sec. #: _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_____

Citizenship: _US_____

Agent's Tax I.D. #: __13-3851046_____

Editor: Malaika Adero

# Exhibit B

K # 10078256

# Publishing Agreement

## SIMON & SCHUSTER, INC.
1230 Avenue of the Americas
New York, New York 10020
(212) 698-7000

### *Atria Books*

AGREEMENT dated July 12, 2007 between **SIMON & SCHUSTER, INC.** (the "Publisher"), 1230 Avenue of the Americas, New York, New York 10020, and

**VICKIE M. STRINGER** (the "Author"), 2184 City Gate Drive, Columbus, Ohio 43219.

In consideration of the premises hereinafter set forth, Publisher and Author hereby agree with respect to a work tentatively entitled:

### LET THAT BE THE REASON

(the "Work").

## I. Rights Granted

### The Grant and the Territory

1.      Author grants to Publisher during the full term of copyright and any renewal or extensions thereof:

(a) the exclusive right to publish the Work **in book, audio and electronic text form,** including the right to exercise or license the rights set forth in Paragraph 2 in the English language throughout the United States, its territories and possessions (which include but are not limited to all U.S. military installations), the Philippine Republic and Canada, and the non-exclusive right to publish the Work including the right to exercise or license the rights set forth in Paragraph 2 in the English language throughout the rest of the world except within the **territories set forth on the attached Schedule of Reserved Territories;**

(b) the non-exclusive right to sell or authorize others to sell Publisher's English language edition of the Work in Australia if no other English language edition is for sale in Australia within 30 days after first publication of the Work, in accordance with the provisions of the Australian Copyright Amendment Act of 1991. The Author shall advise the Publisher immediately following Author's disposition of Australian rights in the Work; and

### Subsidiary Rights

2.      (a) The Publisher shall have the right, in the territories set forth in Paragraph 1, to exercise the following rights in the Work or to license such rights upon such terms as Publisher deems advisable **(subject to certain rights of approval reserved by the Author):** book club rights; anthology/permission rights **(provided that no one selection will exceed approximately 10% of the length of the Work);** second serial rights (*i.e.* publication after first publication in book form, **subject to any limitation required under any prior disposition of first periodical rights);** abridgment/condensation and digest rights **(after publication of the first trade**

edition); large print rights; reprint edition rights; electronic text rights as defined in Paragraph 34(a); audio rights as defined in Paragraph 34(b); and first serial rights (*i.e.*, publication before first publication in book form). **Author will have the right to approve any abbreviated version of the Work to be published by the licensee of digest rights, unless such rights are licensed to *Readers' Digest*. Publisher will consult with the Author on its exercise of large print rights and hardcover reprint rights.**

(b) Any grant of first or second serial rights shall specifically prohibit the licensee from reproducing all or a substantial portion of the Work, **and no excerpt licensed in connection with such rights will exceed 20% of the Work without the Author's prior written approval, such approval not unreasonably to be withheld or delayed.**

(c) Publisher may license others free of charge to publish the Work in Braille or other forms for the handicapped.

(d) Publisher may authorize copyright and permissions clearance organizations to act in full or in part on its behalf (**but shall not directly charge the Author for service of such organizations**) and Publisher shall account to the Author for royalties received from such organizations designated as arising from reproduction of the Work.

(e) The party who controls motion picture, dramatic and television rights is authorized to publish and to license others to publish, in any form, excerpts, summaries and serializations, none to exceed 7,500 words in length, of motion picture, television, stage and other dramatizations based upon the Work for use in advertising and promotion of any such dramatization, and not for resale. The party who authorizes such publication shall take all steps necessary to protect the copyright in the Work.

(f) The Publisher shall notify the Author promptly after each disposition of rights, but inadvertent failure to do so will not be deemed a breach of this Agreement. The Publisher shall provide the Author with copies of any license agreements relating to the Work on Author's request therefor.

(g) Publisher shall have the right, **with the approval of the Author, such approval not unreasonably to be withheld or delayed,** to license the rights set forth in subparagraph (a) above to Publisher's parent, subsidiaries, affiliates and divisions, provided that the terms for such license are **negotiated at arm's length, and** no less favorable to the Author than the terms which Publisher in its reasonable judgment would accept from an unrelated third party licensee for the same rights.

(h) The Author has not granted and will not grant to any person (except to the Publisher), permission, authority, right or license for publication or distribution of the Work in the open English language market, in a paperback edition **except simultaneously with the publication of the first United States paperback edition or 24 months after delivery and acceptance of the Work, whichever shall be sooner. The Publisher shall consult with the Author about the timing of the Publisher's first publication of the Work.**

## Option

3.      (a) The Author grants the Publisher an exclusive option to acquire the Author's next (*i.e.*, written after the Work) full-length work **of fiction** for publication on mutually satisfactory terms. If, within **45** days following submission of **a full and complete outline for** such work to the Publisher, **which submission shall not occur until after delivery and acceptance of the complete manuscript for the Work**, Publisher and Author are unable in good faith to agree upon terms for publication, the Author shall be free thereafter to **sell or license** such next work to another publisher. During **such 45-day period**, Author shall not submit such next work to other publishers, nor seek offers from or negotiate with others with respect thereto.

(b) In the event that the Author's next work **of fiction** is a short work (*i.e.*, a work of less than traditional book length, intended for the general trade market), the Author also grants the Publisher an exclusive option to acquire the Author's next (*i.e.*, written after the Work) short work **of fiction** for publication on mutually satisfactory terms. If, within **30** days following submission of the final manuscript of such work to the Publisher, **which submission shall not occur until after delivery and acceptance of the complete manuscript for the Work,** Publisher and Author are unable in good faith to agree upon terms for publication, the Author shall be free thereafter to **sell or license** such work to **another** publisher. During **such 30-day period,** Author shall not submit such work to other publishers, nor seek offers from or negotiate with others with respect thereto.

**(c) If the Author first submits a full-length work to the Publisher under Paragraph 3(a) above, the option to a short work set forth in Paragraph 3(b) shall be void regardless of whether Publisher chooses to exercise the option on the full-length work or Publisher and Author are able to mutually agree on the terms for the publication of the full-length option work. If the Author first submits a short work to the Publisher under Paragraph 3(b) above, the option to a full-length work set forth in Paragraph 3(a) shall continue until the Author submits said full-length option work to the Publisher.**

## II. Manuscript Delivery

### Delivery of the Manuscript, Related Materials and Permissions



4.    (a) The Author shall deliver to the Publisher one copy of the complete, legible, typewritten manuscript of the Work in the English language (double-spaced, properly margined), satisfactory to the Publisher in length, content and form, on or before August 1, 2008. The Work shall be 60,000-80,000 words in length and will include a bonus chapter. The Work is described as follows: the Author's debut novel (previously self-published by the Author) about a female hustler determined to make tons of money by any means necessary. The Author shall also **use reasonable efforts to** deliver diskettes or other electronic format specified by Publisher containing the Work, **but a failure to do so shall not be considered a breach of this Agreement.**

(b) As part of the complete manuscript, the Author shall, at Author's expense, furnish to Publisher photographs, drawings, charts, maps, illustrations, appendix, bibliography and other related material (herein "related materials") necessary in Publisher's **and Author's mutual** opinion for publication of the Work, all in content and form satisfactory to Publisher. ~~If the Publisher decides there is to be an index in the Work the Publisher will be responsible for preparation of the index and shall charge such cost against the Author's royalty account.~~

(c) If permission from others is **legally** required for publication of any material contained in the Work or for exercise of any of the rights conferred by this Agreement, Author shall obtain such permissions at Author's expense, in form acceptable to Publisher, and shall deliver such permissions to the Publisher as part of the complete manuscript of the Work. Permissions shall cover all territories, rights and editions covered by this Agreement.

(d) If the Author fails to deliver the **mutually-agreed** related materials or required permissions, Publisher shall have the right, but not the obligation, to obtain the same and in such event the **reasonable** cost of such preparation shall be borne by the Author as follows: (i) Author shall pay such costs upon receipt of an invoice from the Publisher; (ii) Publisher may withhold a portion of any advances payable to the Author under this Agreement and deduct such costs from said advances; or (iii) at Publisher's option, Publisher may charge such cost to Author's royalty account, provided however that if the advance payable to the Author under this Agreement is unearned one year after publication of the Work, then Author will reimburse Publisher for such costs upon receipt of an invoice from Publisher.

### III.    Payments to the Author

**Advance**

5.    Publisher shall pay Author, as an advance against all amounts accruing to Author under this Agreement, the sum of $75,000, payable as follows:

> $25,000 on signing of this Agreement;

> $25,000 on delivery and acceptance of the complete manuscript, as satisfactory to the Publisher; and

> $25,000 on Publisher's first publication of the Work, or 12 months after acceptance of the complete manuscript, whichever is earlier.

**Royalties**

6.    The Publisher shall pay the Author royalties on all copies of the Work sold by the Publisher, less returns, as follows:

> (a) if published as a hardcover edition, 10% of the catalog retail price on all copies sold, subject to the exceptions set forth below;

> (b) if published as a trade paperback edition, 7½% of the catalog retail price on all copies sold, subject to the exceptions set forth below;

> (c) if published as a mass-market paperback edition, 8% of the catalog retail price on the first 150,000 copies sold, and 10% of the catalog retail price on all copies sold thereafter, subject to the exceptions set forth below;

> (d) if published as an electronic text (e-book) **or electronic audio (e-audio)** edition, 15% of the catalog retail price on all copies sold, except that on special discount sales (as defined in Paragraph 34(d)), the royalty shall be 15% of the net amount actually received from such sales. **If Publisher publishes the Work simultaneously in hardcover and e-book editions, the catalog retail price of the e-book will be not less than the catalog retail price of the hardcover edition for at least six months after such publication;**

> (e) if published as an **abridged or unabridged** audio edition **intended primarily for sale in the trade retail marketplace,** 5% of the catalog retail price on the first 10,000 copies sold, 6% of the catalog retail price on the next 10,000 copies sold, and 7% of the catalog retail price on all copies sold thereafter, subject to the exceptions set forth below; **if published as an unabridged audio edition intended primarily for sale in the library and school marketplace, 10% of the net amount actually received from such sales;**

> (f) if published as a large print edition, 10% of the net amount actually received from such sales, subject to the exceptions set forth below;

> (g) if published as a low-cost hardcover edition, 10% of the net amount actually received from such sales, subject to the exceptions set forth below;

> (h) on copies of the hardcover and trade paperback editions sold for export to third parties or outside the United States by Publisher or its affiliates, royalties shall be calculated on the net amount actually received from such sales. On copies of the mass-market paperback, large print **and** low-cost hardcover editions sold for export to third parties or outside the United States by Publisher or its affiliates, the royalty shall be 5% of the net amount actually received from such sales. On copies of the audio edition sold for export to third parties or outside the United States by Publisher or its affiliates, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(i) on mail order sales and other direct response sales, the royalty shall be 5% of the net amount actually received from such sales, except that on mail order sales and other direct response sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales. **Sales by Publisher to so-called on-line bookstores shall not be deemed mail order sales;**

(j) on special discount sales (as defined in Paragraph 34(d)), the royalty shall be **10%** of the net amount actually received from such sales, except that on special discount sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(k) on copies sold to book clubs on a royalty-inclusive basis, the royalty shall be 5% of the net amount actually received from such sales, except that on copies of the audio edition sold to book clubs on a royalty-inclusive basis, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(l) on remainder-in-place sales (as defined in Paragraph 34(e)) and remainder sales, the royalty shall be 5% of the net amount actually received from such sales, except that on remainder-in-place sales and remainder sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales, and except that no royalty shall be payable on copies of the Work sold at a discount of 85% or more from the catalog retail price.

## Proceeds on License of Subsidiary Rights

7.    The Publisher shall pay the Author 50% of the proceeds received by Publisher from the sale or license of subsidiary rights, except as follows:

| Type of Right | Author's Share | Publisher's Share |
|---|---|---|
| first serial rights for all editions of the Work except the audio edition | 90% | 10% |

In calculating the proceeds on disposition of the subsidiary rights, Publisher may deduct from the gross amount received any third party agent's commission which may be paid for services rendered in connection with such disposition, and any bank fees or other monetary transfer charges incurred by the Publisher in connection with or by reason of such sale or disposition.

## Special Royalty Provisions

8.    With respect to each edition of the Work published hereunder, the following shall be applicable:

(a) no royalty shall be payable on copies damaged or destroyed or on copies furnished gratis for review, publicity, promotion, sample or similar purposes;

(b) no royalty shall be payable on sales by Publisher to its parent, subsidiaries, affiliates, or related divisions for resale, but any resale thereby shall be deemed a sale by Publisher subject to the applicable royalty herein provided;

(c) in some instances Publisher prints on the jackets and/or covers of its books a suggested cover price that is higher than its catalog retail price. In such instances, where the royalty is based on the retail price, the catalog retail price, not the suggested cover price, shall be the basis for the computation. The difference between the two prices enables the retailer to

recoup its freight costs. **Such difference shall be consistent with industry standards and shall be the same as applied on all other then-current books of Publisher to which freight pass-through applies;**

(d) when the Publisher in its sole discretion determines that copies of the Work are not readily salable at regular prices within a reasonable time, the Publisher may remainder copies of the Work (**but not earlier than 12 months from the publication date unless it is a remainder-in-place, which may occur at any time**) or dispose of such copies as surplus at the best price obtainable. Publisher shall make no remainder sale (other than a remainder-in-place sale) without first offering copies to the Author at the estimated remainder price, provided, however, that inadvertent failure to offer such copies to the Author will not be deemed a material breach of this Agreement;

(e) any advance royalties or other **documented** sums paid to or on behalf of the Author under this Agreement, and any amounts due from the Author to the Publisher **under this Agreement,** may be applied in reduction of any amounts payable to the Author under this Agreement;

(f) in the event of any overpayment by Publisher to Author, Publisher may, in addition to any other remedies available to it, recoup such overpayment from any sums due to Author under this Agreement or any other agreement between Author and Publisher. **An unearned advance shall not be deemed an overpayment;**

(g) any amounts payable to the Author hereunder **as royalty for sales of copies of the Work** shall be subject to such reasonable reserve for returns of copies of the Work as the Publisher shall establish in its reasonable discretion. **Following the fourth full accounting period after publication, Publisher's reserve for returns shall not exceed 20% of the total copies theretofore shipped and not returned, except that (i) after each subsequent substantial printing, the reserve may be reasonably increased above 20% for four additional accounting periods, (ii) Publisher may maintain a reserve in excess of 20% which reserve is equal to the actual percentage of returns in the preceding period, and (iii) Publisher may maintain a higher reserve for any period preceding or during which it is expected that the Work will be or is out of print or is remaindered. Reserves shall be maintained separately with respect to each edition (hardcover, paperback, etc.);**

(h) if the Publisher exercises rights for which royalties are not specifically set forth in this Agreement, then royalties shall be paid to the Author at rates to be negotiated in good faith by the Author and Publisher **prior to such exercise by Publisher.**

**Royalty Statements**

9.    (a) Publisher shall render royalty statements and make accounting and royalty and other payments to the Author (i) in February for the preceding period April 1 to September 30, and (ii) in August for the preceding period October 1 to March 31. Publisher may from time to time change such accounting periods provided no longer than six months elapses between any two accountings to the Author. If for any royalty period the current period total activity in the Author's account for the Work is less than $100, Publisher **shall render a statement but** may defer the rendering of payment until such royalty period as the cumulative activity since the last statement exceeds such amount.

(b) Royalty statements shall state the number of copies sold and returned during the period covered, the reserve for returns being held by the Publisher **and the income received from each subsidiary rights licensee during the royalty period.** If the Author so requests in writing, the Publisher shall, within 60 days after its receipt of such request, advise the Author in available detail of the number of copies printed, sold, and given away during the current period covered by the last royalty statement rendered to the Author, as well as the approximate number of salable copies on hand at the end of said period **and if so requested in writing, the number of copies of each edition printed, sold, given away, and returned cumulatively since**

publication of each such edition. Publisher shall provide the Author with copies of statements received from its licensees on Author's request therefor.

(c) Statements rendered hereunder shall be final and binding upon the Author unless objected to in writing, setting forth the specific objections thereto and the basis for such objections, within **three** years after the date **Publisher renders** the statement.

(d) When the Publisher has disposed of any subsidiary rights in the Work, any proportionate share of the proceeds due to the Author in accordance with Paragraph 7, less any unearned advances and after the Publisher's allowances for reserve for returns, shall be paid at the time the next succeeding royalty statement is rendered; provided, however that with respect to any advances actually received by Publisher in connection with the disposition of U.S. mass market paperback rights or book club rights, if the Author makes a written request for immediate payment after such a disposition, the Publisher shall pay the Author's share of such advance received by Publisher (after such deductions) within 30 days after receiving such written request.

## Examination of Publisher's Books and Records

10.    The Author or the Author's representative may, upon written request not more than once each year, conduct a reasonable examination of the books and records of the Publisher insofar as they relate to the Work for the period of **three** years immediately preceding such examination. Such examination shall be on Publisher's premises at a time convenient to Publisher, but no later than 90 days after Author's request therefor, and shall be at Author's expense **unless errors of accounting amount to 5% or more of the total amount accrued to the Author shall be found to the Author's disadvantage, in which case the reasonable cost of the examination shall be borne by the Publisher. In any case, payment of the amount due shall be made within 30 days thereafter.**

## IV.    Failure to Deliver the Manuscript; Acceptance of the Manuscript

## Failure to Deliver the Manuscript

11.    Timely delivery of the Work, satisfactory to the Publisher in length, content and form, is essential to the Publisher and is of the essence of this Agreement. If Author fails to deliver the complete manuscript of the Work, satisfactory to the Publisher in length, content and form, within **30 days of** the time specified, the Publisher shall have the option to give the Author a notice in writing terminating this Agreement, and in such event the Publisher may then recover and the Author shall repay **within 60 days after the date of such notice** all amounts advanced to the Author. In the event that the Author completes a manuscript for the Work **within one year** after termination of this Agreement pursuant to the preceding sentence, then the Publisher shall have the option, exercisable within 30 days after receipt of said manuscript, to acquire the Work on the same terms and conditions as provided in this Agreement.

## Extension of Time to Deliver

12.    Publisher may in its discretion extend for such period as in its judgment is appropriate, or refuse to extend, Author's time to deliver the complete manuscript. Any extension of the delivery date must be in writing signed by the Publisher. In determining whether to grant such extension and/or the length thereof, Publisher may consider such factors as Publisher deems relevant, including without limitation, Author illness and the changing marketability of the Work.

**Acceptance of Manuscript**

13.    (a) The Publisher shall not be obligated to accept or publish the Work if in its sole judgment the Work is not acceptable to it. If the Author delivers a manuscript of the Work within the time specified, in what the Author represents to be its complete and final form, the Publisher shall, within **60** days after its receipt thereof, determine whether the Work is **editorially acceptable** to it. **If the manuscript is not acceptable to the Publisher, the Publisher shall** request in writing **and in reasonable detail** that Author make revisions, changes or supplements ("revisions") thereto. If Publisher requests one or more revisions in the manuscript as submitted or as thereafter revised, Publisher's time to determine the acceptability thereof shall be extended for a period of 60 days after resubmission by the Author, or 60 days after Publisher's receipt of written notice by Author that no further revisions will be made. Author will make revisions as promptly as **reasonably possible, given the number and complexity of revisions requested by Publisher**. No request for revisions shall be deemed to obligate Publisher to accept the final revision or to constitute a conditional acceptance thereof. If the Publisher in its sole discretion determines to submit the manuscript to a legal review, the Author shall cooperate with the Publisher or Publisher's counsel in such review and notwithstanding anything to the contrary in this Agreement the time for Publisher to accept or reject the Work shall be extended to 30 days after completion of the legal review.

(b) Acceptance of the manuscript shall be made by written notice signed by an authorized signatory of the Publisher. Payment of an advance installment, payable by express provision hereof upon acceptance of the manuscript, shall constitute written notice of acceptance unless such payment is accompanied by a notice to the contrary.

(c) If the Publisher fails to accept the complete manuscript or revised complete manuscript within the time periods provided in subparagraph (a) above, the Author shall thereafter have the right to notify Publisher in writing that unless the manuscript is accepted or written request for revisions provided within 15 business days after the delivery of such notice, the manuscript will be deemed unacceptable and this Agreement shall terminate in accordance with the provisions of subparagraph (d) below.

(d) If the complete manuscript or revised complete manuscript delivered by the Author is not, in Publisher's sole judgment, acceptable to the Publisher, the Author shall repay all sums advanced to the Author hereunder **in accordance with the provisions of subparagraph (e) below** and upon such repayment this Agreement shall terminate.

(e) In the event of termination of this Agreement because the complete manuscript or revised complete manuscript is unacceptable to the Publisher, the Author or the Author's duly authorized representative shall make every effort to sell the Work elsewhere, and the Author shall be obligated to repay all sums advanced hereunder; but **for a period of 18 months after termination of this Agreement** such obligation shall be limited to repayment from the first (and all) proceeds of any contracts with others concerning the **rights in the Work granted to the Publisher under this Agreement** including, without limitation, rights listed in Paragraph 2 above. Author hereby transfers and assigns to Publisher, as security for the repayment of any advances which may become repayable pursuant to this paragraph, any and all monies which may hereafter become due or owing to Author (**up to the amount of such repayable advances**) from other persons or entities as a result of **the license or transfer of the rights granted to the Publisher under this Agreement**, and Author hereby authorizes Publisher to apply such monies as and when received in liquidation of Author's obligation to repay such advances, until such obligation shall have been fully paid. Author hereby authorizes such other person or entity to give full force and effect to this assignment, and hereby releases and discharges such other person or entity from any and all liability to Author for any and all payment or payments made to Publisher pursuant to this paragraph (**up to the amount of such repayable advances**). **At the end of the 18-month period any sums that have not been repaid shall become immediately due and payable to the Publisher.**

## V. Production and Publication of the Work

### Correction of Proofs

14.    Publisher shall furnish Author with one set of galleys or other first proofs and, at its option, subsequent proofs, and the Author shall return each set of proofs with Author's corrections to the Publisher within 21 days of receipt thereof. The Publisher also shall proofread the proofs. If the Author shall fail to return the corrected proofs within the 21-day period herein specified, the Publisher may publish the Work without the Author's approval of the proofs - provided, however, that if, because of illness or any other factor beyond the Author's control, the Author informs the Publisher that Author is unable so to return the corrected proofs, Author's time for correcting such proofs shall be extended for another 21-day period, and after that period the Publisher may publish the Work without the Author's approval of the proofs.

### Cost of Author's Alterations

15.    If, in the correction of proofs, the Author requests changes from the text of the manuscript, the Author shall bear the cost of such changes, **other than the cost of correcting printer's errors and/or changes made by Publisher without the consent of the Author,** over 15% of the original cost of composition, as follows: (a) Author shall pay such costs upon receipt of an invoice from the Publisher; (b) Publisher may withhold a portion of any advances payable to the Author under this Agreement and deduct such costs from said advances; or (c) at Publisher's option, Publisher may charge such cost to Author's royalty account, provided however that if the advance payable to the Author under this Agreement is unearned **18 months** after publication of the Work, then the Author will reimburse Publisher for such costs upon receipt of an invoice from Publisher. At Author's request Publisher shall submit an itemized statement of such charges and shall make available corrected proofs for the Author's inspection at the Publisher's office.

### Publication

16.    (a) The Publisher shall publish the Work **initially in hardcover** book form **under its Atria Books imprint** within 18 months after acceptance of the manuscript therefor. Publication **of any other edition** shall be in any edition and under any imprint of Publisher or its affiliates that Publisher elects, **but Publisher shall consult with the author with respect thereto.**

(b) Publisher shall have the right to use the name, pseudonym, **approved** portrait and **approved** picture of and **approved** biographical material concerning Author in and on the Work, in the advertising, publicity and promotion thereof, and in connection with any rights granted hereunder**, but not to endorse any product or service.** Author shall furnish Publisher, free of charge, original photographs of Author which Publisher may use for such purposes without additional payment to or permission from any third party.

(c) The title of the Work as set forth on page 1 may **only** be changed by mutual agreement of the Author and the Publisher.

(d) The format, imprint, style of printing and binding, and all matters relating to the manufacture, sale, distribution and promotion of the Work shall be determined at the sole discretion of the Publisher. **The Publisher shall consult in good faith with the Author on the cover artwork for the Work. The Author shall have approval over the jacket/cover copy for the Work, such approval not to be unreasonably withheld or delayed.**

(e) The Publisher may publish and authorize others to publish extracts of the Work containing not more than one chapter for promotion of the Work, without compensation therefor. If compensation is received it shall be shared equally by Author and Publisher.

(f) **The Publisher will not include any advertisements in its edition of the Work or authorize others to do so without the Author's written approval, other than advertisements for the Publisher's own publications. No advertisements other than for other books by the Author will be placed anywhere in the Work other than in the last four pages of Publisher's or its licensees' paperback editions.**

## Copyright

17.    (a) The Publisher shall identify the Author as the owner of the copyright in the Work and **shall** register such copyright in the United States in the name of the Author.

(b) The Publisher shall identify the Author as the owner of the © copyright in the audio edition of the Work. The Publisher shall be identified as the owner of the (P) copyright in the audio edition of the Work. Author hereby assigns, and Publisher shall own, all right, title and interest in and to **the (P) copyright of** the audio edition of the Work and all additions to, alterations of or revisions of the audio edition (**all of which shall be subject to Author's approval, not to be unreasonably withheld or delayed**), and all drafts, notes, scripts, voice recordings and musical recordings related thereto, **but not to the verbatim text of the Work**.

(c) The Publisher shall print in each copy of each edition of the Work published by it any notice required to comply with the applicable copyright laws of the United States and the provisions of the Universal Copyright Convention and the Berne Copyright Convention **and shall in any event so print "Copyright © [year of publication] by Vickie M. Stringer."**

(d) Any agreements made by the Author or by the Publisher to dispose of any rights in the Work shall require the licensee or grantee to take all necessary and appropriate steps to protect the copyright in the Work. Whichever party controls first serial rights in the Work will use best efforts to require any licensee of such rights to include an acknowledgement accompanying the published excerpt stating that the excerpt is from an upcoming work to be published by the Publisher and setting forth the title of the Work, Author and Publisher by name.

(e) The Publisher may take such steps as it deems appropriate to copyright the Work in countries other than the United States, but the Publisher shall be under no obligation to procure copyright in any such countries, and shall not be liable to the Author for any acts or omissions by it in connection therewith. The Author may copyright the Work in any foreign country if the Publisher fails to take steps to obtain such a copyright within 30 days after receiving a written request from the Author to do so.

(f) Author hereby appoints Publisher to be Author's attorney-in-fact to execute and to file any and all documents necessary to record in the Copyright Office the **grant** of exclusive rights made to Publisher hereunder.

## No Obligation to Publish

18.    Notwithstanding anything contained herein to the contrary, the Publisher shall not be obligated to publish the Work if, **in the reasonable judgment of its own or outside counsel**, whether before or after acceptance thereof, the Work contains libelous or obscene material, or its publication may violate the right of privacy, common law or statutory copyright, or any other right of any person or entity. In such event, **unless Author makes changes required by Publisher's legal counsel in such counsel's reasonable judgment**, Publisher shall be entitled on demand to the return of all monies advanced to the Author hereunder and to terminate this Agreement. Notwithstanding any request by Publisher for change or substantiation, nothing in this Agreement shall be deemed to impose upon the Publisher any duty of independent investigation or to relieve the Author of any of the obligations assumed by Author hereunder, including, without limitation, the ongoing validity of Author's warranties and representations which shall apply to all material in the Work, whether or not changed at the request of

Publisher's legal counsel. **If the Author hires Author's own legal counsel to review the manuscript, Publisher's counsel will consult with Author's counsel on matters addressed in this Paragraph, but final decision with respect thereto shall rest with the Publisher's counsel.**

## Delays in Publication

19.    (a) The Publisher, in its sole and absolute discretion, shall have the right to reschedule publication of the Work beyond the time set forth in Paragraph 16(a) for a reasonable time **not to exceed six months.** If publication of the Work is delayed in the absence of excusable circumstances the Author's sole and exclusive remedy shall be to give the Publisher a notice in writing, stating that if the Publisher fails to publish the Work within **90** days after the date of such notice, then all of the Publisher's rights in and to the Work shall terminate at the end of such **90**-day period; and if, in such event, the Publisher shall fail to publish the Work within such **90**-day period, all of the Publisher's rights in and to the Work shall terminate and revert to the Author, and the Author shall be entitled, as liquidated damages and in lieu of all damages and remedies, legal or equitable, to retain all payments theretofore made to Author under this Agreement **and to receive and retain any unpaid advances under Paragraph 5 above.**

(b) If publication is delayed beyond the time set forth in Paragraph 16(a) because of acts or conditions beyond the control of the Publisher or its suppliers or contractors, including (by way of illustration and not by way of limitation) war, shortages of material, strikes, riots, civil commotions, fire or flood, the publication date shall be extended to a date **following removal of the cause of the delay but in no event longer than** six months following removal of the cause of the delay, **provided however, that if the condition constituting the force majeure is not one affecting the publishing industry in New York City generally, the maximum extension of the deadline for the publication of the Work, specified above, by any reason of such condition shall be six (6) months. If such condition does affect the NYC publishing industry generally, and if, after a delay of one year, the Publisher continues to be unable to publish the Work due to such cause beyond its control, then the Author may (but shall have no obligation to) give written notice of termination, effective at the expiration of 60 days or such longer period as Author may specify in such notice, and if the Author repays the Publisher all sums advanced hereunder and reimburses the Publisher for all documented expenses incurred by Publisher in connection with the Work, then this Agreement shall terminate at the end of said 60-day period, and all rights shall revert to Author.**

## Out of Print Termination

20.    If, at any time after the expiration of **one year** from the publication date, the Publisher allows all of its **United States** editions of the Work to go out of print and such status continues in effect for six months after the Author has **given Publisher written notice ("Reversion Notice")** to put the Work back into print, and if there is no **U.S.** English language reprint edition authorized by Publisher available or contracted for **within such six-month period, provided that such contract requires publication within nine months**, then the Author may by a notice in writing terminate this Agreement subject to any licenses previously granted by Publisher (and any renewals or extensions thereof) and Publisher's right to continue to share in the proceeds therefrom. In the event of such termination the Author shall have the right to purchase any available plates, **digital files,** or film of the Work at cost, and/or any remaining copies or sheets of the Work at cost. If the Author does not purchase such copies or sheets, then the Publisher may dispose of them at any price and retain the proceeds of such sale, **subject to payment to the Author of appropriate royalties.** The Publisher is under no obligation to retain any such plates, film, copies or sheets. The Work shall not be deemed out of print as long as it is available from the Publisher in any edition, including electronic text editions. **Upon termination of this Agreement the Publisher will provide the Author with copies of any licenses still in effect on Author's request therefor. If, however, six months after Author's Reversion Notice, the Work is only available from the Publisher in an electronic text edition or by means of print-on-demand technology, the Author may by notice in writing terminate this**

Agreement in the manner set forth above provided in the prior 12 months Publisher's revenue from its exercise or license of rights in the Work (excluding revenue derived from the license of book club rights) was $1,000 or less. Upon reversion of print publishing rights from the Publisher to the Author under the provisions of this Paragraph 20, the Publisher also agrees to revert any audio rights in the Work provided the Publisher's audio edition is out of print and with the exception of any licensed audio editions which shall be governed by the provisions of the first sentence of this Paragraph.


## VI.    Other Rights, Undertakings and Obligations


### Author's Rights

21.    All rights not expressly granted by the Author to the Publisher are reserved to the Author **for Author's own use and disposition**. The Author shall not exercise or dispose of any reserved rights in such a way as substantially to destroy, detract from, impair or frustrate the value of any rights granted herein to the Publisher, nor shall the Author publish or permit to be published **for a period of two years after publication of the Work (or one year if it is a sequel or prequel)** any ~~book or other writing~~ **novel** based substantially on subject matter, material, characters or incidents in the Work without the written consent of the Publisher **which consent shall not be unreasonably withheld**.


### Author's Agent

22.    **Deleted.**


### Representation by Single Author

23.    **Deleted.**


### Author's Warranties

24.    Author warrants and represents that:

(a) Author is the sole author and proprietor of the Work;

(b) Author has full power and authority to make this Agreement and to grant the rights granted herein, and Author has not previously assigned, transferred or otherwise encumbered the same; and the Author has no prior agreement, commitment or other arrangement, oral or written, to write or participate in writing any other book-length work and will enter into no such agreement, commitment or other arrangement **without the Publisher's prior written approval** until after delivery and acceptance **or rejection** of the Work. **In no event shall Author enter into any such agreement or commitment that would affect Author's timely fulfillment of Author's obligations under this Agreement;**

(c) **an earlier version of** the Work has been published **by the Author. The Author will cease selling Author's edition of the Work no later than six months prior to Publisher's publication of the Work;**

(d) the Work is not in the public domain;

(e) the Work does not infringe any statutory or common law copyright or any proprietary right of any third party;

(f) the Work does not invade the right of privacy of any third person, or contain any matter libelous or otherwise in contravention of the rights of any third person; and, if the Work is not a work of fiction, all statements in the Work asserted as facts are true or based upon reasonable research for accuracy;

(g) the Work is not, **to the best of the Author's knowledge,** obscene and contains no matter the publication or sale whereof otherwise violates any federal or state statute or regulation thereunder, nor is it in any other manner unlawful, and nothing contained in the Work shall be injurious to the health of the user;

(h) the Work will be the Author's next work (whether under the Author's name or otherwise), and that Author will not publish or authorize publication of **(but may contract for)** any other full-length work of which the Author is an author or co-author until six months after publication of the Work.

Each of the foregoing warranties and representations shall survive the termination of this Agreement.

Each of the foregoing warranties and representations is true on the date of the execution of this Agreement and shall be true on the date of publication of the Work, and at all intervening times. The Publisher may rely on the truth of said warranties and representations in dealings with any third party in connection with the exercise or disposition of any rights in the Work. The Publisher shall be under no obligation to make an independent investigation to determine whether the foregoing warranties and representations are true and correct; and any independent investigation by or for the Publisher, or its failure to investigate, shall not constitute a defense to the Author in any action based upon a breach of any of the foregoing warranties. **In the event the Publisher shall undertake in independent investigation, the Publisher shall inform the Author of the results thereof.**

## Indemnity

25.    (a) The Author shall indemnify and hold the Publisher harmless against any loss, liability, damage, cost or expense (including reasonable attorneys' fees **but excluding the cost of Publisher's in-house attorneys**) arising out of or for the purpose of avoiding any suit, proceeding, claim or demand or the settlement thereof, which may be brought or made against the Publisher by reason of the publication, sale, or distribution of, or disposition of rights in respect to the Work, based on the contents of the Work, except in connection with matters involving solely controversies arising out of or based on commercial transactions between the Publisher and its customers **and in connection with matters inserted in the Work by the Author at the request of the Publisher after Author has informed the Publisher that Author objects to same but will nonetheless honor Publisher's request. The Publisher shall have the right, subject to the approval of the Author, such approval not to be unreasonably withheld, to settle such suit, proceeding, claim or demand on such terms as it deems advisable. If within such time as the situation may allow, the Publisher shall request the Author to consent to the proposed settlement, and the Author shall neglect or decline to do so, the Author shall upon written notice by the Publisher immediately undertake to continue the defense at Author's sole expense and shall provide the Publisher with security in the form of a surety company bond in the amount as shall under all circumstances be in the Publisher's opinion adequate. In the event the Author fails to so assume the defense, and to furnish such bond, the Publisher shall have the right to settle such matter upon terms Publisher thinks advisable or in its discretion to continue the defense thereof, and the Author's indemnity shall be applicable in either such event, provided, however, that nothing herein contained shall prohibit the Publisher from settling any such claim, suit, action or proceeding against it at its own cost and expense. The Author shall have the right to retain Author's own counsel in Author's own interest at Author's own expense. This counsel, if any, will be consulted in connection with any defense or settlement.**

(b) Prompt notice of any suit, proceeding, claim or demand brought or made against the Publisher or Author shall be given to the Author or Publisher respectively.

(c) Whenever any suit, claim or demand as to which Author's indemnity applies is instituted, the Publisher may withhold payments due to the Author under this Agreement **and may apply the payments so withheld to Author's indemnity obligations hereunder. If a claim or demand shall not result in a suit or proceeding within one year after it is first asserted, or if a suit or proceeding shall remain completely dormant for one year, Publisher shall promptly pay withheld sums to the Author but Publisher may thereafter withhold funds in the manner specified in the preceding sentence should a suit or proceeding be commenced. Any sums withheld hereunder shall accrue interest at a reasonable, market-based rate reasonably determined by the Publisher, and if the sums so withheld are paid to the Author, the Author will be entitled to the interest earned on the portion of sums paid to the Author.**

(d) Author shall be insured under **any** Publisher's liability policy which covers claims for libel and other forms of defamation, invasion of privacy or publicity and infringement of copyright or trademark arising from publication of the Work, to the extent such policy is valid and collectible. In connection with such coverage, with respect to all judgments, settlements and costs of defense, including **reasonable outside** attorneys' fees and other costs of claims covered by the policy, the Publisher and the Author shall share equally all costs not paid by the insurance company, provided however, that Author's share such costs will not exceed Author's total earnings with respect to the Work. For purposes of this Paragraph, "Author's total earnings" shall mean all advances paid or payable to the Author with respect to the Work plus all further sums earned by Author from Publisher's sales and licenses of the Work. Publisher shall retain counsel to represent Publisher and Author in any proceeding brought with respect to all such claims and shall control the defense of such claims, and Author shall cooperate fully with Publisher and said counsel in such defense. Notwithstanding the foregoing, Author shall be solely responsible for the cost of counsel separately retained by the Author for any reason and for judgments, settlements and costs of defense, including all **reasonable outside** attorneys' fees, attributable to a willful or reckless breach of this Agreement by Author, and for any all costs not paid by the insurance company in any claim involving a finding of any copyright infringement or in the settlement of such a claim which Publisher in its good faith judgment determines is necessary to avoid such a finding. Nothing herein shall limit the Author's liability with respect to claims which are not covered by insurance or with respect to costs which exceed the limits of the insurance policy.

(e) If any suit, claim or demand is brought or made as to which Author's indemnity applies which is not covered by Publisher's liability policy, the Publisher may elect (i) to undertake the defense thereof, or (ii) to notify the Author to undertake the defense. If the Publisher does so notify the Author, the Author shall undertake such defense; and in such cases the Publisher may, at its option, join in the defense. In all the foregoing events the cost and expense of any defense shall be borne by the Author **unless the Author has, pursuant to notification from the Publisher, undertaken the defense and the Publisher at its option elects to join with the Author in the defense, in which case the Publisher shall be responsible for the cost of its own counsel.**

## Revised Editions

26.    **Deleted.**

## Tie-In Editions

27.    Author shall use **reasonable good faith** efforts to obtain for Publisher the right to publish tie-in editions in connection with any motion picture, television or other dramatic versions of the Work, and to use the title, artwork, photographs, and other material related to any such version and appropriate identification and credits therefrom in Publisher's editions of the Work.

**Care of Property**

28.    Publisher shall not be responsible for loss or damage to any property of Author in Publisher's possession or that of its independent contractors or to anyone to whom delivery is made with Author's consent. Author shall retain copies of any such property and, in the case of photographs, the negative for each photograph furnished.

**Breach by Publisher**

29.    Except as otherwise specifically provided in this Agreement, if the Publisher shall commit a material breach of this Agreement and shall fail to remedy the breach within 60 days after receiving a written notice from the Author requesting the Publisher to remedy such breach, the Author may by a notice in writing (a) revoke the Publisher's right to publish the Work, if it has not been published at such time; (b) require the Publisher to cease further publication of the Work, if it has been published at such time; and (c) revoke the grant to the Publisher of such of the subsidiary rights as the Publisher has not already exercised or disposed of. In such event the Author shall have the right to purchase any available plates, **digital files** or film of the Work at cost, and/or remaining copies or sheets of the Work already printed at the Publisher's manufacturing cost. If the Author does not purchase such copies or sheets, the Publisher may dispose of them at any price and retain the proceeds of such sale, **subject to the payment to the Author of appropriate royalties**. The Publisher is under no obligation to retain any such plates, film, copies or sheets. Any right of the Author pursuant to Paragraph 10 shall survive such termination.

**Free Copies for Author, Purchases by Author**

30.    (a) The Publisher shall present the Author with 50 free copies of each edition of the Work published by the Publisher, upon publication. The Author shall have the right to purchase additional copies for Author's own use, and not for resale, at a 50% discount from the catalog retail price. If the Author wishes to purchase copies of the Work for resale, Author shall negotiate the terms of such purchase with Publisher's Special Sales Department, it being understood that any resale of the Work by Author shall be outside regular trade channels.

       (b) The Publisher will at Author's request present the Author with two free copies of the Work produced by means of print-on-demand technology, and will at Author's request present the Author with one free copy of the e-book edition of the Work.

**Publisher's Trademarks**

31.    Nothing in this Agreement (including but not limited to the rights of Author to purchase books and plates on termination) shall give Author any right in or to any trademark, trade name, logo, imprint or other identification now or hereafter used by Publisher, nor shall Author use any such identification during the term of this Agreement or thereafter, except that Author may dispose of copies of the Work purchased hereunder notwithstanding that such identification may appear thereon when purchased. **As between Author and Publisher, any and all trademark rights in and to the title of the Work shall accrue to the Author.**

**Third Party Copyright Infringement**

32.    If during the existence of this Agreement the copyright, or any other right in respect to the Work, is infringed upon or violated, the Publisher may, at its own cost and expense, take such legal action, in the Author's and/or Author's name if necessary, as may be required to restrain such infringement and to seek damages therefor. The Publisher shall not be liable to the Author for the Publisher's failure to take such legal steps. If the Publisher does not bring such an action, the Author may do so in Author's own name and at Author's own cost and expense. Money

damages recovered for an infringement shall be applied first toward the repayment of the expense of bringing and maintaining the action, and thereafter the balance shall be divided equally between the Author and Publisher. **If the Author alone brings such an action, any damages recovered shall belong to the Author, provided that the Author shall reimburse the Publisher out of such sums for any direct costs and expenses the Publisher incurred in connection therewith, excluding costs and expenses for Publisher's in-house counsel.**

## Execution of Documents

33.    Each party hereto shall, upon request of the other, execute such documents as may be reasonably necessary to confirm the rights of the other party in respect of the Work or to carry out the intention of this Agreement.

## VII.   Definitions

## Definitions

34.    As used in this Agreement:

(a)    (i) "Electronic text rights" shall mean the exclusive right to publish, and to authorize others to publish, the **verbatim** text of the Work (including any photographs and illustrations in the Work) in whole or in part, in visual form for reading **by the human eye,** by any **non-dramatic** electronic, electromagnetic or other means of storage, retrieval, distribution or transmission now known or hereafter devised, but excluding any other text rights provided for herein (an "electronic edition"). In the exercise of the electronic text rights, the Publisher shall not add any textual, visual or other material to the Work, delete any material from or otherwise edit the Work, or couple any electronic edition of the Work with other works without the **written** approval of the Author. Any license of electronic text rights in the Work shall provide that any additions to, deletions from, or other editing of the text of the Work by the licensee, and the coupling of any electronic edition of the Work with other works, shall be subject to the **written** approval of the Author.

(ii) "Electronic adaptation rights" shall mean the exclusive right to adapt and publish, and to authorize others to adapt and publish, the Work or any portion thereof for one or more "electronic versions." As used herein, an "electronic version" shall mean an adaptation of the Work incorporating elements from sources other than the text of the Work including without limitation still photographs and illustrations, video footage, sound and other text, for publication by any electronic, electromagnetic or other means of storage, retrieval, distribution or transmission now known or hereafter devised, but excluding electronic text rights, audio rights, motion picture rights and television rights (provided that the exercise of any of the foregoing rights, if reserved by the Author or licensed to a third party, shall not preclude the exercise of the electronic adaptation rights). **Electronic adaptation rights are reserved to the Author. The Publisher shall have the first opportunity to acquire electronic adaptation rights on mutually satisfactory terms. If the Author and Publisher are unable in good faith to agree on terms for Publisher's acquisition of such rights within 30 days after they commence negotiations with respect thereto, then the Author shall be free thereafter to offer all or some of such rights to other parties, provided, however, that prior to entering into a commitment for such rights, the Author will advise Publisher of all material terms of such proposed commitment and the Publisher shall have ten days to acquire such rights on terms no less favorable to the Author than those offered by any other party. If the Publisher does not acquire such rights, Author may proceed to sell or license them to another party, but only on terms more favorable to the Author than those offered by the Publisher. If the Publisher does not license such rights, if the Author or a licensee of the Author wishes to use all or part of the text of the Work in an electronic version, the Publisher shall promptly authorize such use on reasonable terms and conditions, provided in the Publisher's reasonable judgment such text is not the predominant feature of such electronic version.**

-16-

(b) "audio rights" shall mean the exclusive right to use or adapt, and to authorize others to use or adapt, the Work or any portion thereof as the basis for one or more non-dramatic audio recordings through any method of recording or transmission now known or hereafter devised, including, without limitation, copying or recording by phonographic, magnetic, laser, electronic or any other means and whether on phonograph records, audio cassettes, audio discs or any other human or machine-readable medium and the broadcast or transmission thereof, but excluding all uses encompassed in motion picture, dramatic, television, radio and allied rights. **If the Publisher publishes its own audio edition of the Work, the Author will have the first opportunity to perform the voice recording services therefor, on terms and at a time and place which will be mutually agreed in good faith. If for any reason the parties are unable to agree, or if the Publisher in its sole discretion determines to engage an alternate reader, the Publisher will consult with the Author on such decision and on the person to be engaged. The Publisher will use its best efforts to cause the foregoing provision to be included in any sublicense of the audio rights made by the Publisher.**

(c) a "sale," "disposition" or "grant" of rights shall include a license of the rights referred to or of any interest relating to such rights.

(d) "special discount sales" shall mean sales made in the United States outside regular trade channels at a discount of more than 50% from the catalog retail price, except that for audio editions of the Work "special discount sales" shall mean sales at a discount of more than 55% from the catalog retail price. **Sales by Publisher to warehouse clubs such as Costco and Sam's Club, and to supermarkets and so-called on-line bookstores shall not be deemed special discount sales regardless of the discount.** With respect to special discount sales to organizations, Publisher may, **subject to the approval of the Author, such approval not unreasonably to be withheld or delayed,** imprint the trade name, trademark, logo, imprint and/or other identification of such organization on such copies in addition to or in lieu of Publisher's trade name, trademark, logo, imprint and/or other identification;

(e) "remainder-in-place sales" shall mean sales made in the United States in regular trade channels at regular trade discounts, for which a 50% credit to the bookseller is subsequently given by Publisher.

(f) **as used herein, "net amount actually received" shall mean Publisher's gross receipts less (i) returns, (ii) shipping and handling charges actually incurred by Publisher, (iii) postage and (iv) excise, sales, use or similar taxes.**

## VIII.  Miscellaneous Provisions

### Assignment

35.    This Agreement shall be binding upon and inure to the benefit of the executors, administrators and assigns of the Author, and upon and to the successors and assigns of the Publisher. The Author shall not assign this Agreement without the prior written consent of the Publisher, except that Author may assign sums due and payable to the Author hereunder, provided that such assignment shall not be binding upon Publisher unless and until Publisher shall have given written acknowledgement of its receipt thereof and such assignment shall not in any event affect Publisher's rights or Author's obligations hereunder. **The Publisher shall not assign this agreement without the prior written consent of the Author, such consent not unreasonably to be withheld, except that the Publisher may assign this agreement in its entirety without the consent of the Author to a parent, affiliate or subsidiary company or to a purchaser of all or substantially all of its assets or in connection with a reorganization.** Any purported assignment **by Author or Publisher** in violation of this provision shall be void.

**Effectiveness**

36.    This Agreement shall be binding upon the **parties** only when it has been signed by the Author and by an authorized officer of the Publisher.

**Jurisdiction**

37.    Exclusive jurisdiction for the determination of any dispute solely between or among parties to this Agreement is hereby vested in the federal and state courts sitting in New York County, New York, to which each party irrevocably submits. In addition to service of process by any other means provided at the time by law, each party consents to service of process on him, her or it, as the case may be, by certified mail, first class postage prepaid, return receipt requested, or by overnight courier service provided a signed receipt is obtained, in each case addressed (i) to the party to be served at the address to which notices may be given pursuant to Paragraph 38 of this Agreement or (ii) to that party's actual residence or place of business, **such service of process not to be addressed in care of the Author's agent**. The refusal to accept process so served, including the failure to claim certified mail in the custody of the Postal Service, shall not invalidate such service if a separate copy of the process is sent by first class mail, postage paid, to the same address.

**Notices**

38.    All notices to be given hereunder by either party shall be in writing and shall be sent to the other party at the respective addresses as they are given on page 1 of this Agreement, unless said addresses are changed by either party by a notice in writing to the other party. All notices shall be sent by registered or certified mail or other form of receipted or acknowledged delivery including a fax transmission acknowledged as received by the party to which it is sent. Notices to the Publisher shall be sent to the President **with a copy to the** General Counsel of Publisher **by first class mail with postage paid**.

**Applicable Law**

39.    This Agreement and its interpretation shall be governed by the laws of the State of New York applicable to agreements made and entirely to be performed therein.

**Waivers**

40.    No waiver **by either party** of any term or condition of this Agreement, or of any breach of this Agreement or of any part thereof, shall be deemed a waiver of any other term or condition of this Agreement or of any later breach of this Agreement or of any part thereof, nor shall publication or continued publication or payment by the Publisher **or acceptance of payment by the Author** following notice or claim of facts which, if true, would constitute a breach of **this agreement by either party**, constitute or imply any waiver by **such party** of any defenses, rights or remedies of the **other party**. No failure by either party to assert any right under this Agreement shall preclude any later assertion of such right.

**Validity and Enforceability**

41.    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions hereof, and any such invalid or unenforceable provision shall be deemed to be severable.

**Singular Shall Include Plural**

42.    Wherever required by the context in this Agreement, the singular shall include the plural, and the term "Author" shall include the "Authors" if there are more than one.

**Entire Agreement**

43.    This Agreement constitutes the entire understanding of the parties concerning the subject matter hereof, and may not be modified except by an instrument in writing signed by the party to be charged.

**Captions**

44.    Captions are for convenience only, and are not to be deemed part of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first set forth above.

AUTHOR

_____
**Vickie M. Stringer**

SIMON & SCHUSTER, INC.

By _____
AUTHORIZED SIGNATURE

Editor: Malaika Adero

## SCHEDULE OF RESERVED TERRITORIES

Ascension
Australia
Bangladesh
Belize
Botswana
British West Indies, comprising
        Bahamas
        Barbados
        Bermuda
        Guyana
        the Caicos, Cayman, Leeward, Turks
        and Windward Islands
Brunei
Burma
Egypt
Gambia
Gibraltar
Ghana
Iraq
Irish Republic
Jamaica
Jordan
Kenya
Kuwait
Malawi
Malta and Gozo
Mauritius
Namibia
New Zealand (including Ross)

Nigeria and the Cameroons
Pacific Islands, comprising
        Solomon Islands
        Tonga
        Samoa
        Nauru
        Vanuatu
        Kiribati
        Tuvalu
        Norfolk Islands
        Papua New Guinea
        Pitcairn Island
Seychelles
Sierra Leone
Somali Republic
South African Republic
South Yemen
Sri Lanka
St. Helena
Sudan
Swaziland
Tanzania
Tasmania
Trinidad and Tobago
Tristan da Cunha
Uganda
United Kingdom, including Northern Ireland,
    the Isle of Man and Channel Islands
Zambia
Zimbabwe

# Exhibit C

K#10077015

# Publishing Agreement

**SIMON & SCHUSTER, INC.**
1230 Avenue of the Americas
New York, New York 10020
(212) 698-7000

*Atria Books*

AGREEMENT dated July 17, 2007 between **SIMON & SCHUSTER, INC.** (the "Publisher"), 1230 Avenue of the Americas, New York, New York 10020, and

**VICKIE M. STRINGER** (the "Author"), 2184 City Gate Drive, Columbus, Ohio 43219.

In consideration of the premises hereinafter set forth, Publisher and Author hereby agree with respect to a work tentatively entitled:

**STILL DIRTY**

(the "Work").

## I. Rights Granted

**The Grant and the Territory**

1.      Author grants to Publisher during the full term of copyright and any renewal or extensions thereof:

(a) the exclusive right to publish the Work **in book, audio and electronic text form,** including the right to exercise or license the rights set forth in Paragraph 2 in the English language throughout the United States, its territories and possessions (which include but are not limited to all U.S. military installations), the Philippine Republic and Canada, and the non-exclusive right to publish the Work including the right to exercise or license the rights set forth in Paragraph 2 in the English language throughout the rest of the world except within the **territories set forth on the attached Schedule of Reserved Territories;**

(b) the non-exclusive right to sell or authorize others to sell Publisher's English language edition of the Work in Australia if no other English language edition is for sale in Australia within 30 days after first publication of the Work, in accordance with the provisions of the Australian Copyright Amendment Act of 1991. The Author shall advise the Publisher immediately following Author's disposition of Australian rights in the Work; and

**Subsidiary Rights**

2.      (a) The Publisher shall have the right, in the territories set forth in Paragraph 1, to exercise the following rights in the Work or to license such rights upon such terms as Publisher deems advisable **(subject to certain rights of approval reserved by the Author)**: book club rights; anthology/permission rights **(provided that no one selection will exceed approximately 10% of the length of the Work)**; second serial rights (*i.e.* publication after first publication in book form, **subject to any limitation required under any prior disposition of first periodical rights)**; abridgment/condensation and digest rights **(after publication of the first trade**

**edition**); large print rights; reprint edition rights; electronic text rights as defined in Paragraph 34(a); audio rights as defined in Paragraph 34(b); and first serial rights (*i.e.*, publication before first publication in book form). **Author will have the right to approve any abbreviated version of the Work to be published by the licensee of digest rights, unless such rights are licensed to *Readers' Digest*. Publisher will consult with the Author on its exercise of large print rights and hardcover reprint rights.**

(b) Any grant of first or second serial rights shall specifically prohibit the licensee from reproducing all or a substantial portion of the Work, **and no excerpt licensed in connection with such rights will exceed 20% of the Work without the Author's prior written approval, such approval not unreasonably to be withheld or delayed**.

(c) Publisher may license others free of charge to publish the Work in Braille or other forms for the handicapped.

(d) Publisher may authorize copyright and permissions clearance organizations to act in full or in part on its behalf (**but shall not directly charge the Author for service of such organizations**) and Publisher shall account to the Author for royalties received from such organizations designated as arising from reproduction of the Work.

(e) The party who controls motion picture, dramatic and television rights is authorized to publish and to license others to publish, in any form, excerpts, summaries and serializations, none to exceed 7,500 words in length, of motion picture, television, stage and other dramatizations based upon the Work for use in advertising and promotion of any such dramatization, and not for resale. The party who authorizes such publication shall take all steps necessary to protect the copyright in the Work.

(f) The Publisher shall notify the Author promptly after each disposition of rights, but inadvertent failure to do so will not be deemed a breach of this Agreement. The Publisher shall provide the Author with copies of any license agreements relating to the Work on Author's request therefor.

(g) Publisher shall have the right, **with the approval of the Author, such approval not unreasonably to be withheld or delayed,** to license the rights set forth in subparagraph (a) above to Publisher's parent, subsidiaries, affiliates and divisions, provided that the terms for such license are **negotiated at arm's length, and** no less favorable to the Author than the terms which Publisher in its reasonable judgment would accept from an unrelated third party licensee for the same rights.

(h) The Author has not granted and will not grant to any person (except to the Publisher), permission, authority, right or license for publication or distribution of the Work in the open English language market, in a paperback edition **except simultaneously with the publication of the first United States paperback edition or 24 months after delivery and acceptance of the Work, whichever shall be sooner. The Publisher shall consult with the Author about the timing of the Publisher's first publication of the Work.**

## Option

3.      (a) The Author grants the Publisher an exclusive option to acquire the Author's next (*i.e.*, written after the Work) full-length work **of fiction** for publication on mutually satisfactory terms. If, within **45** days following submission of **a full and complete outline for** such work to the Publisher, **which submission shall not occur until after delivery and acceptance of the complete manuscript for the Work,** Publisher and Author are unable in good faith to agree upon terms for publication, the Author shall be free thereafter to **sell or license** such next work to another publisher. During **such 45-day period,** Author shall not submit such next work to other publishers, nor seek offers from or negotiate with others with respect thereto.

(b) In the event that the Author's next work **of fiction** is a short work (*i.e.*, a work of less than traditional book length, intended for the general trade market), the Author also grants the Publisher an exclusive option to acquire the Author's next (*i.e.*, written after the Work) short work **of fiction** for publication on mutually satisfactory terms. If, within **30** days following submission of the final manuscript of such work to the Publisher, **which submission shall not occur until after delivery and acceptance of the complete manuscript for the Work**, Publisher and Author are unable in good faith to agree upon terms for publication, the Author shall be free thereafter to **sell or license** such work to **a**nother publisher. During **such 30-day period**, Author shall not submit such work to other publishers, nor seek offers from or negotiate with others with respect thereto.

**(c) If the Author first submits a full-length work to the Publisher under Paragraph 3(a) above, the option to a short work set forth in Paragraph 3(b) shall be void regardless of whether Publisher chooses to exercise the option on the full-length work or Publisher and Author are able to mutually agree on the terms for the publication of the full-length option work. If the Author first submits a short work to the Publisher under Paragraph 3(b) above, the option to a full-length work set forth in Paragraph 3(a) shall continue until the Author submits said full-length option work to the Publisher.**

## II. Manuscript Delivery

### Delivery of the Manuscript, Related Materials and Permissions

4.    (a) The Author shall deliver to the Publisher one copy of the complete, legible, typewritten manuscript of the Work in the English language (double-spaced, properly margined), satisfactory to the Publisher in length, content and form, on or before August 31, 2007. The Work shall be 60,000-80,000 words in length and is described as follows: the scorching sequel to *Dirty Red*. The Author shall also **use reasonable efforts to** deliver diskettes or other electronic format specified by Publisher containing the Work**, but a failure to do so shall not be considered a breach of this Agreement**.

(b) As part of the complete manuscript, the Author shall, at Author's expense, furnish to Publisher photographs, drawings, charts, maps, illustrations, appendix, bibliography and other related material (herein "related materials") necessary in Publisher's **and Author's mutual** opinion for publication of the Work, all in content and form satisfactory to Publisher. ~~If the Publisher decides there is to be an index in the Work the Publisher will be responsible for preparation of the index and shall charge such cost against the Author's royalty account.~~

(c) If permission from others is **legally** required for publication of any material contained in the Work or for exercise of any of the rights conferred by this Agreement, Author shall obtain such permissions at Author's expense, in form acceptable to Publisher, and shall deliver such permissions to the Publisher as part of the complete manuscript of the Work. Permissions shall cover all territories, rights and editions covered by this Agreement.

(d) If the Author fails to deliver the **mutually-agreed** related materials or required permissions, Publisher shall have the right, but not the obligation, to obtain the same and in such event the **reasonable** cost of such preparation shall be borne by the Author as follows: (i) Author shall pay such costs upon receipt of an invoice from the Publisher; (ii) Publisher may withhold a portion of any advances payable to the Author under this Agreement and deduct such costs from said advances; or (iii) at Publisher's option, Publisher may charge such cost to Author's royalty account, provided however that if the advance payable to the Author under this Agreement is unearned one year after publication of the Work, then Author will reimburse Publisher for such costs upon receipt of an invoice from Publisher.

### III.    Payments to the Author

**Advance**

5.    Publisher shall pay Author, as an advance against all amounts accruing to Author under this Agreement, the sum of $175,000, payable as follows:

>   $75,000 on signing of this Agreement;

>   $50,000 on delivery and acceptance of the complete manuscript, as satisfactory to the Publisher; and

>   $50,000 on Publisher's first publication of the Work, or 12 months after acceptance of the complete manuscript, whichever is earlier.

**Royalties**

6.    The Publisher shall pay the Author royalties on all copies of the Work sold by the Publisher, less returns, as follows:

(a) if published as a hardcover edition, 10% of the catalog retail price on the first 5,000 copies sold, 12½% of the catalog retail price on the next 5,000 copies sold, and 15% of the catalog retail price on all copies sold thereafter, subject to the exceptions set forth below;

(b) if published as a trade paperback edition, 7½% of the catalog retail price on all copies sold, subject to the exceptions set forth below;

(c) if published as a mass-market paperback edition, 8% of the catalog retail price on the first 150,000 copies sold, and 10% of the catalog retail price on all copies sold thereafter, subject to the exceptions set forth below;

(d) if published as an electronic text (e-book) **or electronic audio (e-audio)** edition, 15% of the catalog retail price on all copies sold, except that on special discount sales (as defined in Paragraph 34(d)), the royalty shall be 15% of the net amount actually received from such sales. **If Publisher publishes the Work simultaneously in hardcover and e-book editions, the catalog retail price of the e-book will be not less than the catalog retail price of the hardcover edition for at least six months after such publication**;

(e) if published as an **abridged or unabridged** audio edition **intended primarily for sale in the trade retail marketplace**, 5% of the catalog retail price on the first 10,000 copies sold, 6% of the catalog retail price on the next 10,000 copies sold, and 7% of the catalog retail price on all copies sold thereafter, subject to the exceptions set forth below; **if published as an unabridged audio edition intended primarily for sale in the library and school marketplace, 10% of the net amount actually received from such sales;**

(f) if published as a large print edition, 10% of the net amount actually received from such sales, subject to the exceptions set forth below;

(g) if published as a low-cost hardcover edition, 10% of the net amount actually received from such sales, subject to the exceptions set forth below;

(h) on copies of the hardcover and trade paperback editions sold for export to third parties or outside the United States by Publisher or its affiliates, royalties shall be calculated on the net amount actually received from such sales. On copies of the mass-market paperback, large print **and** low-cost hardcover editions sold for export to third parties or outside the United States by Publisher or its affiliates, the royalty shall be 5% of the net amount actually received from such

sales. On copies of the audio edition sold for export to third parties or outside the United States by Publisher or its affiliates, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(i) on mail order sales and other direct response sales, the royalty shall be 5% of the net amount actually received from such sales, except that on mail order sales and other direct response sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales. **Sales by Publisher to so-called on-line bookstores shall not be deemed mail order sales**;

(j) on special discount sales (as defined in Paragraph 34(d)), the royalty shall be **10%** of the net amount actually received from such sales, except that on special discount sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(k) on copies sold to book clubs on a royalty-inclusive basis, the royalty shall be 5% of the net amount actually received from such sales, except that on copies of the audio edition sold to book clubs on a royalty-inclusive basis, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(l) on remainder-in-place sales (as defined in Paragraph 34(e)) and remainder sales, the royalty shall be 5% of the net amount actually received from such sales, except that on remainder-in-place sales and remainder sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales, and except that no royalty shall be payable on copies of the Work sold at a discount of 85% or more from the catalog retail price.

## Proceeds on License of Subsidiary Rights

7.    The Publisher shall pay the Author 50% of the proceeds received by Publisher from the sale or license of subsidiary rights, except as follows:

| Type of Right | Author's Share | Publisher's Share |
|---|---|---|
| first serial rights for all editions of the Work except the audio edition | 90% | 10% |

In calculating the proceeds on disposition of the subsidiary rights, Publisher may deduct from the gross amount received any third party agent's commission which may be paid for services rendered in connection with such disposition, and any bank fees or other monetary transfer charges incurred by the Publisher in connection with or by reason of such sale or disposition.

## Special Royalty Provisions

8.    With respect to each edition of the Work published hereunder, the following shall be applicable:

(a) no royalty shall be payable on copies damaged or destroyed or on copies furnished gratis for review, publicity, promotion, sample or similar purposes;

(b) no royalty shall be payable on sales by Publisher to its parent, subsidiaries, affiliates, or related divisions for resale, but any resale thereby shall be deemed a sale by Publisher subject to the applicable royalty herein provided;

(c) in some instances Publisher prints on the jackets and/or covers of its books a suggested cover price that is higher than its catalog retail price. In such instances, where the royalty is based on the retail price, the catalog retail price, not the suggested cover price, shall be the basis for the computation. The difference between the two prices enables the retailer to recoup its freight costs. **Such difference shall be consistent with industry standards and shall be the same as applied on all other then-current books of Publisher to which freight pass-through applies**;

(d) when the Publisher in its sole discretion determines that copies of the Work are not readily salable at regular prices within a reasonable time, the Publisher may remainder copies of the Work (**but not earlier than 12 months from the publication date unless it is a remainder-in-place, which may occur at any time**) or dispose of such copies as surplus at the best price obtainable. Publisher shall make no remainder sale (other than a remainder-in-place sale) without first offering copies to the Author at the estimated remainder price, provided, however, that inadvertent failure to offer such copies to the Author will not be deemed a material breach of this Agreement;

(e) any advance royalties or other **documented** sums paid to or on behalf of the Author under this Agreement, and any amounts due from the Author to the Publisher **under this Agreement,** may be applied in reduction of any amounts payable to the Author under this Agreement;

(f) in the event of any overpayment by Publisher to Author, Publisher may, in addition to any other remedies available to it, recoup such overpayment from any sums due to Author under this Agreement or any other agreement between Author and Publisher. **An unearned advance shall not be deemed an overpayment**;

(g) any amounts payable to the Author hereunder **as royalty for sales of copies of the Work** shall be subject to such reasonable reserve for returns of copies of the Work as the Publisher shall establish in its reasonable discretion. **Following the fourth full accounting period after publication, Publisher's reserve for returns shall not exceed 20% of the total copies theretofore shipped and not returned, except that (i) after each subsequent substantial printing, the reserve may be reasonably increased above 20% for four additional accounting periods, (ii) Publisher may maintain a reserve in excess of 20% which reserve is equal to the actual percentage of returns in the preceding period, and (iii) Publisher may maintain a higher reserve for any period preceding or during which it is expected that the Work will be or is out of print or is remaindered. Reserves shall be maintained separately with respect to each edition (hardcover, paperback, etc.)**;

(h) if the Publisher exercises rights for which royalties are not specifically set forth in this Agreement, then royalties shall be paid to the Author at rates to be negotiated in good faith by the Author and Publisher **prior to such exercise by Publisher**.

## Royalty Statements

9.    (a) Publisher shall render royalty statements and make accounting and royalty and other payments to the Author (i) in February for the preceding period April 1 to September 30, and (ii) in August for the preceding period October 1 to March 31. Publisher may from time to time change such accounting periods provided no longer than six months elapses between any two accountings to the Author. If for any royalty period the current period total activity in the Author's account for the Work is less than $100, Publisher **shall render a statement but** may defer the rendering of payment until such royalty period as the cumulative activity since the last statement exceeds such amount.

(b) Royalty statements shall state the number of copies sold and returned during the period covered, the reserve for returns being held by the Publisher **and the income received from each subsidiary rights licensee during the royalty period**. If the Author so requests in writing, the Publisher shall, within 60 days after its receipt of such request, advise the Author in available detail of the number of copies printed, sold, and given away during the current period covered by the last royalty statement rendered to the Author, as well as the approximate number of salable copies on hand at the end of said period **and if so requested in writing, the number of copies of each edition printed, sold, given away, and returned cumulatively since publication of each such edition. Publisher shall provide the Author with copies of statements received from its licensees on Author's request therefor**.

(c) Statements rendered hereunder shall be final and binding upon the Author unless objected to in writing, setting forth the specific objections thereto and the basis for such objections, within **three** years after the date **Publisher renders** the statement.

(d) **When the Publisher has disposed of any subsidiary rights in the Work, any proportionate share of the proceeds due to the Author in accordance with Paragraph 7, less any unearned advances and after the Publisher's allowances for reserve for returns, shall be paid at the time the next succeeding royalty statement is rendered; provided, however that with respect to any advances actually received by Publisher in connection with the disposition of U.S. mass market paperback rights or book club rights, if the Author makes a written request for immediate payment after such a disposition, the Publisher shall pay the Author's share of such advance received by Publisher (after such deductions) within 30 days after receiving such written request.**

## Examination of Publisher's Books and Records

10.    The Author or the Author's representative may, upon written request not more than once each year, conduct a reasonable examination of the books and records of the Publisher insofar as they relate to the Work for the period of **three** years immediately preceding such examination. Such examination shall be on Publisher's premises at a time convenient to Publisher, but no later than 90 days after Author's request therefor, and shall be at Author's expense **unless errors of accounting amount to 5% or more of the total amount accrued to the Author shall be found to the Author's disadvantage, in which case the reasonable cost of the examination shall be borne by the Publisher. In any case, payment of the amount due shall be made within 30 days thereafter.**

## IV.    Failure to Deliver the Manuscript; Acceptance of the Manuscript

## Failure to Deliver the Manuscript

11.    Timely delivery of the Work, satisfactory to the Publisher in length, content and form, is essential to the Publisher and is of the essence of this Agreement. If Author fails to deliver the complete manuscript of the Work, satisfactory to the Publisher in length, content and form, within **30 days of** the time specified, the Publisher shall have the option to give the Author a notice in writing terminating this Agreement, and in such event the Publisher may then recover and the Author shall repay **within 60 days after the date of such notice** all amounts advanced to the Author. In the event that the Author completes a manuscript for the Work **within one year** after termination of this Agreement pursuant to the preceding sentence, then the Publisher shall have the option, exercisable within 30 days after receipt of said manuscript, to acquire the Work on the same terms and conditions as provided in this Agreement.

**Extension of Time to Deliver**

12.    Publisher may in its discretion extend for such period as in its judgment is appropriate, or refuse to extend, Author's time to deliver the complete manuscript. Any extension of the delivery date must be in writing signed by the Publisher. In determining whether to grant such extension and/or the length thereof, Publisher may consider such factors as Publisher deems relevant, including without limitation, Author illness and the changing marketability of the Work.

**Acceptance of Manuscript**

13.    (a) The Publisher shall not be obligated to accept or publish the Work if in its sole judgment the Work is not acceptable to it. If the Author delivers a manuscript of the Work within the time specified, in what the Author represents to be it complete and final form, the Publisher shall, within **60** days after its receipt thereof, determine whether the Work is **editorially** acceptable to it. **If the manuscript is not acceptable to the Publisher, the Publisher shall** request in writing **and in reasonable detail** that Author make revisions, changes or supplements ("revisions") thereto. If Publisher requests one or more revisions in the manuscript as submitted or as thereafter revised, Publisher's time to determine the acceptability thereof shall be extended for a period of 60 days after resubmission by the Author, or 60 days after Publisher's receipt of written notice by Author that no further revisions will be made. Author will make revisions as promptly as **reasonably possible, given the number and complexity of revisions requested by Publisher**. No request for revisions shall be deemed to obligate Publisher to accept the final revision or to constitute a conditional acceptance thereof. If the Publisher in its sole discretion determines to submit the manuscript to a legal review, the Author shall cooperate with the Publisher or Publisher's counsel in such review and notwithstanding anything to the contrary in this Agreement the time for Publisher to accept or reject the Work shall be extended to 30 days after completion of the legal review.

(b) Acceptance of the manuscript shall be made by written notice signed by an authorized signatory of the Publisher. Payment of an advance installment, payable by express provision hereof upon acceptance of the manuscript, shall constitute written notice of acceptance unless such payment is accompanied by a notice to the contrary.

(c) If the Publisher fails to accept the complete manuscript or revised complete manuscript within the time periods provided in subparagraph (a) above, the Author shall thereafter have the right to notify Publisher in writing that unless the manuscript is accepted or written request for revisions provided within 15 business days after the delivery of such notice, the manuscript will be deemed unacceptable and this Agreement shall terminate in accordance with the provisions of subparagraph (d) below.

(d) If the complete manuscript or revised complete manuscript delivered by the Author is not, in Publisher's sole judgment, acceptable to the Publisher, the Author shall repay all sums advanced to the Author hereunder **in accordance with the provisions of subparagraph (e) below** and upon such repayment this Agreement shall terminate.

(e) In the event of termination of this Agreement because the complete manuscript or revised complete manuscript is unacceptable to the Publisher, the Author or the Author's duly authorized representative shall make every effort to sell the Work elsewhere, and the Author shall be obligated to repay all sums advanced hereunder; but **for a period of 18 months after termination of this Agreement** such obligation shall be limited to repayment from the first (and all) proceeds of any contracts with others concerning the **rights in the Work granted to the Publisher under this Agreement** including, without limitation, rights listed in Paragraph 2 above. Author hereby transfers and assigns to Publisher, as security for the repayment of any advances which may become repayable pursuant to this paragraph, any and all monies which may hereafter become due or owing to Author (**up to the amount of such repayable advances**) from other persons or entities as a result of **the license or transfer of the rights granted to the Publisher under this Agreement**, and Author hereby authorizes Publisher to apply such monies as and when received in liquidation of Author's obligation to repay such advances, until such obligation shall

-8-

have been fully paid. Author hereby authorizes such other person or entity to give full force and effect to this assignment, and hereby releases and discharges such other person or entity from any and all liability to Author for any and all payment or payments made to Publisher pursuant to this paragraph (**up to the amount of such repayable advances**). **At the end of the 18-month period any sums that have not been repaid shall become immediately due and payable to the Publisher.**

# V. Production and Publication of the Work

## Correction of Proofs

14.    Publisher shall furnish Author with one set of galleys or other first proofs and, at its option, subsequent proofs, and the Author shall return each set of proofs with Author's corrections to the Publisher within 21 days of receipt thereof. The Publisher also shall proofread the proofs. If the Author shall fail to return the corrected proofs within the 21-day period herein specified, the Publisher may publish the Work without the Author's approval of the proofs - provided, however, that if, because of illness or any other factor beyond the Author's control, the Author informs the Publisher that Author is unable so to return the corrected proofs, Author's time for correcting such proofs shall be extended for another 21-day period, and after that period the Publisher may publish the Work without the Author's approval of the proofs.

## Cost of Author's Alterations

15.    If, in the correction of proofs, the Author requests changes from the text of the manuscript, the Author shall bear the cost of such changes, **other than the cost of correcting printer's errors and/or changes made by Publisher without the consent of the Author,** over 15% of the original cost of composition, as follows: (a) Author shall pay such costs upon receipt of an invoice from the Publisher; (b) Publisher may withhold a portion of any advances payable to the Author under this Agreement and deduct such costs from said advances; or (c) at Publisher's option, Publisher may charge such cost to Author's royalty account, provided however that if the advance payable to the Author under this Agreement is unearned **18 months** after publication of the Work, then the Author will reimburse Publisher for such costs upon receipt of an invoice from Publisher. At Author's request Publisher shall submit an itemized statement of such charges and shall make available corrected proofs for the Author's inspection at the Publisher's office.

## Publication

16.    (a) The Publisher shall publish the Work **initially in hardcover** book form **under its Atria Books imprint** within 18 months after acceptance of the manuscript therefor. Publication **of any other edition** shall be in any edition and under any imprint of Publisher or its affiliates that Publisher elects, **but Publisher shall consult with the author with respect thereto.**

(b) Publisher shall have the right to use the name, pseudonym, **approved** portrait and **approved** picture of and **approved** biographical material concerning Author in and on the Work, in the advertising, publicity and promotion thereof, and in connection with any rights granted hereunder, **but not to endorse any product or service.** Author shall furnish Publisher, free of charge, original photographs of Author which Publisher may use for such purposes without additional payment to or permission from any third party.

(c) The title of the Work as set forth on page 1 may **only** be changed by mutual agreement of the Author and the Publisher.

(d) The format, imprint, style of printing and binding, and all matters relating to the manufacture, sale, distribution and promotion of the Work shall be determined at the sole discretion of the Publisher. **The Publisher shall consult in good faith with the Author on the cover artwork for the Work. The Author shall have approval over the jacket/cover copy for the Work, such approval not to be unreasonably withheld or delayed.**

(e) The Publisher may publish and authorize others to publish extracts of the Work containing not more than one chapter for promotion of the Work, without compensation therefor. If compensation is received it shall be shared equally by Author and Publisher.

(f) **The Publisher will not include any advertisements in its edition of the Work or authorize others to do so without the Author's written approval, other than advertisements for the Publisher's own publications. No advertisements other than for other books by the Author will be placed anywhere in the Work other than in the last four pages of Publisher's or its licensees' paperback editions.**

## Copyright

17.    (a) The Publisher shall identify the Author as the owner of the copyright in the Work and **shall** register such copyright in the United States in the name of the Author.

(b) The Publisher shall identify the Author as the owner of the © copyright in the audio edition of the Work. The Publisher shall be identified as the owner of the (P) copyright in the audio edition of the Work. Author hereby assigns, and Publisher shall own, all right, title and interest in and to **the (P) copyright of** the audio edition of the Work and all additions to, alterations of or revisions of the audio edition (**all of which shall be subject to Author's approval, not to be unreasonably withheld or delayed**), and all drafts, notes, scripts, voice recordings and musical recordings related thereto, **but not to the verbatim text of the Work.**

(c) The Publisher shall print in each copy of each edition of the Work published by it any notice required to comply with the applicable copyright laws of the United States and the provisions of the Universal Copyright Convention and the Berne Copyright Convention **and shall in any event so print "Copyright © [year of publication] by Vickie M. Stringer."**

(d) Any agreements made by the Author or by the Publisher to dispose of any rights in the Work shall require the licensee or grantee to take all necessary and appropriate steps to protect the copyright in the Work. Whichever party controls first serial rights in the Work will use best efforts to require any licensee of such rights to include an acknowledgement accompanying the published excerpt stating that the excerpt is from an upcoming work to be published by the Publisher and setting forth the title of the Work, Author and Publisher by name.

(e) The Publisher may take such steps as it deems appropriate to copyright the Work in countries other than the United States, but the Publisher shall be under no obligation to procure copyright in any such countries, and shall not be liable to the Author for any acts or omissions by it in connection therewith. The Author may copyright the Work in any foreign country if the Publisher fails to take steps to obtain such a copyright within 30 days after receiving a written request from the Author to do so.

(f) Author hereby appoints Publisher to be Author's attorney-in-fact to execute and to file any and all documents necessary to record in the Copyright Office the **grant** of exclusive rights made to Publisher hereunder.

**No Obligation to Publish**

18.    Notwithstanding anything contained herein to the contrary, the Publisher shall not be obligated to publish the Work if, **in the reasonable judgment of its own or outside counsel,** whether before or after acceptance thereof, the Work contains libelous or obscene material, or its publication may violate the right of privacy, common law or statutory copyright, or any other right of any person or entity. In such event, **unless Author makes changes required by Publisher's legal counsel in such counsel's reasonable judgment,** Publisher shall be entitled on demand to the return of all monies advanced to the Author hereunder and to terminate this Agreement. Notwithstanding any request by Publisher for change or substantiation, nothing in this Agreement shall be deemed to impose upon the Publisher any duty of independent investigation or to relieve the Author of any of the obligations assumed by Author hereunder, including, without limitation, the ongoing validity of Author's warranties and representations which shall apply to all material in the Work, whether or not changed at the request of Publisher's legal counsel. **If the Author hires Author's own legal counsel to review the manuscript, Publisher's counsel will consult with Author's counsel on matters addressed in this Paragraph, but final decision with respect thereto shall rest with the Publisher's counsel.**

**Delays in Publication**

19.    (a) The Publisher, in its sole and absolute discretion, shall have the right to reschedule publication of the Work beyond the time set forth in Paragraph 16(a) for a reasonable time **not to exceed six months.** If publication of the Work is delayed in the absence of excusable circumstances the Author's sole and exclusive remedy shall be to give the Publisher a notice in writing, stating that if the Publisher fails to publish the Work within **90** days after the date of such notice, then all of the Publisher's rights in and to the Work shall terminate at the end of such **90**-day period; and if, in such event, the Publisher shall fail to publish the Work within such **90**-day period, all of the Publisher's rights in and to the Work shall terminate and revert to the Author, and the Author shall be entitled, as liquidated damages and in lieu of all damages and remedies, legal or equitable, to retain all payments theretofore made to Author under this Agreement **and to receive and retain any unpaid advances under Paragraph 5 above.**

(b) If publication is delayed beyond the time set forth in Paragraph 16(a) because of acts or conditions beyond the control of the Publisher or its suppliers or contractors, including (by way of illustration and not by way of limitation) war, shortages of material, strikes, riots, civil commotions, fire or flood, the publication date shall be extended to a date **following removal of the cause of the delay but in no event longer than** six months following removal of the cause of the delay, **provided however, that if the condition constituting the force majeure is not one affecting the publishing industry in New York City generally, the maximum extension of the deadline for the publication of the Work, specified above, by any reason of such condition shall be six (6) months. If such condition does affect the NYC publishing industry generally, and if, after a delay of one year, the Publisher continues to be unable to publish the Work due to such cause beyond its control, then the Author may (but shall have no obligation to) give written notice of termination, effective at the expiration of 60 days or such longer period as Author may specify in such notice, and if the Author repays the Publisher all sums advanced hereunder and reimburses the Publisher for all documented expenses incurred by Publisher in connection with the Work, then this Agreement shall terminate at the end of said 60-day period, and all rights shall revert to Author.**

**Out of Print Termination**

20.    If, at any time after the expiration of **one year** from the publication date, the Publisher allows all of its **United States** editions of the Work to go out of print and such status continues in effect for six months after the Author has **given Publisher written notice ("Reversion Notice")** to put the Work back into print, and if there is no **U.S.** English language reprint edition authorized by Publisher available or contracted for **within such six-month period, provided**

**that such contract requires publication within nine months**, then the Author may by a notice in writing terminate this Agreement subject to any licenses previously granted by Publisher (and any renewals or extensions thereof) and Publisher's right to continue to share in the proceeds therefrom. In the event of such termination the Author shall have the right to purchase any available plates, **digital files**, or film of the Work at cost, and/or any remaining copies or sheets of the Work at cost. If the Author does not purchase such copies or sheets, then the Publisher may dispose of them at any price and retain the proceeds of such sale, **subject to payment to the Author of appropriate royalties**. The Publisher is under no obligation to retain any such plates, film, copies or sheets. The Work shall not be deemed out of print as long as it is available from the Publisher in any edition, including electronic text editions. **Upon termination of this Agreement the Publisher will provide the Author with copies of any licenses still in effect on Author's request therefor. If, however, six months after Author's Reversion Notice, the Work is only available from the Publisher in an electronic text edition or by means of print-on-demand technology, the Author may by notice in writing terminate this Agreement in the manner set forth above provided in the prior 12 months Publisher's revenue from its exercise or license of rights in the Work (excluding revenue derived from the license of book club rights) was $1,000 or less. Upon reversion of print publishing rights from the Publisher to the Author under the provisions of this Paragraph 20, the Publisher also agrees to revert any audio rights in the Work provided the Publisher's audio edition is out of print and with the exception of any licensed audio editions which shall be governed by the provisions of the first sentence of this Paragraph.**

## VI.    Other Rights, Undertakings and Obligations

### Author's Rights

21.    All rights not expressly granted by the Author to the Publisher are reserved to the Author **for Author's own use and disposition**. The Author shall not exercise or dispose of any reserved rights in such a way as substantially to destroy, detract from, impair or frustrate the value of any rights granted herein to the Publisher, nor shall the Author publish or permit to be published **for a period of two years after publication of the Work (or one year if it is a sequel or prequel)** any ~~book or other writing~~ **novel** based substantially on subject matter, material, characters or incidents in the Work without the written consent of the Publisher **which consent shall not be unreasonably withheld**.

### Author's Agent

22.    **Deleted.**

### Representation by Single Author

23.    **Deleted.**

### Author's Warranties

24.    Author warrants and represents that:

(a) Author is the sole author and proprietor of the Work;

(b) Author has full power and authority to make this Agreement and to grant the rights granted herein, and Author has not previously assigned, transferred or otherwise encumbered the same; and the Author has no prior agreement, commitment or other arrangement, oral or written, to write or participate in writing any other book-length work and will enter into no such agreement, commitment or other arrangement **without the Publisher's prior written approval** until after delivery and acceptance **or rejection** of the Work. **In no event shall Author enter into any such agreement or commitment that would affect Author's timely fulfillment of Author's obligations under this Agreement;**

(c) the Work has not been previously published;

(d) the Work is not in the public domain;

(e) the Work does not infringe any statutory or common law copyright or any proprietary right of any third party;

(f) the Work does not invade the right of privacy of any third person, or contain any matter libelous or otherwise in contravention of the rights of any third person; and, if the Work is not a work of fiction, all statements in the Work asserted as facts are true or based upon reasonable research for accuracy;

(g) the Work is not, **to the best of the Author's knowledge,** obscene and contains no matter the publication or sale whereof otherwise violates any federal or state statute or regulation thereunder, nor is it in any other manner unlawful, and nothing contained in the Work shall be injurious to the health of the user;

(h) the Work will be the Author's next work (whether under the Author's name or otherwise), and that Author will not publish or authorize publication of **(but may contract for)** any other full-length work of which the Author is an author or co-author until six months after publication of the Work.

Each of the foregoing warranties and representations shall survive the termination of this Agreement.

Each of the foregoing warranties and representations is true on the date of the execution of this Agreement and shall be true on the date of publication of the Work, and at all intervening times. The Publisher may rely on the truth of said warranties and representations in dealings with any third party in connection with the exercise or disposition of any rights in the Work. The Publisher shall be under no obligation to make an independent investigation to determine whether the foregoing warranties and representations are true and correct; and any independent investigation by or for the Publisher, or its failure to investigate, shall not constitute a defense to the Author in any action based upon a breach of any of the foregoing warranties. **In the event the Publisher shall undertake in independent investigation, the Publisher shall inform the Author of the results thereof.**

## Indemnity

25.    (a) The Author shall indemnify and hold the Publisher harmless against any loss, liability, damage, cost or expense (including reasonable attorneys' fees **but excluding the cost of Publisher's in-house attorneys**) arising out of or for the purpose of avoiding any suit, proceeding, claim or demand or the settlement thereof, which may be brought or made against the Publisher by reason of the publication, sale, or distribution of, or disposition of rights in respect to the Work, based on the contents of the Work, except in connection with matters involving solely controversies arising out of or based on commercial transactions between the Publisher and its customers **and in connection with matters inserted in the Work by the Author at the request of the Publisher after Author has informed the Publisher that Author objects to same but will nonetheless honor Publisher's request. The Publisher shall have the right, subject to the approval of the Author, such approval not to be unreasonably**

withheld, to settle such suit, proceeding, claim or demand on such terms as it deems advisable. If within such time as the situation may allow, the Publisher shall request the Author to consent to the proposed settlement, and the Author shall neglect or decline to do so, the Author shall upon written notice by the Publisher immediately undertake to continue the defense at Author's sole expense and shall provide the Publisher with security in the form of a surety company bond in the amount as shall under all circumstances be in the Publisher's opinion adequate. In the event the Author fails to so assume the defense, and to furnish such bond, the Publisher shall have the right to settle such matter upon terms Publisher thinks advisable or in its discretion to continue the defense thereof, and the Author's indemnity shall be applicable in either such event, provided, however, that nothing herein contained shall prohibit the Publisher from settling any such claim, suit, action or proceeding against it at its own cost and expense. The Author shall have the right to retain Author's own counsel in Author's own interest at Author's own expense. This counsel, if any, will be consulted in connection with any defense or settlement.

(b) Prompt notice of any suit, proceeding, claim or demand brought or made against the Publisher or Author shall be given to the Author or Publisher respectively.

(c) Whenever any suit, claim or demand as to which Author's indemnity applies is instituted, the Publisher may withhold payments due to the Author under this Agreement **and may apply the payments so withheld to Author's indemnity obligations hereunder. If a claim or demand shall not result in a suit or proceeding within one year after it is first asserted, or if a suit or proceeding shall remain completely dormant for one year, Publisher shall promptly pay withheld sums to the Author but Publisher may thereafter withhold funds in the manner specified in the preceding sentence should a suit or proceeding be commenced. Any sums withheld hereunder shall accrue interest at a reasonable, market-based rate reasonably determined by the Publisher, and if the sums so withheld are paid to the Author, the Author will be entitled to the interest earned on the portion of sums paid to the Author.**

(d) Author shall be insured under **any** Publisher's liability policy which covers claims for libel and other forms of defamation, invasion of privacy or publicity and infringement of copyright or trademark arising from publication of the Work, to the extent such policy is valid and collectible. In connection with such coverage, with respect to all judgments, settlements and costs of defense, including **reasonable outside** attorneys' fees and other costs of claims covered by the policy, the Publisher and the Author shall share equally all costs not paid by the insurance company, provided however, that Author's share of such costs will not exceed Author's total earnings with respect to the Work. For purposes of this Paragraph, "Author's total earnings" shall mean all advances paid or payable to the Author with respect to the Work plus all further sums earned by Author from Publisher's sales and licenses of the Work. Publisher shall retain counsel to represent Publisher and Author in any proceeding brought with respect to all such claims and shall control the defense of such claims, and Author shall cooperate fully with Publisher and said counsel in such defense. Notwithstanding the foregoing, Author shall be solely responsible for the cost of counsel separately retained by the Author for any reason and for judgments, settlements and costs of defense, including all **reasonable outside** attorneys' fees, attributable to a willful or reckless breach of this Agreement by Author, and for any all costs not paid by the insurance company in any claim involving a finding of any copyright infringement or in the settlement of such a claim which Publisher in its good faith judgment determines is necessary to avoid such a finding. Nothing herein shall limit the Author's liability with respect to claims which are not covered by insurance or with respect to costs which exceed the limits of the insurance policy.

(e) If any suit, claim or demand is brought or made as to which Author's indemnity applies which is not covered by Publisher's liability policy, the Publisher may elect (i) to undertake the defense thereof, or (ii) to notify the Author to undertake the defense. If the Publisher does so notify the Author, the Author shall undertake such defense; and in such cases the Publisher may, at its option, join in the defense. In all the foregoing events the cost and

expense of any defense shall be borne by the Author **unless the Author has, pursuant to notification from the Publisher, undertaken the defense and the Publisher at its option elects to join with the Author in the defense, in which case the Publisher shall be responsible for the cost of its own counsel.**

## Revised Editions

26.   **Deleted.**

## Tie-In Editions

27.   Author shall use **reasonable good faith** efforts to obtain for Publisher the right to publish tie-in editions in connection with any motion picture, television or other dramatic versions of the Work, and to use the title, artwork, photographs, and other material related to any such version and appropriate identification and credits therefrom in Publisher's editions of the Work.

## Care of Property

28.   Publisher shall not be responsible for loss or damage to any property of Author in Publisher's possession or that of its independent contractors or to anyone to whom delivery is made with Author's consent. Author shall retain copies of any such property and, in the case of photographs, the negative for each photograph furnished.

## Breach by Publisher

29.   Except as otherwise specifically provided in this Agreement, if the Publisher shall commit a material breach of this Agreement and shall fail to remedy the breach within 60 days after receiving a written notice from the Author requesting the Publisher to remedy such breach, the Author may by a notice in writing (a) revoke the Publisher's right to publish the Work, if it has not been published at such time; (b) require the Publisher to cease further publication of the Work, if it has been published at such time; and (c) revoke the grant to the Publisher of such of the subsidiary rights as the Publisher has not already exercised or disposed of. In such event the Author shall have the right to purchase any available plates, **digital files** or film of the Work at cost, and/or remaining copies or sheets of the Work already printed at the Publisher's manufacturing cost. If the Author does not purchase such copies or sheets, the Publisher may dispose of them at any price and retain the proceeds of such sale, **subject to the payment to the Author of appropriate royalties**. The Publisher is under no obligation to retain any such plates, film, copies or sheets. Any right of the Author pursuant to Paragraph 10 shall survive such termination.

## Free Copies for Author, Purchases by Author

30.   (a) The Publisher shall present the Author with 50 free copies of each edition of the Work published by the Publisher, upon publication, except as provided in (b) below. The Author shall have the right to purchase additional copies for Author's own use, and not for resale, at a 50% discount from the catalog retail price. If the Author wishes to purchase copies of the Work for resale, Author shall negotiate the terms of such purchase with Publisher's Special Sales Department, it being understood that any resale of the Work by Author shall be outside regular trade channels.

(b) The Publisher will at Author's request present the Author with two free copies of the Work produced by means of print-on-demand technology, and will at Author's request present the Author with one free copy of the e-book edition of the Work.

## Publisher's Trademarks

31.    Nothing in this Agreement (including but not limited to the rights of Author to purchase books and plates on termination) shall give Author any right in or to any trademark, trade name, logo, imprint or other identification now or hereafter used by Publisher, nor shall Author use any such identification during the term of this Agreement or thereafter, except that Author may dispose of copies of the Work purchased hereunder notwithstanding that such identification may appear thereon when purchased. **As between Author and Publisher, any and all trademark rights in and to the title of the Work shall accrue to the Author.**

## Third Party Copyright Infringement

32.    If during the existence of this Agreement the copyright, or any other right in respect to the Work, is infringed upon or violated, the Publisher may, at its own cost and expense, take such legal action, in the Author's and/or Author's name if necessary, as may be required to restrain such infringement and to seek damages therefor. The Publisher shall not be liable to the Author for the Publisher's failure to take such legal steps. If the Publisher does not bring such an action, the Author may do so in Author's own name and at Author's own cost and expense. Money damages recovered for an infringement shall be applied first toward the repayment of the expense of bringing and maintaining the action, and thereafter the balance shall be divided equally between the Author and Publisher. **If the Author alone brings such an action, any damages recovered shall belong to the Author, provided that the Author shall reimburse the Publisher out of such sums for any direct costs and expenses the Publisher incurred in connection therewith, excluding costs and expenses for Publisher's in-house counsel.**

## Execution of Documents

33.    Each party hereto shall, upon request of the other, execute such documents as may be reasonably necessary to confirm the rights of the other party in respect of the Work or to carry out the intention of this Agreement.

## VII.   Definitions

## Definitions

34.    As used in this Agreement:

(a)    (i) "Electronic text rights" shall mean the exclusive right to publish, and to authorize others to publish, the **verbatim** text of the Work (including any photographs and illustrations in the Work) in whole or in part, in visual form for reading **by the human eye,** by any **non-dramatic** electronic, electromagnetic or other means of storage, retrieval, distribution or transmission now known or hereafter devised, but excluding any other text rights provided for herein (an "electronic edition"). In the exercise of the electronic text rights, the Publisher shall not add any textual, visual or other material to the Work, delete any material from or otherwise edit the Work, or couple any electronic edition of the Work with other works without the **written** approval of the Author. Any license of electronic text rights in the Work shall provide that any additions to, deletions from, or other editing of the text of the Work by the licensee, and the coupling of any electronic edition of the Work with other works, shall be subject to the **written** approval of the Author.

(ii) "Electronic adaptation rights" shall mean the exclusive right to adapt and publish, and to authorize others to adapt and publish, the Work or any portion thereof for one or more "electronic versions." As used herein, an "electronic version" shall mean an adaptation of the Work incorporating elements from sources other than the text of the Work including without limitation still photographs and illustrations, video footage, sound and other text, for publication by any electronic, electromagnetic or other means of storage, retrieval, distribution or transmission now known or hereafter devised, but excluding electronic text rights, audio rights, motion picture rights and television rights (provided that the exercise of any of the foregoing rights, if reserved by the Author or licensed to a third party, shall not preclude the exercise of the electronic adaptation rights). **Electronic adaptation rights are reserved to the Author. The Publisher shall have the first opportunity to acquire electronic adaptation rights on mutually satisfactory terms. If the Author and Publisher are unable in good faith to agree on terms for Publisher's acquisition of such rights within 30 days after they commence negotiations with respect thereto, then the Author shall be free thereafter to offer all or some of such rights to other parties, provided, however, that prior to entering into a commitment for such rights, the Author will advise Publisher of all material terms of such proposed commitment and the Publisher shall have ten days to acquire such rights on terms no less favorable to the Author than those offered by any other party. If the Publisher does not acquire such rights, Author may proceed to sell or license them to another party, but only on terms more favorable to the Author than those offered by the Publisher. If the Publisher does not license such rights, if the Author or a licensee of the Author wishes to use all or part of the text of the Work in an electronic version, the Publisher shall promptly authorize such use on reasonable terms and conditions, provided in the Publisher's reasonable judgment such text is not the predominant feature of such electronic version.**

(b) "audio rights" shall mean the exclusive right to use or adapt, and to authorize others to use or adapt, the Work or any portion thereof as the basis for one or more non-dramatic audio recordings through any method of recording or transmission now known or hereafter devised, including, without limitation, copying or recording by phonographic, magnetic, laser, electronic or any other means and whether on phonograph records, audio cassettes, audio discs or any other human or machine-readable medium and the broadcast or transmission thereof, but excluding all uses encompassed in motion picture, dramatic, television, radio and allied rights. **If the Publisher publishes its own audio edition of the Work, the Author will have the first opportunity to perform the voice recording services therefor, on terms and at a time and place which will be mutually agreed in good faith. If for any reason the parties are unable to agree, or if the Publisher in its sole discretion determines to engage an alternate reader, the Publisher will consult with the Author on such decision and on the person to be engaged. The Publisher will use its best efforts to cause the foregoing provision to be included in any sublicense of the audio rights made by the Publisher.**

(c) a "sale," "disposition" or "grant" of rights shall include a license of the rights referred to or of any interest relating to such rights.

(d) "special discount sales" shall mean sales made in the United States outside regular trade channels at a discount of more than 50% from the catalog retail price, except that for audio editions of the Work "special discount sales" shall mean sales at a discount of more than 55% from the catalog retail price. **Sales by Publisher to warehouse clubs such as Costco and Sam's Club, and to supermarkets and so-called on-line bookstores shall not be deemed special discount sales regardless of the discount.** With respect to special discount sales to organizations, Publisher may, **subject to the approval of the Author, such approval not unreasonably to be withheld or delayed,** imprint the trade name, trademark, logo, imprint and/or other identification of such organization on such copies in addition to or in lieu of Publisher's trade name, trademark, logo, imprint and/or other identification;

(e) "remainder-in-place sales" shall mean sales made in the United States in regular trade channels at regular trade discounts, for which a 50% credit to the bookseller is subsequently given by Publisher.

(f) as used herein, "net amount actually received" shall mean Publisher's gross receipts less (i) returns, (ii) shipping and handling charges actually incurred by Publisher, (iii) postage and (iv) excise, sales, use or similar taxes.

## VIII.  Miscellaneous Provisions

### Assignment

35.    This Agreement shall be binding upon and inure to the benefit of the executors, administrators and assigns of the Author, and upon and to the successors and assigns of the Publisher. The Author shall not assign this Agreement without the prior written consent of the Publisher, except that Author may assign sums due and payable to the Author hereunder, provided that such assignment shall not be binding upon Publisher unless and until Publisher shall have given written acknowledgement of its receipt thereof and such assignment shall not in any event affect Publisher's rights or Author's obligations hereunder. **The Publisher shall not assign this agreement without the prior written consent of the Author, such consent not unreasonably to be withheld, except that the Publisher may assign this agreement in its entirety without the consent of the Author to a parent, affiliate or subsidiary company or to a purchaser of all or substantially all of its assets or in connection with a reorganization.** Any purported assignment **by Author or Publisher** in violation of this provision shall be void.

### Effectiveness

36.    This Agreement shall be binding upon the **parties** only when it has been signed by the Author and by an authorized officer of the Publisher.

### Jurisdiction

37.    Exclusive jurisdiction for the determination of any dispute solely between or among parties to this Agreement is hereby vested in the federal and state courts sitting in New York County, New York, to which each party irrevocably submits. In addition to service of process by any other means provided at the time by law, each party consents to service of process on him, her or it, as the case may be, by certified mail, first class postage prepaid, return receipt requested, or by overnight courier service provided a signed receipt is obtained, in each case addressed (i) to the party to be served at the address to which notices may be given pursuant to Paragraph 38 of this Agreement or (ii) to that party's actual residence or place of business, **such service of process not to be addressed in care of the Author's agent.** The refusal to accept process so served, including the failure to claim certified mail in the custody of the Postal Service, shall not invalidate such service if a separate copy of the process is sent by first class mail, postage paid, to the same address.

### Notices

38.    All notices to be given hereunder by either party shall be in writing and shall be sent to the other party at the respective addresses as they are given on page 1 of this Agreement, unless said addresses are changed by either party by a notice in writing to the other party. All notices shall be sent by registered or certified mail or other form of receipted or acknowledged delivery including a fax transmission acknowledged as received by the party to which it is sent. Notices to the Publisher shall be sent to the President **with a copy to the** General Counsel of Publisher **by first class mail with postage paid**.

**Applicable Law**

39.     THIS AGREEMENT AND ITS INTERPRETATION SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND ENTIRELY TO BE PERFORMED THEREIN.

**Waivers**

40.     No waiver **by either party** of any term or condition of this Agreement, or of any breach of this Agreement or of any part thereof, shall be deemed a waiver of any other term or condition of this Agreement or of any later breach of this Agreement or of any part thereof, nor shall publication or continued publication or payment by the Publisher **or acceptance of payment by the Author** following notice or claim of facts which, if true, would constitute a breach of **this agreement by either party**, constitute or imply any waiver by **such party** of any defenses, rights or remedies of the **other party**. No failure by either party to assert any right under this Agreement shall preclude any later assertion of such right.

**Validity and Enforceability**

41.     The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions hereof, and any such invalid or unenforceable provision shall be deemed to be severable.

**Singular Shall Include Plural**

42.     Wherever required by the context in this Agreement, the singular shall include the plural, and the term "Author" shall include the "Authors" if there are more than one.

**Entire Agreement**

43.     This Agreement constitutes the entire understanding of the parties concerning the subject matter hereof, and may not be modified except by an instrument in writing signed by the party to be charged.

**Captions**

44.     Captions are for convenience only, and are not to be deemed part of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first set forth above.

AUTHOR

Vickie M. Stringer

Editor: Malaika Adero

SIMON & SCHUSTER, INC.

By _____
AUTHORIZED SIGNATURE

## SCHEDULE OF RESERVED TERRITORIES

Ascension
Australia
Bangladesh
Belize
Botswana
British West Indies, comprising
       Bahamas
       Barbados
       Bermuda
       Guyana
       the Caicos, Cayman, Leeward, Turks
       and Windward Islands
Brunei
Burma
Egypt
Gambia
Gibraltar
Ghana
Iraq
Irish Republic
Jamaica
Jordan
Kenya
Kuwait
Malawi
Malta and Gozo
Mauritius
Namibia
New Zealand (including Ross)

Nigeria and the Cameroons
Pacific Islands, comprising
       Solomon Islands
       Tonga
       Samoa
       Nauru
       Vanuatu
       Kiribati
       Tuvalu
       Norfolk Islands
       Papua New Guinea
       Pitcairn Island
Seychelles
Sierra Leone
Somali Republic
South African Republic
South Yemen
Sri Lanka
St. Helena
Sudan
Swaziland
Tanzania
Tasmania
Trinidad and Tobago
Tristan da Cunha
Uganda
United Kingdom, including Northern Ireland,
       the Isle of Man and Channel Islands
Zambia
Zimbabwe

# Exhibit D

*K# 10079060*

# Publishing Agreement

## SIMON & SCHUSTER, INC.
1230 Avenue of the Americas
New York, New York 10020
(212) 698-7000

### *Atria Books*

AGREEMENT dated April 1, 2009 between **SIMON & SCHUSTER, INC.** (the "Publisher"),
1230 Avenue of the Americas, New York, New York 10020, and

**VICKIE M. STRINGER** (the "Author"), 3124 Genevive Drive, Columbus, OH 43219.

In consideration of the premises hereinafter set forth, Publisher and Author hereby agree with
respect to a work tentatively entitled:

**THE REASON WHY ("Book 1") and
DIRTIER THAN EVER ("Book 2")**

**(jointly,** the "Work").

## I. Rights Granted

### The Grant and the Territory

1.      Author grants to Publisher during the full term of copyright and any renewal or
extensions thereof the exclusive right to publish the Work including the right to exercise or
license the rights set forth in Paragraph 2 in throughout the world in all languages.

### Subsidiary Rights

2.      (a) The Publisher shall have the right, in the territories set forth in Paragraph 1, to
exercise the following rights in the Work or to license such rights upon such terms as Publisher
deems advisable **(subject to certain rights of approval reserved by the Author)**: book club
rights; anthology/permission rights **(provided that no one selection will exceed approximately
10% of the length of the Work)**; second serial rights (*i.e.* publication after first publication in
book form, **subject to any limitation required under any prior disposition of first periodical
rights)**; abridgment/condensation and digest rights **(after publication of the first trade
edition)**; large print rights; reprint and special edition rights; electronic text rights as defined in
Paragraph 34(a); audio rights as defined in Paragraph 34(b); first serial rights (*i.e.*, publication
before first publication in book form); British Commonwealth rights; and foreign language
rights. **Author will have the right to approve any abbreviated version of the Work to be
published by the licensee of digest rights, unless such rights are licensed to *Readers' Digest*.
Publisher will consult with the Author on its exercise of large print rights and hardcover
reprint rights.**

        (b) Any grant of first or second serial rights shall specifically prohibit the licensee from
reproducing all or a substantial portion of the Work.

(c) Publisher may license others free of charge to publish the Work in Braille or other forms for the handicapped.

(d) Publisher may authorize copyright and permissions clearance organizations to act in full or in part on its behalf (**but shall not directly charge the Author for service of such organizations**) and Publisher shall account to the Author for royalties received from such organizations designated as arising from reproduction of the Work.

(e) The party who controls motion picture, dramatic and television rights is authorized to publish and to license others to publish, in any form, excerpts, summaries and serializations, none to exceed 7,500 words in length, of motion picture, television, stage and other dramatizations based upon the Work for use in advertising and promotion of any such dramatization, and not for resale. The party who authorizes such publication shall take all steps necessary to protect the copyright in the Work.

(f) The Publisher shall notify the Author promptly after each disposition of rights, but inadvertent failure to do so will not be deemed a breach of this Agreement. The Publisher shall provide the Author with copies of any license agreements relating to the Work on Author's request therefor.

(g) Publisher shall have the right, **with the approval of the Author, such approval not unreasonably to be withheld or delayed,** to license the rights set forth in subparagraph (a) above to Publisher's parent, subsidiaries, affiliates and divisions, provided that the terms for such license are no less favorable to the Author than the terms which Publisher in its reasonable judgment would accept from an unrelated third party licensee for the same rights.

(h) The Author has not granted and will not grant to any person (except to the Publisher), permission, authority, right or license for publication or distribution of the Work in the open English language market, in a paperback edition **except simultaneously with the publication of the first United States paperback edition or 24 months after delivery and acceptance of the Work, whichever shall be sooner. The Publisher shall consult with the Author about the timing of the Publisher's first publication of the Work.**

## Option

3.      (a) The Author grants the Publisher an exclusive option to acquire the Author's next (*i.e.*, written after the Work) full-length work **of fiction** for publication on mutually satisfactory terms. If, within **45** days following submission of **a full and complete outline** for such work to the Publisher, **which submission shall not occur until after delivery and acceptance of the complete manuscript for the Work**, Publisher and Author are unable in good faith to agree upon terms for publication, the Author shall be free thereafter to **sell or license** such next work to another publisher, provided, however, that the Publisher shall retain the first option to acquire the work on terms no less favorable to the Author than those offered by any other publisher. During the exclusive period of this option, Author shall not submit such next work to other publishers, nor seek offers from or negotiate with others with respect thereto.

(b) In the event that the Author's next work **of fiction** is a short work (*i.e.*, a work of less than traditional book length, intended for the general trade market), the Author also grants the Publisher an exclusive option to acquire the Author's next (*i.e.*, written after the Work) short work **of fiction** for publication on mutually satisfactory terms. If, within **30** days following submission of the final manuscript of such work to the Publisher, **which submission shall not occur until after delivery and acceptance of the complete manuscript for the Work**, Publisher and Author are unable in good faith to agree upon terms for publication, the Author shall be free thereafter to **sell or license** such work to another publisher, provided, however, that the Publisher shall retain the first option to acquire said short work on terms no less favorable to the Author than those offered by any other publisher. During the exclusive period of this option,

Author shall not submit such work to other publishers, nor seek offers from or negotiate with others with respect thereto.

## II. Manuscript Delivery

**Delivery of the Manuscript, Related Materials and Permissions**

4.    (a) The Author shall deliver to the Publisher one copy of the complete, legible, typewritten manuscript of **Book 1** in the English language (double-spaced, properly margined), satisfactory to the Publisher in length, content and form, on or before April 15 2009, and shall deliver to the Publisher one copy of the complete, legible, typewritten manuscript of **Book 2** in the English language (double-spaced, properly margined), satisfactory to the Publisher in length, content and form, on or before August 15, 2010. Book 1 shall be approximately 66,000 words in length and is described as follows: a prequel to *Let That Be the Reason*. Book 2 shall be 75,000-90,000 words in length and is described as follows: the third installment to the Red series (*Dirty Red* and *Still Dirty*). The Author shall also **use reasonable efforts to** deliver diskettes or other electronic format specified by Publisher containing the Work, **but a failure to do so shall not be considered a breach of this Agreement**.

(b) As part of the complete manuscript, the Author shall, at Author's expense, furnish to Publisher photographs, drawings, charts, maps, illustrations, appendix, bibliography and other related material (herein "related materials") necessary in Publisher's **and Author's mutual** opinion for publication of the Work, all in content and form satisfactory to Publisher. ~~If the Publisher decides there is to be an index in the Work the Publisher will be responsible for preparation of the index and shall charge such cost against the Author's royalty account.~~

(c) If permission from others is **legally** required for publication of any material contained in the Work or for exercise of any of the rights conferred by this Agreement, Author shall obtain such permissions at Author's expense, in form acceptable to Publisher, and shall deliver such permissions to the Publisher as part of the complete manuscript of the Work. Permissions shall cover all territories, rights and editions covered by this Agreement.

(d) If the Author fails to deliver the related materials or required permissions, Publisher shall have the right, but not the obligation, to obtain the same and in such event the **reasonable** cost of such preparation shall be borne by the Author as follows: (i) Author shall pay such costs upon receipt of an invoice from the Publisher; (ii) Publisher may withhold a portion of any advances payable to the Author under this Agreement and deduct such costs from said advances; or (iii) at Publisher's option, Publisher may charge such cost to Author's royalty account, provided however that if the advance payable to the Author under this Agreement is unearned one year after publication of the Work, then Author will reimburse Publisher for such costs upon receipt of an invoice from Publisher.

## III.    Payments to the Author

**Advance**

5.    Publisher shall pay Author, as an advance against all amounts accruing to Author under this Agreement, the sum of $200,000, payable as follows:

$60,000 on signing of this Agreement;

$28,000 on delivery and acceptance of the complete manuscript for
Book 1, as satisfactory to the Publisher;

$28,000 on Publisher's first publication of Book 1, or 12 months after
acceptance of the complete manuscript, whichever is earlier;

$28,000 on delivery and acceptance of the complete manuscript for
Book 2, as satisfactory to the Publisher;

$28,000 on Publisher's first publication the hardcover edition of Book 2,
or 12 months after acceptance of the complete manuscript,
whichever is earlier; and

$28,000 on Publisher's first publication of the trade paperback edition of Book 2,
or 24 months after acceptance of the complete manuscript, whichever is earlier.

## Royalties

6.    The Publisher shall pay the Author royalties on all copies of the Work sold by the
Publisher, less returns, as follows:

(a) if published as a hardcover edition, 10% of the catalog retail price on the first 5,000
copies sold, 12½% of the catalog retail price on the next 5,000 copies sold, and 15% of the
catalog retail price on all copies sold thereafter, subject to the exceptions set forth below;

(b) if published as a trade paperback edition, 7½% of the catalog retail price on all copies
sold, subject to the exceptions set forth below;

(c) if published as a mass-market paperback edition, 8% of the catalog retail price on the
first 150,000 copies sold, and 10% of the catalog retail price on all copies sold thereafter, subject
to the exceptions set forth below;

(d) if published as an electronic text (e-book) or electronic audio (e-audio) edition, 25%
of the net amount actually received from such sales. However, should marketplace conditions
change such that said royalty rate is below prevailing market rates, Publisher agrees to
renegotiate the royalty rate at Author's request at any time following three years after first
publication of the e-book edition;

(e) if published as an audio edition, 5% of the catalog retail price on the first 10,000
copies sold, 6% of the catalog retail price on the next 10,000 copies sold, and 7% of the catalog
retail price on all copies sold thereafter, subject to the exceptions set forth below;

(f) if published as a large print edition, 10% of the net amount actually received from
such sales, subject to the exceptions set forth below;

(g) if published as a low-cost hardcover edition, 10% of the net amount actually received
from such sales, subject to the exceptions set forth below;

(h) on copies of the hardcover and trade paperback editions sold for export to third parties
or outside the United States by Publisher or its affiliates, royalties shall be calculated on the net
amount actually received from such sales. On copies of the mass-market paperback, large print,
low-cost hardcover and calendar editions sold for export to third parties or outside the United
States by Publisher or its affiliates, the royalty shall be 5% of the net amount actually received
from such sales. On copies of the audio edition sold for export to third parties or outside the
United States by Publisher or its affiliates, the royalty shall be one-half the prevailing rate in
subparagraph (e) above, calculated on the net amount actually received from such sales;

(i) on mail order sales and other direct response sales, the royalty shall be 5% of the net
amount actually received from such sales, except that on mail order sales and other direct

response sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(j) on special discount sales (as defined in Paragraph 34(d)), the royalty shall be **10%** of the net amount actually received from such sales, except that on special discount sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(k) on copies sold to book clubs on a royalty-inclusive basis, the royalty shall be 5% of the net amount actually received from such sales, except that on copies of the audio edition sold to book clubs on a royalty-inclusive basis, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(l) on remainder-in-place sales (as defined in Paragraph 34(e)) and remainder sales, the royalty shall be 5% of the net amount actually received from such sales, except that on remainder-in-place sales and remainder sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales, and except that no royalty shall be payable on copies of the Work sold at a discount of 85% or more from the catalog retail price;

(m) on any revised edition of the Work, royalties will be computed separately from the number of copies sold of prior editions. If individuals other than Author revise any edition of the Work and are entitled to royalties on such edition, then Author shall receive royalties on such edition at rates to be negotiated in good faith.


**Proceeds on License of Subsidiary Rights**

7.    The Publisher shall pay the Author 50% of the proceeds received by Publisher from the sale or license of subsidiary rights, except as follows:

| Type of Right | Author's Share | Publisher's Share |
|---|---|---|
| first serial rights (*i.e.* publication before first publication in book form) | 90% | 10% |
| British Commonwealth rights for all editions of the Work except the audio edition | 80% | 20% |
| foreign language rights for all editions of the Work except the audio edition | 75% | 25% |

In calculating the proceeds on disposition of the subsidiary rights, Publisher may deduct from the gross amount received any third party agent's commission which may be paid for services rendered in connection with such disposition, and any bank fees or other monetary transfer charges incurred by the Publisher in connection with or by reason of such sale or disposition.


**Special Royalty Provisions**

8.    With respect to each edition of the Work published hereunder, the following shall be applicable:

(a) no royalty shall be payable on copies damaged or destroyed or on copies furnished gratis for review, publicity, promotion, sample or similar purposes;

(b) no royalty shall be payable on sales by Publisher to its parent, subsidiaries, affiliates, or related divisions for resale, but any resale thereby shall be deemed a sale by Publisher subject to the applicable royalty herein provided;

(c) in some instances Publisher prints on the jackets and/or covers of its books a suggested cover price that is higher than its catalog retail price. In such instances, where the royalty is based on the retail price, the catalog retail price, not the suggested cover price, shall be the basis for the computation. The difference between the two prices enables the retailer to recoup its freight costs;

(d) when the Publisher in its sole discretion determines that copies of the Work are not readily salable at regular prices within a reasonable time, the Publisher may remainder copies of the Work **(but not earlier than 12 months from the publication date unless it is a remainder-in-place, which may occur at any time)** or dispose of such copies as surplus at the best price obtainable. Publisher shall make no remainder sale (other than a remainder-in-place sale) without first offering copies to the Author at the estimated remainder price, provided, however, that inadvertent failure to offer such copies to the Author will not be deemed a material breach of this Agreement;

(e) any advance royalties or other sums paid to or on behalf of the Author under this Agreement, and any amounts due from the Author to the Publisher **under this Agreement**, may be applied in reduction of any amounts payable to the Author under this Agreement;

(f) in the event of any overpayment by Publisher to Author, Publisher may, in addition to any other remedies available to it, recoup such overpayment from any sums due to Author under this Agreement or any other agreement between Author and Publisher. **An unearned advance shall not be deemed an overpayment;**

(g) any amounts payable to the Author hereunder shall be subject to such reasonable reserve for returns of copies of the Work as the Publisher shall establish in its reasonable discretion. **Following the fourth full accounting period after publication, Publisher's reserve for returns shall not exceed 20% of the total copies theretofore shipped and not returned, except that (i) after each subsequent substantial printing, the reserve may be reasonably increased above 20% for four additional accounting periods, (ii) Publisher may maintain a reserve in excess of 20% which reserve is equal to the actual percentage of returns in the preceding period, and (iii) Publisher may maintain a higher reserve for any period preceding or during which it is expected that the Work will be or is out of print or is remaindered. Reserves shall be maintained separately with respect to each edition (hardcover, paperback, etc.);**

(h) if the Publisher exercises rights for which royalties are not specifically set forth in this Agreement, then royalties shall be paid to the Author at rates to be negotiated in good faith by the Author and Publisher.

## Royalty Statements

9.    (a) Publisher shall render royalty statements and make accounting and royalty and other payments to the Author (i) in February for the preceding period April 1 to September 30, and (ii) in August for the preceding period October 1 to March 31. Publisher may from time to time change such accounting periods provided no longer than six months elapses between any two accountings to the Author. If for any royalty period the current period total activity in the Author's account for the Work is less than $100, Publisher may defer the rendering of payment until such royalty period as the cumulative activity since the last statement exceeds such amount.

(b) Royalty statements shall state the number of copies sold and returned during the period covered and the reserve for returns being held by the Publisher. If the Author so requests in writing, the Publisher shall, within 60 days after its receipt of such request, advise the Author in available detail of the number of copies printed, sold, and given away during the current period

covered by the last royalty statement rendered to the Author, as well as the approximate number of salable copies on hand at the end of said period.

(c) Statements rendered hereunder shall be final and binding upon the Author unless objected to in writing, setting forth the specific objections thereto and the basis for such objections, within **three** years after the date **Publisher renders** the statement.

(d) **When the Publisher has disposed of any subsidiary rights in the Work, any proportionate share of the proceeds due to the Author in accordance with Paragraph 7, less any unearned advances and after the Publisher's allowances for reserve for returns, shall be paid at the time the next succeeding royalty statement is rendered; provided, however that with respect to any advances actually received by Publisher in connection with the disposition of U.S. mass market paperback rights or book club rights, if the Author makes a written request for immediate payment after such a disposition, the Publisher shall pay the Author's share of such advance received by Publisher (after such deductions) within 30 days after receiving such written request.**

(e) **The Publisher shall create a General Royalty Account to which will be credited all earnings and against which will be charged all payments to or on behalf of the Author under this Agreement. Notwithstanding anything to the contrary in the foregoing, in the event of termination of this Agreement with respect to Book 1 or Book 2, total advance allocated to Book 1 shall be $75,000 and the total advance allocated to Book 2 shall be $125,000; and the advance payable on signing hereof shall be deemed allocated $19,000 to Book 1 and $41,000 to Book 2.**

## Examination of Publisher's Books and Records

10.    The Author or the Author's representative may, upon written request not more than once each year, conduct a reasonable examination of the books and records of the Publisher insofar as they relate to the Work for the period of **three** years immediately preceding such examination. Such examination shall be on Publisher's premises at a time convenient to Publisher, but no later than 90 days after Author's request therefor, and shall be at Author's expense **unless errors of accounting amount to 5% or more of the total amount accrued to the Author shall be found to the Author's disadvantage, in which case the reasonable cost of the examination shall be borne by the Publisher.**

## IV.    Failure to Deliver the Manuscript; Acceptance of the Manuscript

## Failure to Deliver the Manuscript

11.    Timely delivery of the Work, satisfactory to the Publisher in length, content and form, is essential to the Publisher and is of the essence of this Agreement. If Author fails to deliver the complete manuscript of **Book 1 or Book 2**, satisfactory to the Publisher in length, content and form, within **30 days of** the time specified, the Publisher shall have the option to give the Author a notice in writing terminating this Agreement **with respect to said Book**, and in such event the Publisher may then recover and the Author shall repay **within 60 days after the date of such notice** all amounts advanced to the Author **with respect to said Book**. In the event that the Author completes a manuscript for **Book 1 or Book 2** after termination of this Agreement pursuant to the preceding sentence, then the Publisher shall have the option, exercisable within 30 days after receipt of said manuscript, to acquire **said Book** on the same terms and conditions as provided in this Agreement.

**Extension of Time to Deliver**

12.     Publisher may in its discretion extend for such period as in its judgment is appropriate, or refuse to extend, Author's time to deliver the complete manuscript. Any extension of the delivery date must be in writing signed by the Publisher. In determining whether to grant such extension and/or the length thereof, Publisher may consider such factors as Publisher deems relevant, including without limitation, Author illness and the changing marketability of the Work.

**Acceptance of Manuscript**

13.     (a) The Publisher shall not be obligated to accept or publish **Book 1 or Book 2** if in its sole judgment **said Book** is not acceptable to it. If the Author delivers a manuscript of **Book 1 or Book 2** within the time specified, in what the Author represents to be its complete and final form, the Publisher shall, within **60** days after its receipt thereof, determine whether **said Book** is acceptable to it. In lieu thereof, Publisher may request in writing that Author make revisions, changes or supplements ("revisions") thereto. If Publisher requests one or more revisions in the manuscript as submitted or as thereafter revised, Publisher's time to determine the acceptability thereof shall be extended for a period of 60 days after resubmission by the Author, or 60 days after Publisher's receipt of written notice by Author that no further revisions will be made. Author will make revisions as promptly as possible after Publisher's request therefor. No request for revisions shall be deemed to obligate Publisher to accept the final revision or to constitute a conditional acceptance thereof. If the Publisher in its sole discretion determines to submit the manuscript **of Book 1 or Book 2** to a legal review, the Author shall cooperate with the Publisher or Publisher's counsel in such review and notwithstanding anything to the contrary in this Agreement the time for Publisher to accept or reject **said Book** shall be extended to 30 days after completion of the legal review.

     (b) Acceptance of the manuscript shall be made by written notice signed by an authorized signatory of the Publisher. Payment of an advance installment, payable by express provision hereof upon acceptance of the manuscript, shall constitute written notice of acceptance unless such payment is accompanied by a notice to the contrary.

     (c) If the Publisher fails to accept the complete manuscript or revised complete manuscript **of Book 1 or Book 2** within the time periods provided in subparagraph (a) above, the Author shall thereafter have the right to notify Publisher in writing that unless the manuscript is accepted or written request for revisions provided within 15 business days after the delivery of such notice, the manuscript will be deemed unacceptable and this Agreement shall terminate **with respect to said Book** in accordance with the provisions of subparagraph (d) below.

     (d) If the complete manuscript or revised complete manuscript **of Book 1 or Book 2** delivered by the Author is not, in Publisher's sole judgment, acceptable to the Publisher, the Author shall repay all sums advanced to the Author hereunder **with respect to said Book in accordance with the provisions of subparagraph (e) below** and upon such repayment this Agreement shall terminate **with respect to said Book**.

     (e) In the event of termination of this Agreement **with respect to Book 1 or Book 2** because the complete manuscript or revised complete manuscript is unacceptable to the Publisher, the Author or the Author's duly authorized representative shall make every effort to sell **said Book** elsewhere, and the Author shall be obligated to repay all sums advanced hereunder **with respect to said Book**; but **for a period of 12 months after termination of this Agreement** such obligation shall be limited to repayment from the first (and all) proceeds of any contracts with others concerning the **rights in said Book granted to the Publisher under this Agreement** including, without limitation, rights listed in Paragraph 2 above. Author hereby transfers and assigns to Publisher, as security for the repayment of any advances which may become repayable pursuant to this paragraph, any and all monies which may hereafter become due or owing to Author from other persons or entities as a result of **the rights granted to the Publisher under this Agreement in said Book**, and Author hereby authorizes Publisher to apply such monies as and when received in liquidation of Author's obligation to repay such advances, until such obligation shall have been fully paid. Author hereby authorizes such other person or entity to give full force and effect to this

assignment, and hereby releases and discharges such other person or entity from any and all liability to Author for any and all payment or payments made to Publisher pursuant to this paragraph. **At the end of the 12-month period any sums that have not been repaid shall become immediately due and payable to the Publisher.**

# V. Production and Publication of the Work

### Correction of Proofs

14.    Publisher shall furnish Author with one set of galleys or other first proofs and, at its option, subsequent proofs, and the Author shall return each set of proofs with Author's corrections to the Publisher within 21 days of receipt thereof. The Publisher also shall proofread the proofs. If the Author shall fail to return the corrected proofs within the 21-day period herein specified, the Publisher may publish the Work without the Author's approval of the proofs - provided, however, that if, because of illness or any other factor beyond the Author's control, the Author informs the Publisher that Author is unable so to return the corrected proofs, Author's time for correcting such proofs shall be extended for another 21-day period, and after that period the Publisher may publish the Work without the Author's approval of the proofs.

### Cost of Author's Alterations

15.    If, in the correction of proofs, the Author requests changes from the text of the manuscript, the Author shall bear the cost of such changes, **other than the cost of correcting printer's errors,** over 15% of the original cost of composition, as follows: (a) Author shall pay such costs upon receipt of an invoice from the Publisher; (b) Publisher may withhold a portion of any advances payable to the Author under this Agreement and deduct such costs from said advances; or (c) at Publisher's option, Publisher may charge such cost to Author's royalty account, provided however that if the advance payable to the Author under this Agreement is unearned **18 months** after publication of the Work, then the Author will reimburse Publisher for such costs upon receipt of an invoice from Publisher. At Author's request Publisher shall submit an itemized statement of such charges and shall make available corrected proofs for the Author's inspection at the Publisher's office.

### Publication

16.    (a) The Publisher shall publish **each of Book 1 and Book 2** in book form within 18 months after acceptance of the manuscript therefor. Publication shall be in any edition and under any imprint of Publisher or its affiliates that Publisher elects.

(b) Publisher shall have the right to use the name, pseudonym, **approved** portrait and **approved** picture of and **approved** biographical material concerning Author in and on the Work, in the advertising, publicity and promotion thereof, and in connection with any rights granted hereunder, **but not to endorse any product or service.** Author shall furnish Publisher, free of charge, original photographs of Author which Publisher may use for such purposes without additional payment to or permission from any third party.

(c) The title of the Work as set forth on page 1 may **only** be changed by mutual agreement of the Author and the Publisher.

(d) The format, imprint, style of printing and binding, and all matters relating to the manufacture, sale, distribution and promotion of the Work shall be determined at the sole discretion of the Publisher. **The Publisher shall consult with the Author on the cover artwork for the Work. The Author shall have approval over the cover copy for the Work, such approval not to be unreasonably withheld or delayed.**

(e) The Publisher may publish and authorize others to publish extracts of the Work containing not more than one chapter for promotion of the Work, without compensation therefor. If compensation is received it shall be shared equally by Author and Publisher.

(f) **The Publisher will not include any advertisements in its edition of the Work or authorize others to do so without the Author's written approval, other than advertisements for the Publisher's own publications. No advertisements other than for other books by the Author will be placed inside the front cover.**

## Copyright

17.    (a) The Publisher shall identify the Author as the owner of the copyright in the Work and **shall** register such copyright in the United States in the name of the Author.

(b) The Publisher shall identify the Author as the owner of the © copyright in the audio edition of the Work. The Publisher shall be identified as the owner of the (P) copyright in the audio edition of the Work. Author hereby assigns, and Publisher shall own, all right, title and interest in and to the audio edition of the Work and all additions to, alterations of or revisions of the audio edition, and all drafts, notes, scripts, voice recordings and musical recordings related thereto, **but not the verbatim text of the Work.**

(c) The Publisher shall print in each copy of each edition of the Work published by it any notice required to comply with the applicable copyright laws of the United States and the provisions of the Universal Copyright Convention and the Berne Copyright Convention.

(d) Any agreements made by the Author or by the Publisher to dispose of any rights in the Work shall require the licensee or grantee to take all necessary and appropriate steps to protect the copyright in the Work. Whichever party controls first serial rights in the Work will use best efforts to require any licensee of such rights to include an acknowledgement accompanying the published excerpt stating that the excerpt is from an upcoming work to be published by the Publisher and setting forth the title of the Work, Author and Publisher by name.

(e) The Publisher may take such steps as it deems appropriate to copyright the Work in countries other than the United States, but the Publisher shall be under no obligation to procure copyright in any such countries, and shall not be liable to the Author for any acts or omissions by it in connection therewith. The Author may copyright the Work in any foreign country if the Publisher fails to take steps to obtain such a copyright within 30 days after receiving a written request from the Author to do so.

(f) Author hereby appoints Publisher to be Author's attorney-in-fact to execute and to file any and all documents necessary to record in the Copyright Office the assignment of exclusive rights made to Publisher hereunder.

## No Obligation to Publish

18.    Notwithstanding anything contained herein to the contrary, the Publisher shall not be obligated to publish **Book 1 or Book 2** if, **in the reasonable judgment of its own or outside counsel,** whether before or after acceptance thereof, **said Book** contains libelous or obscene material, or its publication may violate the right of privacy, common law or statutory copyright, or any other right of any person or entity. In such event, **unless Author makes changes required by Publisher's legal counsel in such counsel's reasonable judgment,** Publisher shall be entitled on demand to the return of all monies advanced to the Author hereunder **with respect to said Book,** and to terminate this Agreement **with respect to said Book.** Notwithstanding any request by Publisher for change or substantiation, nothing in this Agreement shall be deemed to impose upon the Publisher any duty of independent investigation or to relieve the Author of any of the obligations assumed by Author hereunder, including, without limitation, the ongoing

validity of Author's warranties and representations which shall apply to all material in the Work, whether or not changed at the request of Publisher's legal counsel.

## Delays in Publication

19.    (a) The Publisher, in its sole and absolute discretion, shall have the right to reschedule publication of **Book 1 and/or Book 2** beyond the time set forth in Paragraph 16(a) for a reasonable time. If publication of **Book 1 or Book 2** is delayed in the absence of excusable circumstances the Author's sole and exclusive remedy shall be to give the Publisher a notice in writing, stating that if the Publisher fails to publish **said Book** within 90 days after the date of such notice, then all of the Publisher's rights in and to **said Book** shall terminate at the end of such 90-day period; and if, in such event, the Publisher shall fail to publish **said Book** within such 90-day period, all of the Publisher's rights in and to **said Book** shall terminate and revert to the Author, and the Author shall be entitled, as liquidated damages and in lieu of all damages and remedies, legal or equitable, to retain all payments theretofore made to Author under this Agreement **with respect to said Book and to receive any unpaid advances for said Book under Paragraph 5(a) above**.

(b) If publication is delayed beyond the time set forth in Paragraph 16(a) because of acts or conditions beyond the control of the Publisher or its suppliers or contractors, including (by way of illustration and not by way of limitation) war, shortages of material, strikes, riots, civil commotions, fire or flood, the publication date shall be extended to a date **following removal of the cause of the delay but in no event longer than** six months following removal of the cause of the delay.

## Out of Print Termination

20.    If, at any time after the expiration of **one year** from the publication date **of Book 1 or Book 2**, the Publisher allows all of its **United States** editions of **said Book** to go out of print and such status continues in effect for six months after the Author has **given Publisher written notice ("Reversion Notice")** to put **said Book** back into print, and if there is no English language reprint edition authorized by Publisher available or contracted for **within such six-month period, provided that such contract requires publication within nine months**, then the Author may by a notice in writing terminate this Agreement **with respect to said Book** subject to any licenses previously granted by Publisher (and any renewals or extensions thereof) and Publisher's right to continue to share in the proceeds therefrom. In the event of such termination the Author shall have the right to purchase any available plates or film of **said Book** at cost, and/or any remaining copies or sheets of **said Book** at cost. If the Author does not purchase such plates, film, copies or sheets, then the Publisher may dispose of them at any price and retain the proceeds of such sale, **subject to payment to the Author of appropriate royalties**. The Publisher is under no obligation to retain any such plates, film, copies or sheets. **Neither Book hereunder** shall be deemed out of print as long as it is available from the Publisher in any edition, including electronic text editions. If, **however, six months after Author's Reversion Notice for Book 1 or Book 2, said Book is only available from the Publisher in an electronic text edition or by means of print-on-demand technology, the Author may by notice in writing terminate this Agreement in the manner set forth above provided in the prior 12 months Publisher's revenue from its exercise or license of rights in the Work (excluding revenue derived from the license of book club rights) was $1,000 or less. Upon reversion of print publishing rights from the Publisher to the Author under the provisions of this Paragraph 20, the Publisher also agrees to revert any audio rights in the Work provided the Publisher's audio edition is out of print and with the exception of any licensed audio editions which shall be governed by the provisions of the first sentence of this Paragraph.**

## VI.    Other Rights, Undertakings and Obligations

### Author's Rights

21.    All rights not expressly granted by the Author to the Publisher are reserved to the Author **for Author's own use and disposition**. The Author shall not exercise or dispose of any reserved rights in such a way as substantially to destroy, detract from, impair or frustrate the value of any rights granted herein to the Publisher, nor shall the Author publish or permit to be published **for a period of two years after publication of the Work (or one year if it is a sequel or prequel)** any ~~book or other writing~~ **novel** based substantially on subject matter, material, characters or incidents in the Work without the written consent of the Publisher **which consent shall not be unreasonably withheld**.

### Author's Agent

22.    **Deleted.**

### Representation by Single Author

23.    **Deleted.**

### Author's Warranties

24.    Author warrants and represents that:

(a) Author is the sole author and proprietor of the Work;

(b) Author has full power and authority to make this Agreement and to grant the rights granted herein, and Author has not previously assigned, transferred or otherwise encumbered the same; and neither the Author nor the Author has any prior agreement, commitment or other arrangement, oral or written, to write or participate in writing any other book-length work and will enter into no such agreement, commitment or other arrangement until after delivery and acceptance of the Work;

(c) the Work has not been previously published;

(d) the Work is not in the public domain;

(e) the Work does not infringe any statutory or common law copyright or any proprietary right of any third party;

(f) the Work does not invade the right of privacy of any third person, or contain any matter libelous or otherwise in contravention of the rights of any third person; and, if the Work is not a work of fiction, all statements in the Work asserted as facts are true or based upon reasonable research for accuracy;

(g) the Work is not, **to the best of the Author's knowledge,** obscene and contains no matter the publication or sale whereof otherwise violates any federal or state statute or regulation thereunder, nor is it in any other manner unlawful, and nothing contained in the Work shall be injurious to the health of the user;

(h) the Work will be the Author's next work (whether under the Author's name or otherwise), and that Author will not publish or authorize publication of **(but may contract for)** any other full-length work of which the Author is an author or co-author until six months after publication of the Work.

Each of the foregoing warranties and representations shall survive the termination of this Agreement.

Each of the foregoing warranties and representations is true on the date of the execution of this Agreement and shall be true on the date of publication of the Work, and at all intervening times. The Publisher may rely on the truth of said warranties and representations in dealings with any third party in connection with the exercise or disposition of any rights in the Work. The Publisher shall be under no obligation to make an independent investigation to determine whether the foregoing warranties and representations are true and correct; and any independent investigation by or for the Publisher, or its failure to investigate, shall not constitute a defense to the Author in any action based upon a breach of any of the foregoing warranties.

## Indemnity

25.    (a) The Author shall indemnify and hold the Publisher harmless against any loss, liability, damage, cost or expense (including reasonable attorneys' fees **but excluding the cost of Publisher's in-house attorneys**) arising out of or for the purpose of avoiding any suit, proceeding, claim or demand or the settlement thereof, which may be brought or made against the Publisher by reason of the publication, sale, or distribution of, or disposition of rights in respect to the Work, based on the contents of the Work, except in connection with matters involving solely controversies arising out of or based on commercial transactions between the Publisher and its customers. **The Publisher shall have the right, subject to the approval of the Author, such approval not to be unreasonably withheld, to settle such suit, proceeding, claim or demand on such terms as it deems advisable. If within such time as the situation may allow, the Publisher shall request the Author to consent to the proposed settlement, and the Author shall neglect or decline to do so, the Author shall upon written notice by the Publisher immediately undertake to continue the defense at Author's sole expense and shall provide the Publisher with security in the form of a surety company bond in the amount as shall under all circumstances be in the Publisher's opinion adequate. In the event the Author fails to so assume the defense, and to furnish such bond, the Publisher shall have the right to settle such matter upon terms Publisher thinks advisable or in its discretion to continue the defense thereof, and the Author's indemnity shall be applicable in either such event, provided, however, that nothing herein contained shall prohibit the Publisher from settling any such claim, suit, action or proceeding against it at its own cost and expense.**

(b) Prompt notice of any suit, proceeding, claim or demand brought or made against the Publisher or Author shall be given to the Author or Publisher respectively.

(c) Whenever any suit, claim or demand as to which Author's indemnity applies is instituted, the Publisher may withhold payments due to the Author under this Agreement, or any other agreement between the Author and the Publisher **and may apply the payments so withheld to Author's indemnity obligations hereunder. If a claim or demand shall not result in a suit or proceeding within one year after it is first asserted, Publisher shall not continue to withhold funds based on such claim or demand, but may in the future should a suit or proceeding be commenced.**

(d) Author shall be insured under **any** Publisher's liability policy which covers claims for libel and other forms of defamation, invasion of privacy or publicity and infringement of copyright or trademark arising from publication of the Work, to the extent such policy is valid and collectible. In connection with such coverage, with respect to all judgments, settlements and costs of defense, including **reasonable outside** attorneys' fees and other costs of claims covered by the policy, the Publisher and the Author shall share equally **all costs not paid by the insurance company, provided however, that Author's share of such costs will not exceed Author's total earnings with respect to the Work. For purposes of this Paragraph, "Author's total earnings" shall mean all advances paid or payable to the Author with respect to the Work plus all further sums earned by Author from Publisher's sales and licenses of the Work.** Publisher shall retain counsel to represent Publisher and Author in any proceeding brought with respect to all such claims and shall control the defense of such claims, and Author shall cooperate fully with Publisher and said counsel in such defense.

Notwithstanding the foregoing, Author shall be solely responsible for the cost of counsel separately retained by the Author for any reason and for judgments, settlements and costs of defense, including all **reasonable outside** attorneys' fees, attributable to a willful or reckless breach of this Agreement by Author, and for any **all costs not paid by the insurance company in any claim involving a finding of any copyright infringement or in the settlement of such a claim which Publisher in its good faith judgment determines is necessary to avoid such a finding. Nothing herein shall limit the Author's liability with respect to claims which are not covered by insurance or with respect to costs which exceed the limits of the insurance policy.**

(e) If any suit, claim or demand is brought or made as to which Author's indemnity applies which is not covered by Publisher's liability policy, the Publisher may elect (i) to undertake the defense thereof, or (ii) to notify the Author to undertake the defense. If the Publisher does so notify the Author, the Author shall undertake such defense; and in such cases the Publisher may, at its option, join in the defense. In all the foregoing events the cost and expense of any defense shall be borne by the Author.

**Revised Editions**

26.    **Deleted.**

**Tie-In Editions**

27.    Author shall use **reasonable good faith** efforts to obtain for Publisher the right to publish tie-in editions in connection with any motion picture, television or other dramatic versions of the Work, and to use the title, artwork, photographs, and other material related to any such version and appropriate identification and credits therefrom in Publisher's editions of the Work.

**Care of Property**

28.    Publisher shall not be responsible for loss or damage to any property of Author in Publisher's possession or that of its independent contractors or to anyone to whom delivery is made with Author's consent. Author shall retain copies of any such property and, in the case of photographs, the negative for each photograph furnished.

**Breach by Publisher**

29.    Except as otherwise specifically provided in this Agreement, if the Publisher shall commit a material breach of this Agreement and shall fail to remedy the breach within 60 days after receiving a written notice from the Author requesting the Publisher to remedy such breach, the Author may by a notice in writing (a) revoke the Publisher's right to publish the Work, if it has not been published at such time; (b) require the Publisher to cease further publication of the Work, if it has been published at such time; and (c) revoke the grant to the Publisher of such of the subsidiary rights as the Publisher has not already exercised or disposed of. In such event the Author shall have the right to purchase any available plates or film of the Work at cost, and/or remaining copies or sheets of the Work already printed at the Publisher's manufacturing cost. If the Author does not purchase such plates, film, copies or sheets, the Publisher may dispose of them at any price and retain the proceeds of such sale, **subject to the payment to the Author of appropriate royalties.** The Publisher is under no obligation to retain any such plates, film, copies or sheets. Any right of the Author pursuant to Paragraph 10 shall survive such termination.

**Free Copies for Author, Purchases by Author**

30.      (a) The Publisher shall present the Author with 50 free copies of each edition of **Book 1 and Book 2** published by the Publisher, upon publication, except as provided in (b) below. The Author shall have the right to purchase additional copies for Author's own use, and not for resale, at a 50% discount from the catalog retail price. If the Author wishes to purchase copies of the Work for resale, Author shall negotiate the terms of such purchase with Publisher's Special Sales Department, it being understood that any resale of the Work by Author shall be outside regular trade channels.

(b) The Publisher will at Author's request present the Author with two free copies of **Book 1 and Book 2** produced by means of print-on-demand technology, and will at Author's request present the Author with one free copy of the e-book edition of **Book 1 and Book 2.**

**Publisher's Trademarks**

31.      Nothing in this Agreement (including but not limited to the rights of Author to purchase books and plates on termination) shall give Author any right in or to any trademark, trade name, logo, imprint or other identification now or hereafter used by Publisher, nor shall Author use any such identification during the term of this Agreement or thereafter, except that Author may dispose of copies of the Work purchased hereunder notwithstanding that such identification may appear thereon when purchased.

**Third Party Copyright Infringement**

32.      If during the existence of this Agreement the copyright, or any other right in respect to the Work, is infringed upon or violated, the Publisher may, at its own cost and expense, take such legal action, in the Author's and/or Author's name if necessary, as may be required to restrain such infringement and to seek damages therefor. The Publisher shall not be liable to the Author for the Publisher's failure to take such legal steps. If the Publisher does not bring such an action, the Author may do so in Author's own name and at Author's own cost and expense. Money damages recovered for an infringement shall be applied first toward the repayment of the expense of bringing and maintaining the action, and thereafter the balance shall be divided equally between the Author and Publisher.

**Execution of Documents**

33.      Each party hereto shall, upon request of the other, execute such documents as may be reasonably necessary to confirm the rights of the other party in respect of the Work or to carry out the intention of this Agreement.

## VII.   Definitions

**Definitions**

34.      As used in this Agreement:

(a)      (i) "Electronic text rights" shall mean the exclusive right to publish, and to authorize others to publish, the text of the Work (including any photographs and illustrations in the Work) in whole or in part, in visual form for reading **by the human eye,** by any **non-dramatic** electronic, electromagnetic or other means of storage, retrieval, distribution or transmission now known or hereafter devised, but excluding any other text rights provided for herein (an "electronic edition"). In the exercise of the electronic text rights, the Publisher shall not add any textual, visual or other material to the Work, delete any material from or otherwise

edit the Work, or couple any electronic edition of the Work with other works without the **written** approval of the Author, such approval not unreasonably to be withheld or delayed. Any license of electronic text rights in the Work shall provide that any additions to, deletions from, or other editing of the text of the Work by the licensee, and the coupling of any electronic edition of the Work with other works, shall be subject to the **written** approval of the Author, such approval not unreasonably to be withheld or delayed.

(ii) "Electronic adaptation rights" shall mean the exclusive right to adapt and publish, and to authorize others to adapt and publish, the Work or any portion thereof for one or more "electronic versions." As used herein, an "electronic version" shall mean an adaptation of the Work incorporating elements from sources other than the text of the Work including without limitation still photographs and illustrations, video footage, sound and other text, for publication by any electronic, electromagnetic or other means of storage, retrieval, distribution or transmission now known or hereafter devised, but excluding electronic text rights, audio rights, motion picture rights and television rights (provided that the exercise of any of the foregoing rights, if reserved by the Author or licensed to a third party, shall not preclude the exercise of the electronic adaptation rights). **Electronic adaptation rights are reserved to the Author. The Publisher shall have the first opportunity to acquire electronic adaptation rights on mutually satisfactory terms. If the Author and Publisher are unable in good faith to agree on terms for Publisher's acquisition of such rights within 30 days after they commence negotiations with respect thereto, then the Author shall be free thereafter to offer all or some of such rights to other parties, provided, however, that prior to entering into a commitment for such rights, the Author will advise Publisher of all material terms of such proposed commitment and the Publisher shall have ten days to acquire such rights on terms no less favorable to the Author than those offered by any other party. If the Publisher does not acquire such rights, Author may proceed to sell or license them to another party, provided, however, that the Author shall re-submit to Publisher, on the terms and conditions set forth herein, any offer Author is prepared to accept that is less favorable to the Author than the last offer rejected by the Publisher. If the Publisher does not license such rights, if the Author or a licensee of the Author wishes to use all or part of the text of the Work in an electronic version, the Publisher shall promptly authorize such use on reasonable terms and conditions, provided in the Publisher's reasonable judgment such text is not the predominant feature of such electronic version.**

(b) "audio rights" shall mean the exclusive right to use or adapt, and to authorize others to use or adapt, the Work or any portion thereof as the basis for one or more non-dramatic audio recordings through any method of recording or transmission now known or hereafter devised, including, without limitation, copying or recording by phonographic, magnetic, laser, electronic or any other means and whether on phonograph records, audio cassettes, audio discs or any other human or machine-readable medium and the broadcast or transmission thereof, but excluding all uses encompassed in motion picture, dramatic, television, radio and allied rights. **If the Publisher publishes its own audio edition of the Work, the Author will have the first opportunity to perform the voice recording services therefor, on terms and at a time and place which will be mutually agreed in good faith. If for any reason the parties are unable to agree, or if the Publisher in its sole discretion determines to engage an alternate reader, the Publisher will consult with the Author on such decision and on the person to be engaged. The Publisher will use its best efforts to cause the foregoing provision to be included in any sublicense of the audio rights made by the Publisher.**

(c) a "sale," "disposition" or "grant" of rights shall include an assignment, transfer or license of the rights referred to or of any interest or option relating to such rights.

(d) "special discount sales" shall mean sales made in the United States outside regular trade channels at a discount of more than 50% from the catalog retail price, except that for audio editions of the Work "special discount sales" shall mean sales at a discount of more than 55% from the catalog retail price. With respect to special discount sales to organizations, Publisher may imprint the trade name, trademark, logo, imprint and/or other identification of such organization on such copies in addition to or in lieu of Publisher's trade name, trademark, logo, imprint and/or other identification;

(e) "remainder-in-place sales" shall mean sales made in the United States in regular trade channels at regular trade discounts, for which a 50% credit to the bookseller is subsequently given by Publisher.

(f) **as used herein, "net amount actually received" shall mean Publisher's gross receipts less (i) returns, (ii) shipping and handling charges, (iii) postage and (iv) excise, sales, use or similar taxes.**

## VIII.  Miscellaneous Provisions

### Assignment

35.    This Agreement shall be binding upon and inure to the benefit of the executors, administrators and assigns of the Author, and upon and to the successors and assigns of the Publisher. The Author shall not assign this Agreement without the prior written consent of the Publisher, except that Author may assign sums due and payable to the Author hereunder, provided that such assignment shall not be binding upon Publisher unless and until Publisher shall have given written acknowledgement of its receipt thereof and such assignment shall not in any event affect Publisher's rights or Author's obligations hereunder. **The Publisher shall not assign this agreement without the written consent of the Author, such consent not unreasonably to be withheld, except that the Publisher may assign this agreement without the consent of the Author to a parent, affiliate or subsidiary company or to a purchaser of all or substantially all of its assets or in connection with a reorganization.** Any purported assignment **by Author or Publisher** in violation of this provision shall be void.

### Effectiveness

36.    This Agreement shall be binding upon the Publisher only when it has been signed by the Author and by an authorized officer of the Publisher.

### Jurisdiction

37.    Exclusive jurisdiction for the determination of any dispute solely between or among parties to this Agreement is hereby vested in the federal and state courts sitting in New York County, New York, to which each party irrevocably submits. In addition to service of process by any other means provided at the time by law, each party consents to service of process on him, her or it, as the case may be, by certified mail, first class postage prepaid, return receipt requested, or by overnight courier service provided a signed receipt is obtained, in each case addressed (i) to the party to be served at the address to which notices may be given pursuant to Paragraph 38 of this Agreement or (ii) to that party's actual residence or place of business, **such service of process not to be addressed in care of the Author's agent.** The refusal to accept process so served, including the failure to claim certified mail in the custody of the Postal Service, shall not invalidate such service if a separate copy of the process is sent by first class mail, postage paid, to the same address.

### Notices

38.    All notices to be given hereunder by either party shall be in writing and shall be sent to the other party at the respective addresses as they are given on page 1 of this Agreement, unless said addresses are changed by either party by a notice in writing to the other party. All notices shall be sent by registered or certified mail or other form of receipted or acknowledged delivery including a fax transmission acknowledged as received by the party to which it is sent. Notices to the Publisher shall be sent to the President **with a copy to the** General Counsel of Publisher **by first class mail with postage paid.**

**Applicable Law**

39.    THIS AGREEMENT AND ITS INTERPRETATION SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND ENTIRELY TO BE PERFORMED THEREIN.

**Waivers**

40.    No waiver **by either party** of any term or condition of this Agreement, or of any breach of this Agreement or of any part thereof, shall be deemed a waiver of any other term or condition of this Agreement or of any later breach of this Agreement or of any part thereof, nor shall publication or continued publication or payment by the Publisher **or acceptance of payment by the Author** following notice or claim of facts which, if true, would constitute a breach of **this agreement by either party**, constitute or imply any waiver by **such party** of any defenses, rights or remedies of the **other party**. No failure by either party to assert any right under this Agreement shall preclude any later assertion of such right.

**Validity and Enforceability**

41.    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions hereof, and any such invalid or unenforceable provision shall be deemed to be severable.

**Singular Shall Include Plural**

42.    Wherever required by the context in this Agreement, the singular shall include the plural, and the term "Author" shall include the "Authors" if there are more than one.

**Entire Agreement**

43.    This Agreement constitutes the entire understanding of the parties concerning the subject matter hereof, and may not be modified except by an instrument in writing signed by the party to be charged.

**Captions**

44.    Captions are for convenience only, and are not to be deemed part of this Agreement.


IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first set forth above.


AUTHOR                                                    SIMON & SCHUSTER, INC.


_____                    By_____
Vickie M. Stringer                                              AUTHORIZED SIGNATURE

Editor: Malaika Adero

# Exhibit E

*K # 10081807*

# Publishing Agreement

## SIMON & SCHUSTER, INC.
1230 Avenue of the Americas
New York, New York 10020
(212) 698-7000

*Atria Books*

AGREEMENT dated May 10, 2011 between **SIMON & SCHUSTER, INC.** (the "Publisher"), 1230 Avenue of the Americas, New York, New York 10020, and

**VICKIE M. STRINGER** (the "Author"), 3124 Genevive Drive, Columbus, OH 43219.

In consideration of the premises hereinafter set forth, Publisher and Author hereby agree with respect to a work tentatively entitled:

## LOW DOWN AND DIRTY

(the "Work").

## I. Rights Granted

### The Grant and the Territory

1.    Author grants to Publisher during the full term of copyright and any renewal or extensions thereof the exclusive right to publish the Work including the right to exercise or license the rights set forth in Paragraph 2 in throughout the world in all languages.

### Subsidiary Rights

2.    (a) The Publisher shall have the right, in the territories set forth in Paragraph 1, to exercise the following rights in the Work or to license such rights upon such terms as Publisher deems advisable **(subject to certain rights of approval reserved by the Author)**: book club rights; anthology/permission rights **(provided that no one selection will exceed approximately 10% of the length of the Work)**; second serial rights (*i.e.* publication after first publication in book form, **subject to any limitation required under any prior disposition of first periodical rights**); abridgment/condensation and digest rights **(after publication of the first trade edition)**; large print rights; reprint and special edition rights; electronic text rights as defined in Paragraph 34(a); audio rights as defined in Paragraph 34(b); first serial rights (*i.e.*, publication before first publication in book form); British Commonwealth rights; and foreign language rights. **Author will have the right to approve any abbreviated version of the Work to be published by the licensee of digest rights, unless such rights are licensed to *Readers' Digest*. Publisher will consult with the Author on its exercise of large print rights and hardcover reprint rights.**

(b) Any grant of first or second serial rights shall specifically prohibit the licensee from reproducing all or a substantial portion of the Work.

(c) Publisher may license others free of charge to publish the Work in Braille or other forms for the handicapped.

(d) Publisher may authorize copyright and permissions clearance organizations to act in full or in part on its behalf **(but shall not directly charge the Author for service of such organizations)** and Publisher shall account to the Author for royalties received from such organizations designated as arising from reproduction of the Work.

(e) The party who controls motion picture, dramatic and television rights is authorized to publish and to license others to publish, in any form, excerpts, summaries and serializations, none to exceed 7,500 words in length, of motion picture, television, stage and other dramatizations based upon the Work for use in advertising and promotion of any such dramatization, and not for resale. The party who authorizes such publication shall take all steps necessary to protect the copyright in the Work.

(f) The Publisher shall notify the Author promptly after each disposition of rights, but inadvertent failure to do so will not be deemed a breach of this Agreement. The Publisher shall provide the Author with copies of any license agreements relating to the Work on Author's request therefor.

(g) Publisher shall have the right, **with the approval of the Author, such approval not unreasonably to be withheld or delayed,** to license the rights set forth in subparagraph (a) above to Publisher's parent, subsidiaries, affiliates and divisions, provided that the terms for such license are no less favorable to the Author than the terms which Publisher in its reasonable judgment would accept from an unrelated third party licensee for the same rights.

(h) **The Publisher shall consult with the Author about the timing of the Publisher's first publication of the Work.**

## Option

3.    (a) The Author grants the Publisher an exclusive option to acquire the Author's next (*i.e.*, written after the Work) full-length work **of fiction** for publication on mutually satisfactory terms. If, within **45** days following submission of **a full and complete outline for** such work to the Publisher, **which submission shall not occur until after delivery and acceptance of the complete manuscript for the Work,** Publisher and Author are unable in good faith to agree upon terms for publication, the Author shall be free thereafter to **sell or license** such next work to **an**other publisher, provided, however, that the Publisher shall retain the first option to acquire the work on terms no less favorable to the Author than those offered by any other publisher. During the exclusive period of this option, Author shall not submit such next work to other publishers, nor seek offers from or negotiate with others with respect thereto.

(b) In the event that the Author's next work **of fiction** is a short work (*i.e.*, a work of less than traditional book length, intended for the general trade market), the Author also grants the Publisher an exclusive option to acquire the Author's next (*i.e.*, written after the Work) short work **of fiction** for publication on mutually satisfactory terms. If, within **30** days following submission of the final manuscript of such work to the Publisher, **which submission shall not occur until after delivery and acceptance of the complete manuscript for the Work,** Publisher and Author are unable in good faith to agree upon terms for publication, the Author shall be free thereafter to **sell or license** such work to **an**other publisher, provided, however, that the Publisher shall retain the first option to acquire said short work on terms no less favorable to the Author than those offered by any other publisher. During the exclusive period of this option, Author shall not submit such work to other publishers, nor seek offers from or negotiate with others with respect thereto.

## II. Manuscript Delivery

### Delivery of the Manuscript, Related Materials and Permissions

4.    (a) The Author shall deliver to the Publisher one copy of the complete, legible, typewritten manuscript of the Work in the English language (double-spaced, properly margined), satisfactory to the Publisher in length, content and form, on or before August 1, 2011. The Work shall be 75,000-90,000 words in length and is described as follows: the next novel in the Author's series featuring the notorious Raven "Dirty Red" Gomez. The Author shall also **use**

**reasonable efforts to** deliver diskettes or other electronic format specified by Publisher containing the Work, **but a failure to do so shall not be considered a breach of this Agreement**.

(b) As part of the complete manuscript, the Author shall, at Author's expense, furnish to Publisher photographs, drawings, charts, maps, illustrations, appendix, bibliography and other related material (herein "related materials") necessary in Publisher's **and Author's mutual** opinion for publication of the Work, all in content and form satisfactory to Publisher. ~~If the Publisher decides there is to be an index in the Work the Publisher will be responsible for preparation of the index and shall charge such cost against the Author's royalty account.~~

(c) If permission from others is **legally** required for publication of any material contained in the Work or for exercise of any of the rights conferred by this Agreement, Author shall obtain such permissions at Author's expense, in form acceptable to Publisher, and shall deliver such permissions to the Publisher as part of the complete manuscript of the Work. Permissions shall cover all territories, rights and editions covered by this Agreement.

(d) If the Author fails to deliver the related materials or required permissions, Publisher shall have the right, but not the obligation, to obtain the same and in such event the **reasonable** cost of such preparation shall be borne by the Author as follows: (i) Author shall pay such costs upon receipt of an invoice from the Publisher; (ii) Publisher may withhold a portion of any advances payable to the Author under this Agreement and deduct such costs from said advances; or (iii) at Publisher's option, Publisher may charge such cost to Author's royalty account, provided however that if the advance payable to the Author under this Agreement is unearned one year after publication of the Work, then Author will reimburse Publisher for such costs upon receipt of an invoice from Publisher.

## III.    Payments to the Author

### Advance

5.    Publisher shall pay Author, as an advance against all amounts accruing to Author under this Agreement, the sum of $75,000, payable as follows:

$25,000 on signing of this Agreement;

$20,000 on delivery and acceptance of the complete manuscript for the Work, as satisfactory to the Publisher;

$20,000 on Publisher's first publication of the Work, or 12 months after acceptance of the complete manuscript, whichever is earlier; and

$10,000 on Publisher's first publication of the trade paperback edition of the Work, or 24 months after acceptance of the complete manuscript, whichever is earlier.

### Royalties

6.    The Publisher shall pay the Author royalties on all copies of the Work sold by the Publisher, less returns, as follows:

(a) if published as a hardcover edition, 10% of the catalog retail price on the first 5,000 copies sold, 12½% of the catalog retail price on the next 5,000 copies sold, and 15% of the catalog retail price on all copies sold thereafter, subject to the exceptions set forth below;

(b) if published as a trade paperback edition, 7½% of the catalog retail price on all copies sold, subject to the exceptions set forth below;

(c) if published as a mass-market paperback edition, 8% of the catalog retail price on the first 150,000 copies sold, and 10% of the catalog retail price on all copies sold thereafter, subject to the exceptions set forth below;

(d) if published as an electronic text (e-book) or electronic audio (e-audio) edition, 25% of the net amount actually received from such sales. However, should marketplace conditions change such that said royalty rate is below prevailing market rates, Publisher agrees to renegotiate the royalty rate at Author's request at any time following three years after first publication of the e-book edition;

(e) if published as an audio edition, 5% of the catalog retail price on the first 10,000 copies sold, 6% of the catalog retail price on the next 10,000 copies sold, and 7% of the catalog retail price on all copies sold thereafter, subject to the exceptions set forth below;

(f) if published as a large print edition, 10% of the net amount actually received from such sales, subject to the exceptions set forth below;

(g) if published as a low-cost hardcover edition, 10% of the net amount actually received from such sales, subject to the exceptions set forth below;

(h) on copies of the hardcover and trade paperback editions sold for export to third parties or outside the United States by Publisher or its affiliates, royalties shall be calculated on the net amount actually received from such sales. On copies of the mass-market paperback, large print, low-cost hardcover and calendar editions sold for export to third parties or outside the United States by Publisher or its affiliates, the royalty shall be 5% of the net amount actually received from such sales. On copies of the audio edition sold for export to third parties or outside the United States by Publisher or its affiliates, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(i) on mail order sales and other direct response sales excluding such sales made through Publisher's own websites, the royalty shall be 5% of the net amount actually received from such sales, except that on mail order sales and other direct response sales excluding such sales made through Publisher's own websites of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(j) on special discount sales (as defined in Paragraph 34(d)), the royalty shall be **10%** of the net amount actually received from such sales, except that on special discount sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(k) on copies sold to book clubs on a royalty-inclusive basis, the royalty shall be 5% of the net amount actually received from such sales, except that on copies of the audio edition sold to book clubs on a royalty-inclusive basis, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(l) on remainder-in-place sales (as defined in Paragraph 34(e)) and remainder sales, the royalty shall be 5% of the net amount actually received from such sales, except that on remainder-in-place sales and remainder sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales, and except that no royalty shall be payable on copies of the Work sold at a discount of 85% or more from the catalog retail price;

(m) on any revised edition of the Work, royalties will be computed separately from the number of copies sold of prior editions. If individuals other than Author revise any edition of the Work and are entitled to royalties on such edition, then Author shall receive royalties on such edition at rates to be negotiated in good faith.

**Proceeds on License of Subsidiary Rights**

7.      The Publisher shall pay the Author 50% of the proceeds received by Publisher from the sale or license of subsidiary rights, except as follows:

| Type of Right | Author's Share | Publisher's Share |
|---|---|---|
| first serial rights (*i.e.* publication before first publication in book form) | 90% | 10% |
| British Commonwealth rights for all editions of the Work except the audio edition | 80% | 20% |
| foreign language rights for all editions of the Work except the audio edition | 75% | 25% |

In calculating the proceeds on disposition of the subsidiary rights, Publisher may deduct from the gross amount received any third party agent's commission which may be paid for services rendered in connection with such disposition, and any bank fees or other monetary transfer charges incurred by the Publisher in connection with or by reason of such sale or disposition.

**Special Royalty Provisions**

8.      With respect to each edition of the Work published hereunder, the following shall be applicable:

(a) no royalty shall be payable on copies damaged or destroyed or on copies furnished gratis for review, publicity, promotion, sample or similar purposes;

(b) no royalty shall be payable on sales by Publisher to its parent, subsidiaries, affiliates, or related divisions for resale, but any resale thereby shall be deemed a sale by Publisher subject to the applicable royalty herein provided;

(c) in some instances Publisher prints on the jackets and/or covers of its books a suggested cover price that is higher than its catalog retail price. In such instances, where the royalty is based on the retail price, the catalog retail price, not the suggested cover price, shall be the basis for the computation. The difference between the two prices enables the retailer to recoup its freight costs;

(d) when the Publisher in its sole discretion determines that copies of the Work are not readily salable at regular prices within a reasonable time, the Publisher may remainder copies of the Work (**but not earlier than 12 months from the publication date unless it is a remainder-in-place, which may occur at any time**) or dispose of such copies as surplus at the best price obtainable. Publisher shall make no remainder sale (other than a remainder-in-place sale) without first offering copies to the Author at the estimated remainder price, provided, however, that inadvertent failure to offer such copies to the Author will not be deemed a material breach of this Agreement;

(e) any advance royalties or other sums paid to or on behalf of the Author under this Agreement, and any amounts due from the Author to the Publisher **under this Agreement**, may be applied in reduction of any amounts payable to the Author under this Agreement;

(f) in the event of any overpayment by Publisher to Author, Publisher may, in addition to any other remedies available to it, recoup such overpayment from any sums due to Author under this Agreement or any other agreement between Author and Publisher. **An unearned advance shall not be deemed an overpayment**;

(g) any amounts payable to the Author hereunder shall be subject to such reasonable reserve for returns of copies of the Work as the Publisher shall establish in its reasonable

discretion. **Following the fourth full accounting period after publication, Publisher's reserve for returns shall not exceed 20% of the total copies theretofore shipped and not returned, except that (i) after each subsequent substantial printing, the reserve may be reasonably increased above 20% for four additional accounting periods, (ii) Publisher may maintain a reserve in excess of 20% which reserve is equal to the actual percentage of returns in the preceding period, and (iii) Publisher may maintain a higher reserve for any period preceding or during which it is expected that the Work will be or is out of print or is remaindered. Reserves shall be maintained separately with respect to each edition (hardcover, paperback, etc.);**

(h) if the Publisher exercises rights for which royalties are not specifically set forth in this Agreement, then royalties shall be paid to the Author at rates to be negotiated in good faith by the Author and Publisher.

## Royalty Statements

9.    (a) Publisher shall render royalty statements and make accounting and royalty and other payments to the Author (i) in February for the preceding period April 1 to September 30, and (ii) in August for the preceding period October 1 to March 31. Publisher may from time to time change such accounting periods provided no longer than six months elapses between any two accountings to the Author. If for any royalty period the current period total activity in the Author's account for the Work is less than $100, Publisher may defer the rendering of payment until such royalty period as the cumulative activity since the last statement exceeds such amount.

(b) Royalty statements shall state the number of copies sold and returned during the period covered and the reserve for returns being held by the Publisher. If the Author so requests in writing, the Publisher shall, within 60 days after its receipt of such request, advise the Author in available detail of the number of copies printed, sold, and given away during the current period covered by the last royalty statement rendered to the Author, as well as the approximate number of salable copies on hand at the end of said period.

(c) Statements rendered hereunder shall be final and binding upon the Author unless objected to in writing, setting forth the specific objections thereto and the basis for such objections, within **three** years after the date **Publisher renders** the statement.

(d) **When the Publisher has disposed of any subsidiary rights in the Work, any proportionate share of the proceeds due to the Author in accordance with Paragraph 7, less any unearned advances and after the Publisher's allowances for reserve for returns, shall be paid at the time the next succeeding royalty statement is rendered; provided, however that with respect to any advances actually received by Publisher in connection with the disposition of U.S. mass market paperback rights or book club rights, if the Author makes a written request for immediate payment after such a disposition, the Publisher shall pay the Author's share of such advance received by Publisher (after such deductions) within 30 days after receiving such written request.**

## Examination of Publisher's Books and Records

10.    The Author or the Author's representative may, upon written request not more than once each year, conduct a reasonable examination of the books and records of the Publisher insofar as they relate to the Work for the period of **three** years immediately preceding such examination. Such examination shall be on Publisher's premises at a time convenient to Publisher, but no later than 90 days after Author's request therefor, and shall be at Author's expense **unless errors of accounting amount to 5% or more of the total amount accrued to the Author shall be found to the Author's disadvantage, in which case the reasonable cost of the examination shall be borne by the Publisher.**

## IV.    Failure to Deliver the Manuscript; Acceptance of the Manuscript

**Failure to Deliver the Manuscript**

11.    Timely delivery of the Work, satisfactory to the Publisher in length, content and form, is essential to the Publisher and is of the essence of this Agreement. If Author fails to deliver the complete manuscript of the Work, satisfactory to the Publisher in length, content and form, within **30 days of the** time specified, the Publisher shall have the option to give the Author a notice in writing terminating this Agreement, and in such event the Publisher may then recover and the Author shall repay **within 60 days after the date of such notice** all amounts advanced to the Author. In the event that the Author completes a manuscript for the Work after termination of this Agreement pursuant to the preceding sentence, then the Publisher shall have the option, exercisable within 30 days after receipt of said manuscript, to acquire the Work on the same terms and conditions as provided in this Agreement.

**Extension of Time to Deliver**

12.    Publisher may in its discretion extend for such period as in its judgment is appropriate, or refuse to extend, Author's time to deliver the complete manuscript. Any extension of the delivery date must be in writing signed by the Publisher. In determining whether to grant such extension and/or the length thereof, Publisher may consider such factors as Publisher deems relevant, including without limitation, Author illness and the changing marketability of the Work.

**Acceptance of Manuscript**

13.    (a) The Publisher shall not be obligated to accept or publish the Work if in its sole judgment the Work is not acceptable to it. If the Author delivers a manuscript of the Work within the time specified, in what the Author represents to be its complete and final form, the Publisher shall, within 90 days after its receipt thereof, determine whether the Work is acceptable to it. In lieu thereof, Publisher may request in writing that Author make revisions, changes or supplements ("revisions") thereto. If Publisher requests one or more revisions in the manuscript as submitted or as thereafter revised, Publisher's time to determine the acceptability thereof shall be extended for a period of 60 days after resubmission by the Author, or 60 days after Publisher's receipt of written notice by Author that no further revisions will be made. Author will make revisions as promptly as possible after Publisher's request therefor. No request for revisions shall be deemed to obligate Publisher to accept the final revision or to constitute a conditional acceptance thereof. If the Publisher in its sole discretion determines to submit the manuscript to a legal review, the Author shall cooperate with the Publisher or Publisher's counsel in such review and notwithstanding anything to the contrary in this Agreement the time for Publisher to accept or reject the Work shall be extended to 30 days after completion of the legal review.

(b) Acceptance of the manuscript shall be made by written notice signed by an authorized signatory of the Publisher. Payment of an advance installment, payable by express provision hereof upon acceptance of the manuscript, shall constitute written notice of acceptance unless such payment is accompanied by a notice to the contrary.

(c) If the Publisher fails to accept the complete manuscript or revised complete manuscript within the time periods provided in subparagraph (a) above, the Author shall thereafter have the right to notify Publisher in writing that unless the manuscript is accepted or written request for revisions provided within 15 business days after the delivery of such notice, the manuscript will be deemed unacceptable and this Agreement shall terminate in accordance with the provisions of subparagraph (d) below.

(d) If the complete manuscript or revised complete manuscript of the Work delivered by the Author is not, in Publisher's sole judgment, acceptable to the Publisher, the Author shall repay all sums advanced to the Author hereunder **in accordance with the provisions of subparagraph (e) below** and upon such repayment this Agreement shall terminate.

(e) In the event of termination of this Agreement because the complete manuscript or revised complete manuscript is unacceptable to the Publisher, the Author or the Author's duly authorized representative shall make every effort to sell the Work elsewhere, and the Author shall be obligated to repay all sums advanced hereunder but **for a period of 12 months after termination of this Agreement** such obligation shall be limited to repayment from the first (and all) proceeds of any contracts with others concerning the **rights in the Work granted to the Publisher under this Agreement** including, without limitation, rights listed in Paragraph 2 above. Author hereby transfers and assigns to Publisher, as security for the repayment of any advances which may become repayable pursuant to this paragraph, any and all monies which may hereafter become due or owing to Author from other persons or entities as a result of **the rights granted to the Publisher under this Agreement**, and Author hereby authorizes Publisher to apply such monies as and when received in liquidation of Author's obligation to repay such advances, until such obligation shall have been fully paid. Author hereby authorizes such other person or entity to give full force and effect to this assignment, and hereby releases and discharges such other person or entity from any and all liability to Author for any and all payment or payments made to Publisher pursuant to this paragraph. **At the end of the 12-month period any sums that have not been repaid shall become immediately due and payable to the Publisher.**

## V. Production and Publication of the Work

### Correction of Proofs

14.     Publisher shall furnish Author with one set of galleys or other first proofs and, at its option, subsequent proofs, and the Author shall return each set of proofs with Author's corrections to the Publisher within 21 days of receipt thereof. The Publisher also shall proofread the proofs. If the Author shall fail to return the corrected proofs within the 21-day period herein specified, the Publisher may publish the Work without the Author's approval of the proofs - provided, however, that if, because of illness or any other factor beyond the Author's control, the Author informs the Publisher that Author is unable so to return the corrected proofs, Author's time for correcting such proofs shall be extended for another 21-day period, and after that period the Publisher may publish the Work without the Author's approval of the proofs.

### Cost of Author's Alterations

15.     If, in the correction of proofs, the Author requests changes from the text of the manuscript, the Author shall bear the cost of such changes, **other than the cost of correcting printer's errors,** over 15% of the original cost of composition, as follows: (a) Author shall pay such costs upon receipt of an invoice from the Publisher; (b) Publisher may withhold a portion of any advances payable to the Author under this Agreement and deduct such costs from said advances; or (c) at Publisher's option, Publisher may charge such cost to Author's royalty account, provided however that if the advance payable to the Author under this Agreement is unearned **18 months** after publication of the Work, then the Author will reimburse Publisher for such costs upon receipt of an invoice from Publisher. At Author's request Publisher shall submit an itemized statement of such charges and shall make available corrected proofs for the Author's inspection at the Publisher's office.

### Publication

16.     (a) The Publisher shall publish the Work in book form within 18 months after acceptance of the manuscript therefor. Publication shall be in any edition and under any imprint of Publisher or its affiliates that Publisher elects.

(b) Publisher shall have the right to use the name, pseudonym, **approved** portrait and **approved** picture of and **approved** biographical material concerning Author in and on the Work, in the advertising, publicity and promotion thereof, and in connection with any rights granted hereunder, **but not to endorse any product or service**. Author shall furnish Publisher, free of

charge, original photographs of Author which Publisher may use for such purposes without additional payment to or permission from any third party.

(c) The title of the Work as set forth on page 1 may **only** be changed by mutual agreement of the Author and the Publisher.

(d) The format, imprint, style of printing and binding, and all matters relating to the manufacture, sale, distribution and promotion of the Work shall be determined at the sole discretion of the Publisher. **The Publisher shall consult with the Author on the cover artwork for the Work. The Author shall have approval over the cover copy for the Work, such approval not to be unreasonably withheld or delayed.**

(e) The Publisher may publish and authorize others to publish extracts of the Work containing not more than one chapter for promotion of the Work, without compensation therefor. If compensation is received it shall be shared equally by Author and Publisher.

(f) **The Publisher will not include any advertisements in its edition of the Work or authorize others to do so without the Author's written approval, other than advertisements for the Publisher's own publications. No advertisements other than for other books by the Author will be placed inside the front cover.**

## Copyright

17.    (a) The Publisher shall identify the Author as the owner of the copyright in the Work and **shall** register such copyright in the United States in the name of the Author.

(b) The Publisher shall identify the Author as the owner of the © copyright in the audio edition of the Work. The Publisher shall be identified as the owner of the (P) copyright in the audio edition of the Work. Author hereby assigns, and Publisher shall own, all right, title and interest in and to the audio edition of the Work and all additions to, alterations of or revisions of the audio edition, and all drafts, notes, scripts, voice recordings and musical recordings related thereto, **but not the verbatim text of the Work.**

(c) The Publisher shall print in each copy of each edition of the Work published by it any notice required to comply with the applicable copyright laws of the United States and the provisions of the Universal Copyright Convention and the Berne Copyright Convention.

(d) Any agreements made by the Author or by the Publisher to dispose of any rights in the Work shall require the licensee or grantee to take all necessary and appropriate steps to protect the copyright in the Work. Whichever party controls first serial rights in the Work will use best efforts to require any licensee of such rights to include an acknowledgement accompanying the published excerpt stating that the excerpt is from an upcoming work to be published by the Publisher and setting forth the title of the Work, Author and Publisher by name.

(e) The Publisher may take such steps as it deems appropriate to copyright the Work in countries other than the United States, but the Publisher shall be under no obligation to procure copyright in any such countries, and shall not be liable to the Author for any acts or omissions by it in connection therewith. The Author may copyright the Work in any foreign country if the Publisher fails to take steps to obtain such a copyright within 30 days after receiving a written request from the Author to do so.

(f) Author hereby appoints Publisher to be Author's attorney-in-fact to execute and to file any and all documents necessary to record in the Copyright Office the assignment of exclusive rights made to Publisher hereunder.

## No Obligation to Publish

18.    Notwithstanding anything contained herein to the contrary, the Publisher shall not be obligated to publish the Work, if, **in the reasonable judgment of its own or outside counsel,**

whether before or after acceptance thereof, the Work contains libelous or obscene material, or its publication may violate the right of privacy, common law or statutory copyright, or any other right of any person or entity. In such event, **unless Author makes changes required by Publisher's legal counsel in such counsel's reasonable judgment,** Publisher shall be entitled on demand to the return of all monies advanced to the Author hereunder, and to terminate this Agreement. Notwithstanding any request by Publisher for change or substantiation, nothing in this Agreement shall be deemed to impose upon the Publisher any duty of independent investigation or to relieve the Author of any of the obligations assumed by Author hereunder, including, without limitation, the ongoing validity of Author's warranties and representations which shall apply to all material in the Work, whether or not changed at the request of Publisher's legal counsel.

## Delays in Publication

19.     (a) The Publisher, in its sole and absolute discretion, shall have the right to reschedule publication of the Work beyond the time set forth in Paragraph 16(a) for a reasonable time. If publication of the Work is delayed in the absence of excusable circumstances the Author's sole and exclusive remedy shall be to give the Publisher a notice in writing, stating that if the Publisher fails to publish the Work within **90** days after the date of such notice, then all of the Publisher's rights in and to the Work shall terminate at the end of such **90**-day period; and if, in such event, the Publisher shall fail to publish the Work within such **90**-day period, all of the Publisher's rights in and to the Work shall terminate and revert to the Author, and the Author shall be entitled, as liquidated damages and in lieu of all damages and remedies, legal or equitable, to retain all payments theretofore made to Author under this Agreement **and to receive any unpaid advances under Paragraph 5(a) above**.

        (b) If publication is delayed beyond the time set forth in Paragraph 16(a) because of acts or conditions beyond the control of the Publisher or its suppliers or contractors, including (by way of illustration and not by way of limitation) war, shortages of material, strikes, riots, civil commotions, fire or flood, the publication date shall be extended to a date **following removal of the cause of the delay but in no event longer than** six months following removal of the cause of the delay.

## Out of Print Termination

20.     If, at any time after the expiration of **one year** from the publication date of the Work, the Publisher allows all of its **United States** editions of **said Book** to go out of print and such status continues in effect for six months after the Author has **given Publisher written notice ("Reversion Notice")** to put the Work back into print, and if there is no English language reprint edition authorized by Publisher available or contracted for **within such six-month period, provided that such contract requires publication within nine months,** then the Author may by a notice in writing terminate this Agreement, subject to any licenses previously granted by Publisher (and any renewals or extensions thereof) and Publisher's right to continue to share in the proceeds therefrom. In the event of such termination the Author shall have the right to purchase any available plates or film of the Work at cost, and/or any remaining copies or sheets of at cost. If the Author does not purchase such plates, film, copies or sheets, then the Publisher may dispose of them at any price and retain the proceeds of such sale, **subject to payment to the Author of appropriate royalties.** The Publisher is under no obligation to retain any such plates, film, copies or sheets. The Work shall not be deemed out of print as long as it is available from the Publisher in any edition, including electronic text editions. If, **however, six months after Author's Reversion Notice, the Work is only available from the Publisher in an electronic text edition or by means of print-on-demand technology, the Author may by notice in writing terminate this Agreement in the manner set forth above provided in the prior 12 months Publisher's revenue from its exercise or license of rights in the Work (excluding revenue derived from the license of book club rights) was $1,000 or less. Upon reversion of print publishing rights from the Publisher to the Author under the provisions of this Paragraph 20, the Publisher also agrees to revert any audio rights in the Work provided the Publisher's audio edition is out of print and with the exception of any licensed audio editions which shall be governed by the provisions of the first sentence of this Paragraph.**

## VI.    Other Rights, Undertakings and Obligations

### Author's Rights

21.     All rights not expressly granted by the Author to the Publisher are reserved to the Author **for Author's own use and disposition**. The Author shall not exercise or dispose of any reserved rights in such a way as substantially to destroy, detract from, impair or frustrate the value of any rights granted herein to the Publisher, nor shall the Author publish or permit to be published **for a period of two years after publication of the Work (or one year if it is a sequel or prequel)** any ~~book or other writing~~ **novel** based substantially on subject matter, material, characters or incidents in the Work without the written consent of the Publisher **which consent shall not be unreasonably withheld.**

### Author's Agent

22.     **Deleted.**

### Representation by Single Author

23.     **Deleted.**

### Author's Warranties

24.     Author warrants and represents that:

(a) Author is the **sole** proprietor of **rights in** the Work **granted herein and has valid and subsisting written agreements with contributors to the Work (the "Contributors"), if any, including but not limited to the Author and any Writer, enabling the Author to grant the rights to the Publisher granted under this Agreement. The Author shall be solely responsible for performing the agreements with Contributors, shall do everything necessary to keep said agreements in effect, and shall not permit any alterations or termination thereof which would affect the Publisher's rights in the Work;**

(b) Author has full power and authority to make this Agreement and to grant the rights granted herein, and Author has not previously assigned, transferred or otherwise encumbered the same; and neither the Author nor the Author has any prior agreement, commitment or other arrangement, oral or written, to write or participate in writing any other book-length work and will enter into no such agreement, commitment or other arrangement until after delivery and acceptance of the Work;

(c) the Work has not been previously published;

(d) the Work is not in the public domain;

(e) the Work does not infringe any statutory or common law copyright or any proprietary right of any third party;

(f) the Work does not invade the right of privacy of any third person, or contain any matter libelous or otherwise in contravention of the rights of any third person; and, if the Work is not a work of fiction, all statements in the Work asserted as facts are true or based upon reasonable research for accuracy;

(g) the Work is not, **to the best of the Author's knowledge,** obscene and contains no matter the publication or sale whereof otherwise violates any federal or state statute or regulation thereunder, nor is it in any other manner unlawful, and nothing contained in the Work shall be injurious to the health of the user;

(h) neither this Agreement nor payments under this Agreement are subject any to so-called "Son of Sam" statute or any other federal, state or local victim compensation statutes;

(i) the Work will be the Author's next work (whether under the Author's name or otherwise), and that Author will not publish or authorize publication of (**but may contract for**) any other full-length work of which the Author is an author or co-author until six months after publication of the Work.

Each of the foregoing warranties and representations shall survive the termination of this Agreement.

Each of the foregoing warranties and representations is true on the date of the execution of this Agreement and shall be true on the date of publication of the Work, and at all intervening times. The Publisher may rely on the truth of said warranties and representations in dealings with any third party in connection with the exercise or disposition of any rights in the Work. The Publisher shall be under no obligation to make an independent investigation to determine whether the foregoing warranties and representations are true and correct; and any independent investigation by or for the Publisher, or its failure to investigate, shall not constitute a defense to the Author in any action based upon a breach of any of the foregoing warranties.

## Indemnity

25.    (a) The Author shall indemnify and hold the Publisher harmless against any loss, liability, damage, cost or expense (including reasonable attorneys' fees **but excluding the cost of Publisher's in-house attorneys**) arising out of or for the purpose of avoiding any suit, proceeding, claim or demand or the settlement thereof, which may be brought or made against the Publisher by reason of the publication, sale, or distribution of, or disposition of rights in respect to the Work, based on the contents of the Work, except in connection with matters involving solely controversies arising out of or based on commercial transactions between the Publisher and its customers. **The Publisher shall have the right, subject to the approval of the Author, such approval not to be unreasonably withheld, to settle such suit, proceeding, claim or demand on such terms as it deems advisable. If within such time as the situation may allow, the Publisher shall request the Author to consent to the proposed settlement, and the Author shall neglect or decline to do so, the Author shall upon written notice by the Publisher immediately undertake to continue the defense at Author's sole expense and shall provide the Publisher with security in the form of a surety company bond in the amount as shall under all circumstances be in the Publisher's opinion adequate. In the event the Author fails to so assume the defense, and to furnish such bond, the Publisher shall have the right to settle such matter upon terms Publisher thinks advisable or in its discretion to continue the defense thereof, and the Author's indemnity shall be applicable in either such event, provided, however, that nothing herein contained shall prohibit the Publisher from settling any such claim, suit, action or proceeding against it at its own cost and expense.**

(b) Prompt notice of any suit, proceeding, claim or demand brought or made against the Publisher or Author shall be given to the Author or Publisher respectively.

(c) Whenever any suit, claim or demand as to which Author's indemnity applies is instituted, the Publisher may withhold payments due to the Author under this Agreement, or any other agreement between the Author and the Publisher **and may apply the payments so withheld to Author's indemnity obligations hereunder. If a claim or demand shall not result in a suit or proceeding within one year after it is first asserted, Publisher shall not continue to withhold funds based on such claim or demand, but may in the future should a suit or proceeding be commenced.**

(d) Author shall be insured under **any** Publisher's liability policy which covers claims for libel and other forms of defamation, invasion of privacy or publicity and infringement of copyright or trademark arising from publication of the Work, to the extent such policy is valid and collectible. In connection with such coverage, with respect to all judgments, settlements and

costs of defense, including **reasonable outside** attorneys' fees and other costs of claims covered by the policy, the Publisher and the Author shall share equally **all costs not paid by the insurance company, provided however, that Author's share of such costs will not exceed Author's total earnings with respect to the Work. For purposes of this Paragraph, "Author's total earnings" shall mean all advances paid or payable to the Author with respect to the Work plus all further sums earned by Author from Publisher's sales and licenses of the Work.** Publisher shall retain counsel to represent Publisher and Author in any proceeding brought with respect to all such claims and shall control the defense of such claims, and Author shall cooperate fully with Publisher and said counsel in such defense. Notwithstanding the foregoing, Author shall be solely responsible for the cost of counsel separately retained by the Author for any reason and for judgments, settlements and costs of defense, including all **reasonable outside** attorneys' fees, attributable to a willful or reckless breach of this Agreement by Author, and for any **all costs not paid by the insurance company in any claim involving a** finding of any copyright infringement **or in the settlement of such a claim which Publisher in its good faith judgment determines is necessary to avoid such a finding. Nothing herein shall limit the Author's liability with respect to claims which are not covered by insurance or with respect to costs which exceed the limits of the insurance policy**.

(e) If any suit, claim or demand is brought or made as to which Author's indemnity applies which is not covered by Publisher's liability policy, the Publisher may elect (i) to undertake the defense thereof, or (ii) to notify the Author to undertake the defense. If the Publisher does so notify the Author, the Author shall undertake such defense; and in such cases the Publisher may, at its option, join in the defense. In all the foregoing events the cost and expense of any defense shall be borne by the Author.

## Revised Editions

26.    **Deleted.**

## Tie-In Editions

27.    Author shall use **reasonable good faith** efforts to obtain for Publisher the right to publish tie-in editions in connection with any motion picture, television or other dramatic versions of the Work, and to use the title, artwork, photographs, and other material related to any such version and appropriate identification and credits therefrom in Publisher's editions of the Work.

## Care of Property

28.    Publisher shall not be responsible for loss or damage to any property of Author in Publisher's possession or that of its independent contractors or to anyone to whom delivery is made with Author's consent. Author shall retain copies of any such property and, in the case of photographs, the negative for each photograph furnished.

## Breach by Publisher

29.    Except as otherwise specifically provided in this Agreement, if the Publisher shall commit a material breach of this Agreement and shall fail to remedy the breach within 60 days after receiving a written notice from the Author requesting the Publisher to remedy such breach, the Author may by a notice in writing (a) revoke the Publisher's right to publish the Work, if it has not been published at such time; (b) require the Publisher to cease further publication of the Work, if it has been published at such time; and (c) revoke the grant to the Publisher of such of the subsidiary rights as the Publisher has not already exercised or disposed of. In such event the Author shall have the right to purchase any available plates or film of the Work at cost, and/or remaining copies or sheets of the Work already printed at the Publisher's manufacturing cost. If the Author does not purchase such plates, film, copies or sheets, the Publisher may dispose of them at any price and retain the proceeds of such sale, **subject to the payment to the Author of**

**appropriate royalties**. The Publisher is under no obligation to retain any such plates, film, copies or sheets. Any right of the Author pursuant to Paragraph 10 shall survive such termination.

### Free Copies for Author, Purchases by Author

30.     (a) The Publisher shall present the Author with 50 free copies of each edition of the Work published by the Publisher, upon publication, except as provided in (b) below. The Author shall have the right to purchase additional copies for Author's own use, and not for resale, at a 50% discount from the catalog retail price. If the Author wishes to purchase copies of the Work for resale, Author shall negotiate the terms of such purchase with Publisher's Special Sales Department, it being understood that any resale of the Work by Author shall be outside regular trade channels.

(b) The Publisher will at Author's request present the Author with two free copies of the Work produced by means of print-on-demand technology, and will at Author's request present the Author with one free copy of the e-book edition of the Work.

### Publisher's Trademarks

31.     Nothing in this Agreement (including but not limited to the rights of Author to purchase books and plates on termination) shall give Author any right in or to any trademark, trade name, logo, imprint or other identification now or hereafter used by Publisher, nor shall Author use any such identification during the term of this Agreement or thereafter, except that Author may dispose of copies of the Work purchased hereunder notwithstanding that such identification may appear thereon when purchased.

### Third Party Copyright Infringement

32.     If during the existence of this Agreement the copyright, or any other right in respect to the Work, is infringed upon or violated, the Publisher may, at its own cost and expense, take such legal action, in the Author's and/or Author's name if necessary, as may be required to restrain such infringement and to seek damages therefor. The Publisher shall not be liable to the Author for the Publisher's failure to take such legal steps. If the Publisher does not bring such an action, the Author may do so in Author's own name and at Author's own cost and expense. Money damages recovered for an infringement shall be applied first toward the repayment of the expense of bringing and maintaining the action, and thereafter the balance shall be divided equally between the Author and Publisher.

### Execution of Documents

33.     Each party hereto shall, upon request of the other, execute such documents as may be reasonably necessary to confirm the rights of the other party in respect of the Work or to carry out the intention of this Agreement.

## VII.   Definitions

### Definitions

34.     As used in this Agreement:

(a)     (i) "Electronic text rights" shall mean the exclusive right to publish, and to authorize others to publish, the text of the Work (including any photographs and illustrations in the Work) in whole or in part, in visual form for reading **by the human eye**, by any **non-dramatic** electronic, electromagnetic or other means of storage, retrieval, distribution or

transmission now known or hereafter devised, but excluding any other text rights provided for herein (an "electronic edition"). In the exercise of the electronic text rights, the Publisher shall not add any textual, visual or other material to the Work, delete any material from or otherwise edit the Work, or couple any electronic edition of the Work with other works without the **written** approval of the Author, such approval not unreasonably to be withheld or delayed. Any license of electronic text rights in the Work shall provide that any additions to, deletions from, or other editing of the text of the Work by the licensee, and the coupling of any electronic edition of the Work with other works, shall be subject to the **written** approval of the Author, such approval not unreasonably to be withheld or delayed.

(ii) "Electronic adaptation rights" shall mean the exclusive right to adapt and publish, and to authorize others to adapt and publish, the Work or any portion thereof for one or more "electronic versions." As used herein, an "electronic version" shall mean an adaptation of the Work incorporating elements from sources other than the text of the Work including without limitation still photographs and illustrations, video footage, sound and other text, for publication by any electronic, electromagnetic or other means of storage, retrieval, distribution or transmission now known or hereafter devised, but excluding electronic text rights, audio rights, motion picture rights and television rights (provided that the exercise of any of the foregoing rights, if reserved by the Author or licensed to a third party, shall not preclude the exercise of the electronic adaptation rights). **Electronic adaptation rights are reserved to the Author. The Publisher shall have the first opportunity to acquire electronic adaptation rights on mutually satisfactory terms. If the Author and Publisher are unable in good faith to agree on terms for Publisher's acquisition of such rights within 30 days after they commence negotiations with respect thereto, then the Author shall be free thereafter to offer all or some of such rights to other parties, provided, however, that prior to entering into a commitment for such rights, the Author will advise Publisher of all material terms of such proposed commitment and the Publisher shall have ten days to acquire such rights on terms no less favorable to the Author than those offered by any other party. If the Publisher does not acquire such rights, Author may proceed to sell or license them to another party, provided, however, that the Author shall re-submit to Publisher, on the terms and conditions set forth herein, any offer Author is prepared to accept that is less favorable to the Author than the last offer rejected by the Publisher. If the Publisher does not license such rights, if the Author or a licensee of the Author wishes to use all or part of the text of the Work in an electronic version, the Publisher shall promptly authorize such use on reasonable terms and conditions, provided in the Publisher's reasonable judgment such text is not the predominant feature of such electronic version.**

(b) "audio rights" shall mean the exclusive right to use or adapt, and to authorize others to use or adapt, the Work or any portion thereof as the basis for one or more non-dramatic audio recordings through any method of recording or transmission now known or hereafter devised, including, without limitation, copying or recording by phonographic, magnetic, laser, electronic or any other means and whether on phonograph records, audio cassettes, audio discs or any other human or machine-readable medium and the broadcast or transmission thereof, but excluding all uses encompassed in motion picture, dramatic, television, radio and allied rights. **If the Publisher publishes its own audio edition of the Work, the Author will have the first opportunity to perform the voice recording services therefor, on terms and at a time and place which will be mutually agreed in good faith. If for any reason the parties are unable to agree, or if the Publisher in its sole discretion determines to engage an alternate reader, the Publisher will consult with the Author on such decision and on the person to be engaged. The Publisher will use its best efforts to cause the foregoing provision to be included in any sublicense of the audio rights made by the Publisher.**

(c) a "sale," "disposition" or "grant" of rights shall include an assignment, transfer or license of the rights referred to or of any interest or option relating to such rights.

(d) "special discount sales" shall mean sales made in the United States outside regular trade channels or direct-to-the-consumer through Publisher's websites at a discount of more than 50% from the catalog retail price, except that for audio editions of the Work "special discount sales" shall mean sales at a discount of more than 55% from the catalog retail price. With respect to special discount sales to organizations, Publisher may imprint the trade name, trademark, logo, imprint and/or other identification of such organization on such copies in addition to or in lieu of Publisher's trade name, trademark, logo, imprint and/or other identification;

(e) "remainder-in-place sales" shall mean sales made in the United States in regular trade channels at regular trade discounts, for which a 50% credit to the bookseller is subsequently given by Publisher.

**(f) as used herein, "net amount actually received" shall mean Publisher's gross receipts less (i) returns, (ii) shipping and handling charges, (iii) postage, (iv) distribution fees, (v) sales commissions and (vi) excise, sales, use or similar taxes.**

# VIII.  Miscellaneous Provisions

## Assignment

35.    This Agreement shall be binding upon and inure to the benefit of the executors, administrators and assigns of the Author, and upon and to the successors and assigns of the Publisher. The Author shall not assign this Agreement without the prior written consent of the Publisher, except that Author may assign sums due and payable to the Author hereunder, provided that such assignment shall not be binding upon Publisher unless and until Publisher shall have given written acknowledgement of its receipt thereof and such assignment shall not in any event affect Publisher's rights or Author's obligations hereunder. **The Publisher shall not assign this agreement without the written consent of the Author, such consent not unreasonably to be withheld, except that the Publisher may assign this agreement without the consent of the Author to a parent, affiliate or subsidiary company or to a purchaser of all or substantially all of its assets or in connection with a reorganization.** Any purported assignment **by Author or Publisher** in violation of this provision shall be void.

## Effectiveness

36.    This Agreement shall be binding upon the Publisher only when it has been signed by the Author and by an authorized officer of the Publisher.

## Jurisdiction

37.    Exclusive jurisdiction for the determination of any dispute solely between or among parties to this Agreement is hereby vested in the federal and state courts sitting in New York County, New York, to which each party irrevocably submits. In addition to service of process by any other means provided at the time by law, each party consents to service of process on him, her or it, as the case may be, by certified mail, first class postage prepaid, return receipt requested, or by overnight courier service provided a signed receipt is obtained, in each case addressed (i) to the party to be served at the address to which notices may be given pursuant to Paragraph 38 of this Agreement or (ii) to that party's actual residence or place of business, **such service of process not to be addressed in care of the Author's agent**. The refusal to accept process so served, including the failure to claim certified mail in the custody of the Postal Service, shall not invalidate such service if a separate copy of the process is sent by first class mail, postage paid, to the same address.

## Notices

38.    All notices to be given hereunder by either party shall be in writing and shall be sent to the other party at the respective addresses as they are given on page 1 of this Agreement, unless said addresses are changed by either party by a notice in writing to the other party. All notices shall be sent by registered or certified mail or other form of receipted or acknowledged delivery including a fax transmission acknowledged as received by the party to which it is sent. Notices to the Publisher shall be sent to the President **with a copy to the** General Counsel of Publisher **by first class mail with postage paid**.

**Applicable Law**

39.    THIS AGREEMENT AND ITS INTERPRETATION SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND ENTIRELY TO BE PERFORMED THEREIN.

**Waivers**

40.    No waiver **by either party** of any term or condition of this Agreement, or of any breach of this Agreement or of any part thereof, shall be deemed a waiver of any other term or condition of this Agreement or of any later breach of this Agreement or of any part thereof, nor shall publication or continued publication or payment by the Publisher **or acceptance of payment by the Author** following notice or claim of facts which, if true, would constitute a breach of **this agreement by either party**, constitute or imply any waiver by **such party** of any defenses, rights or remedies of the **other party**. No failure by either party to assert any right under this Agreement shall preclude any later assertion of such right.

**Validity and Enforceability**

41.    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions hereof, and any such invalid or unenforceable provision shall be deemed to be severable.

**Singular Shall Include Plural**

42.    Wherever required by the context in this Agreement, the singular shall include the plural, and the term "Author" shall include the "Authors" if there are more than one.

**Entire Agreement**

43.    This Agreement constitutes the entire understanding of the parties concerning the subject matter hereof, and may not be modified except by an instrument in writing signed by the party to be charged.

**Captions**

44.    Captions are for convenience only, and are not to be deemed part of this Agreement.


IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first set forth above.


AUTHOR                                   SIMON & SCHUSTER, INC.

_____                By _____
Vickie M. Stringer                          AUTHORIZED SIGNATURE


Editor: Malaika Adero

# Exhibit F

*K#10081808*

# Publishing Agreement

## SIMON & SCHUSTER, INC.
1230 Avenue of the Americas
New York, New York 10020
(212) 698-7000

*Atria Books*

AGREEMENT dated May 16, 2011 between **SIMON & SCHUSTER, INC.** (the "Publisher"), 1230 Avenue of the Americas, New York, New York 10020, and

**TRIPLE CROWN PUBLICATIONS** (the "Proprietor"), whose agent is Vickie M. Stringer, 3124 Genevive Drive, Columbus, OH 43219.

In consideration of the premises hereinafter set forth, Publisher and Author hereby agree with respect to two works tentatively entitled:

**CRACKHEAD ("Book 1"); and**
**CRACKHEAD 2 ("Book 2")**

(jointly, the "Work") by **LISA LENNOX** (the "Writer"). **Publisher acknowledges that earlier versions of Book 1 and Book 2 were previously published by the Proprietor. As a material condition precedent to the Publisher's performance of this Agreement, the Proprietor warrants and represents to the Publisher that the Proprietor shall cease all sale and distribution of said editions of each of Book 1 and Book 2 no later than August 16, 2011. After said off-sale date, the Proprietor shall refer all orders from the trade retail market for copies of each of Book 1 and Book 2 to the Publisher for fulfillment. Further, after such off-sale date, Proprietor shall only fulfill orders from outside the trade retail marketplace, including but not limited to direct mail channels, for copies of Book 1 and Book 2 with copies of the Publisher's edition thereof. If the Proprietor registered the copyright in the earlier versions of Book 1 and Book 2, Proprietor shall furnish to Publisher certified copies of the Original Copyright Registration Certificate for such earlier versions.**

## I. Rights Granted

### The Grant and the Territory

1.    Proprietor grants to Publisher during the full term of copyright and any renewal or extensions thereof the exclusive right to publish the Work including the right to exercise or license the rights set forth in Paragraph 2 in throughout the world in all languages.

### Subsidiary Rights

2.    (a) The Publisher shall have the right, in the territories set forth in Paragraph 1, to exercise the following rights in the Work or to license such rights upon such terms as Publisher deems advisable (**subject to certain rights of approval reserved by the Proprietor**): book club rights; anthology/permission rights (**provided that no one selection will exceed approximately 10% of the length of the Work**); second serial rights (*i.e.* publication after first publication in book form, **subject to any limitation required under any prior disposition of first periodical rights**); abridgment/condensation and digest rights (**after publication of the first trade edition**); large print rights; reprint and special edition rights; electronic text rights as defined in Paragraph 34(a); audio rights as defined in Paragraph 34(b); first serial rights (*i.e.*, publication before first publication in book form); British Commonwealth rights; and foreign language

rights. **Proprietor will have the right to approve any abbreviated version of the Work to be published by the licensee of digest rights, unless such rights are licensed to *Readers' Digest.* Publisher will consult with the Proprietor on its exercise of large print rights and hardcover reprint rights.**

(b) Any grant of first or second serial rights shall specifically prohibit the licensee from reproducing all or a substantial portion of the Work.

(c) Publisher may license others free of charge to publish the Work in Braille or other forms for the handicapped.

(d) Publisher may authorize copyright and permissions clearance organizations to act in full or in part on its behalf (**but shall not directly charge the Proprietor for service of such organizations**) and Publisher shall account to the Proprietor for royalties received from such organizations designated as arising from reproduction of the Work.

(e) The party who controls motion picture, dramatic and television rights is authorized to publish and to license others to publish, in any form, excerpts, summaries and serializations, none to exceed 7,500 words in length, of motion picture, television, stage and other dramatizations based upon the Work for use in advertising and promotion of any such dramatization, and not for resale. The party who authorizes such publication shall take all steps necessary to protect the copyright in the Work.

(f) The Publisher shall notify the Proprietor promptly after each disposition of rights, but inadvertent failure to do so will not be deemed a breach of this Agreement. The Publisher shall provide the Proprietor with copies of any license agreements relating to the Work on Proprietor's request therefor.

(g) Publisher shall have the right, **with the approval of the Proprietor, such approval not unreasonably to be withheld or delayed,** to license the rights set forth in subparagraph (a) above to Publisher's parent, subsidiaries, affiliates and divisions, provided that the terms for such license are no less favorable to the Proprietor than the terms which Publisher in its reasonable judgment would accept from an unrelated third party licensee for the same rights.

(h) **The Publisher shall consult with the Proprietor about the timing of the Publisher's first publication of each of Book 1 and Book 2.**

## Option

3.     (a) The Proprietor grants the Publisher an exclusive option to acquire the Proprietor's next (*i.e.*, written after the Work) full-length work **of fiction by the Writer** for publication on mutually satisfactory terms. If, within **45** days following submission of **a full and complete outline for** such work to the Publisher, **which submission shall not occur until after delivery and acceptance of the complete manuscript for Book 2,** Publisher and Proprietor are unable in good faith to agree upon terms for publication, the Proprietor shall be free thereafter to **sell or license** such next work to another publisher, provided, however, that the Publisher shall retain the first option to acquire the work on terms no less favorable to the Proprietor than those offered by any other publisher. During the exclusive period of this option, Proprietor shall not submit such next work to other publishers, nor seek offers from or negotiate with others with respect thereto.

(b) In the event that the Proprietor's next work **of fiction by the Writer** is a short work (*i.e.*, a work of less than traditional book length, intended for the general trade market), the Proprietor also grants the Publisher an exclusive option to acquire the Proprietor's next (*i.e.*, written after the Work) short work **of fiction by the Author** for publication on mutually satisfactory terms. If, within **30** days following submission of the final manuscript of such work to the Publisher, **which submission shall not occur until after delivery and acceptance of the complete manuscript for the Work,** Publisher and Proprietor are unable in good faith to agree upon terms for publication, the Proprietor shall be free thereafter to **sell or license** such work to another publisher, provided, however, that the Publisher shall retain the first option to acquire

said short work on terms no less favorable to the Proprietor than those offered by any other publisher. During the exclusive period of this option, Proprietor shall not submit such work to other publishers, nor seek offers from or negotiate with others with respect thereto.

## II. Manuscript Delivery

**Delivery of the Manuscript, Related Materials and Permissions**

4.    (a) The Proprietor **has delivered** to the Publisher one copy of the complete, legible, typewritten manuscript of each of Book 1 and Book 2 in the English language (double-spaced, properly margined), satisfactory to the Publisher in length, content and form.  Each Book is approximately 80,000 words in length and is described as follows: a novel by the pseudonymous Author. **The Proprietor shall deliver camera-ready, reproduction-quality final files or other electronic format specified by Publisher containing each of Book 1 and Book 2 on or before June 1, 2011.**

(b) As part of the complete manuscript, the Proprietor shall, at Proprietor's expense, furnish to Publisher photographs, drawings, charts, maps, illustrations, appendix, bibliography and other related material (herein "related materials") necessary in Publisher's **and Proprietor's mutual** opinion for publication of the Work, all in content and form satisfactory to Publisher. ~~If the Publisher decides there is to be an index in the Work the Publisher will be responsible for preparation of the index and shall charge such cost against the Proprietor's royalty account.~~

(c) If permission from others is **legally** required for publication of any material contained in the Work or for exercise of any of the rights conferred by this Agreement, Proprietor shall obtain such permissions at Proprietor's expense, in form acceptable to Publisher, and shall deliver such permissions to the Publisher as part of the complete manuscript of the Work. Permissions shall cover all territories, rights and editions covered by this Agreement.

(d) If the Proprietor fails to deliver the related materials or required permissions, Publisher shall have the right, but not the obligation, to obtain the same and in such event the **reasonable** cost of such preparation shall be borne by the Proprietor as follows: (i) Proprietor shall pay such costs upon receipt of an invoice from the Publisher; (ii) Publisher may withhold a portion of any advances payable to the Proprietor under this Agreement and deduct such costs from said advances; or (iii) at Publisher's option, Publisher may charge such cost to Proprietor's royalty account, provided however that if the advance payable to the Proprietor under this Agreement is unearned one year after publication of the Work, then Proprietor will reimburse Publisher for such costs upon receipt of an invoice from Publisher.

## III.    Payments to the Proprietor

**Advance**

5.    Publisher shall pay Proprietor, as an advance against all amounts accruing to Proprietor under this Agreement, the sum of $10,000, payable as follows:

$4,000 on signing of this Agreement;

$2,000 on delivery and Publisher's approval of the final files for Book 1;

$1,000 on Publisher's first publication of Book 1, or 12 months after delivery of the final files for Book 1, whichever is earlier;

$2,000 on delivery and Publisher's approval of the final files for Book 2; and

$1,000 on Publisher's first publication of Book 2, or 12 months after delivery of the final files for Book 2, whichever is earlier;

**Royalties**

6.    The Publisher shall pay the Proprietor royalties on all copies of the Work sold by the Publisher, less returns, as follows:

(a) if published as a hardcover edition, 10% of the catalog retail price on the first 5,000 copies sold, 12½% of the catalog retail price on the next 5,000 copies sold, and 15% of the catalog retail price on all copies sold thereafter, subject to the exceptions set forth below;

(b) if published as a trade paperback edition, 7½% of the catalog retail price on all copies sold, subject to the exceptions set forth below;

(c) if published as a mass-market paperback edition, 8% of the catalog retail price on the first 150,000 copies sold, and 10% of the catalog retail price on all copies sold thereafter, subject to the exceptions set forth below;

(d) if published as an electronic text (e-book) or electronic audio (e-audio) edition, 25% of the net amount actually received from such sales. However, should marketplace conditions change such that said royalty rate is below prevailing market rates, Publisher agrees to renegotiate the royalty rate at Proprietor's request at any time following three years after first publication of the e-book edition;

(e) if published as an audio edition, 5% of the catalog retail price on the first 10,000 copies sold, 6% of the catalog retail price on the next 10,000 copies sold, and 7% of the catalog retail price on all copies sold thereafter, subject to the exceptions set forth below;

(f) if published as a large print edition, 10% of the net amount actually received from such sales, subject to the exceptions set forth below;

(g) if published as a low-cost hardcover edition, 10% of the net amount actually received from such sales, subject to the exceptions set forth below;

(h) on copies of the hardcover and trade paperback editions sold for export to third parties or outside the United States by Publisher or its affiliates, royalties shall be calculated on the net amount actually received from such sales. On copies of the mass-market paperback, large print, low-cost hardcover and calendar editions sold for export to third parties or outside the United States by Publisher or its affiliates, the royalty shall be 5% of the net amount actually received from such sales. On copies of the audio edition sold for export to third parties or outside the United States by Publisher or its affiliates, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(i) on mail order sales and other direct response sales excluding such sales made through Publisher's own websites, the royalty shall be 5% of the net amount actually received from such sales, except that on mail order sales and other direct response sales excluding such sales made through Publisher's own websites of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(j) on special discount sales (as defined in Paragraph 34(d)), the royalty shall be **10%** of the net amount actually received from such sales, except that on special discount sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(k) on copies sold to book clubs on a royalty-inclusive basis, the royalty shall be 5% of the net amount actually received from such sales, except that on copies of the audio edition sold to book clubs on a royalty-inclusive basis, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales;

(l) on remainder-in-place sales (as defined in Paragraph 34(e)) and remainder sales, the royalty shall be 5% of the net amount actually received from such sales, except that on remainder-in-place sales and remainder sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (e) above, calculated on the net amount actually received from such sales, and except that no royalty shall be payable on copies of the Work sold at a discount of 85% or more from the catalog retail price;

(m) on any revised edition of the Work, royalties will be computed separately from the number of copies sold of prior editions. If individuals other than Proprietor revise any edition of the Work and are entitled to royalties on such edition, then Proprietor shall receive royalties on such edition at rates to be negotiated in good faith.

## Proceeds on License of Subsidiary Rights

7.    The Publisher shall pay the Proprietor 50% of the proceeds received by Publisher from the sale or license of subsidiary rights, except as follows:

| Type of Right | Proprietor's Share | Publisher's Share |
|---|---|---|
| first serial rights (*i.e.* publication before first publication in book form) | 90% | 10% |
| British Commonwealth rights for all editions of the Work except the audio edition | 80% | 20% |
| foreign language rights for all editions of the Work except the audio edition | 75% | 25% |

In calculating the proceeds on disposition of the subsidiary rights, Publisher may deduct from the gross amount received any third party agent's commission which may be paid for services rendered in connection with such disposition, and any bank fees or other monetary transfer charges incurred by the Publisher in connection with or by reason of such sale or disposition.

## Special Royalty Provisions

8.    With respect to each edition of the Work published hereunder, the following shall be applicable:

(a) no royalty shall be payable on copies damaged or destroyed or on copies furnished gratis for review, publicity, promotion, sample or similar purposes;

(b) no royalty shall be payable on sales by Publisher to its parent, subsidiaries, affiliates, or related divisions for resale, but any resale thereby shall be deemed a sale by Publisher subject to the applicable royalty herein provided;

(c) in some instances Publisher prints on the jackets and/or covers of its books a suggested cover price that is higher than its catalog retail price. In such instances, where the royalty is based on the retail price, the catalog retail price, not the suggested cover price, shall be the basis for the computation. The difference between the two prices enables the retailer to recoup its freight costs;

(d) when the Publisher in its sole discretion determines that copies of the Work are not readily salable at regular prices within a reasonable time, the Publisher may remainder copies of the Work (**but not earlier than 12 months from the publication date unless it is a remainder-in-place, which may occur at any time**) or dispose of such copies as surplus at the best price obtainable. Publisher shall make no remainder sale (other than a remainder-in-place sale) without first offering copies to the Proprietor at the estimated remainder price, provided, however, that

inadvertent failure to offer such copies to the Proprietor will not be deemed a material breach of this Agreement;

(e) any advance royalties or other sums paid to or on behalf of the Proprietor under this Agreement, and any amounts due from the Proprietor to the Publisher **under this Agreement,** may be applied in reduction of any amounts payable to the Proprietor under this Agreement;

(f) in the event of any overpayment by Publisher to Proprietor, Publisher may, in addition to any other remedies available to it, recoup such overpayment from any sums due to Proprietor under this Agreement or any other agreement between Proprietor and Publisher. **An unearned advance shall not be deemed an overpayment;**

(g) any amounts payable to the Proprietor hereunder shall be subject to such reasonable reserve for returns of copies of the Work as the Publisher shall establish in its reasonable discretion. **Following the fourth full accounting period after publication, Publisher's reserve for returns shall not exceed 20% of the total copies theretofore shipped and not returned, except that (i) after each subsequent substantial printing, the reserve may be reasonably increased above 20% for four additional accounting periods, (ii) Publisher may maintain a reserve in excess of 20% which reserve is equal to the actual percentage of returns in the preceding period, and (iii) Publisher may maintain a higher reserve for any period preceding or during which it is expected that the Work will be or is out of print or is remaindered. Reserves shall be maintained separately with respect to each edition (hardcover, paperback, etc.);**

(h) if the Publisher exercises rights for which royalties are not specifically set forth in this Agreement, then royalties shall be paid to the Proprietor at rates to be negotiated in good faith by the Proprietor and Publisher.

## Royalty Statements

9.    (a) Publisher shall render royalty statements and make accounting and royalty and other payments to the Proprietor (i) in February for the preceding period April 1 to September 30, and (ii) in August for the preceding period October 1 to March 31. Publisher may from time to time change such accounting periods provided no longer than six months elapses between any two accountings to the Proprietor. If for any royalty period the current period total activity in the Proprietor's account for the Work is less than $100, Publisher may defer the rendering of payment until such royalty period as the cumulative activity since the last statement exceeds such amount.

(b) Royalty statements shall state the number of copies sold and returned during the period covered and the reserve for returns being held by the Publisher. If the Proprietor so requests in writing, the Publisher shall, within 60 days after its receipt of such request, advise the Proprietor in available detail of the number of copies printed, sold, and given away during the current period covered by the last royalty statement rendered to the Proprietor, as well as the approximate number of salable copies on hand at the end of said period.

(c) Statements rendered hereunder shall be final and binding upon the Proprietor unless objected to in writing, setting forth the specific objections thereto and the basis for such objections, within **three** years after the date **Publisher renders** the statement.

(d) **When the Publisher has disposed of any subsidiary rights in the Work, any proportionate share of the proceeds due to the Proprietor in accordance with Paragraph 7, less any unearned advances and after the Publisher's allowances for reserve for returns, shall be paid at the time the next succeeding royalty statement is rendered; provided, however that with respect to any advances actually received by Publisher in connection with the disposition of U.S. mass market paperback rights or book club rights, if the Proprietor makes a written request for immediate payment after such a disposition, the Publisher shall pay the Proprietor's share of such advance received by Publisher (after such deductions) within 30 days after receiving such written request.**

## Examination of Publisher's Books and Records

10.    The Proprietor or the Proprietor's representative may, upon written request not more than once each year, conduct a reasonable examination of the books and records of the Publisher insofar as they relate to the Work for the period of **three** years immediately preceding such examination. Such examination shall be on Publisher's premises at a time convenient to Publisher, but no later than 90 days after Proprietor's request therefor, and shall be at Proprietor's expense **unless errors of accounting amount to 5% or more of the total amount accrued to the Proprietor shall be found to the Proprietor's disadvantage, in which case the reasonable cost of the examination shall be borne by the Publisher**.


# IV.    Failure to Deliver the Manuscript; Acceptance of the Manuscript


## Failure to Deliver the Manuscript

11.    **Deleted.**


## Extension of Time to Deliver

12.    **Deleted.**


## Acceptance of Manuscript

13.    **Deleted.**


# V. Production and Publication of the Work


## Correction of Proofs

14.    Publisher shall furnish Proprietor with one set of galleys or other first proofs and, at its option, subsequent proofs, and the Proprietor shall return each set of proofs with Proprietor's corrections to the Publisher within 21 days of receipt thereof. The Publisher also shall proofread the proofs. If the Proprietor shall fail to return the corrected proofs within the 21-day period herein specified, the Publisher may publish the Work without the Proprietor's approval of the proofs - provided, however, that if, because of illness or any other factor beyond the Proprietor's control, the Proprietor informs the Publisher that Proprietor is unable so to return the corrected proofs, Proprietor's time for correcting such proofs shall be extended for another 21-day period, and after that period the Publisher may publish the Work without the Proprietor's approval of the proofs.


## Cost of Proprietor's Alterations

15.    If, in the correction of proofs, the Proprietor requests changes from the text of the manuscript, the Proprietor shall bear the cost of such changes, **other than the cost of correcting printer's errors,** over 15% of the original cost of composition, as follows: (a) Proprietor shall pay such costs upon receipt of an invoice from the Publisher; (b) Publisher may withhold a portion of any advances payable to the Proprietor under this Agreement and deduct such costs from said advances; or (c) at Publisher's option, Publisher may charge such cost to Proprietor's

royalty account, provided however that if the advance payable to the Proprietor under this Agreement is unearned **18 months** after publication of the Work, then the Proprietor will reimburse Publisher for such costs upon receipt of an invoice from Publisher. At Proprietor's request Publisher shall submit an itemized statement of such charges and shall make available corrected proofs for the Proprietor's inspection at the Publisher's office.

## Publication

16.    (a) The Publisher shall publish each of Book 1 and Book 2 in book form within 18 months after the date of this Agreement. Publication shall be in any edition and under any imprint of Publisher or its affiliates that Publisher elects.

(b) Publisher shall have the right to use the **pseudonym, approved** portrait and **approved** picture of and **approved** biographical material concerning the Writer in and on the Work, in the advertising, publicity and promotion thereof, and in connection with any rights granted hereunder, **but not to endorse any product or service**. Proprietor shall furnish Publisher, free of charge, original photographs of Writer which Publisher may use for such purposes without additional payment to or permission from any third party.

(c) The title of the Work as set forth on page 1 may **only** be changed by mutual agreement of the Proprietor and the Publisher.

(d) The format, imprint, style of printing and binding, and all matters relating to the manufacture, sale, distribution and promotion of the Work shall be determined at the sole discretion of the Publisher. **The Publisher shall consult with the Proprietor on the cover artwork for the Work. The Proprietor shall have approval over the cover copy for the Work, such approval not to be unreasonably withheld or delayed.**

(e) The Publisher may publish and authorize others to publish extracts of the Work containing not more than one chapter for promotion of the Work, without compensation therefor. If compensation is received it shall be shared equally by Proprietor and Publisher.

(f) **The Publisher will not include any advertisements in its edition of the Work or authorize others to do so without the Proprietor's written approval, other than advertisements for the Publisher's own publications. No advertisements other than for other books by the Proprietor will be placed inside the front cover.**

## Copyright

17.    (a) The Publisher shall identify the Proprietor as the owner of the copyright in each of Book 1 and Book 2 and **shall** register such copyright in the United States in the name of the Proprietor.

(b) The Publisher shall identify the Proprietor as the owner of the © copyright in the audio edition of the Work. The Publisher shall be identified as the owner of the (P) copyright in the audio edition of the Work. Proprietor hereby assigns, and Publisher shall own, all right, title and interest in and to the audio edition of the Work and all additions to, alterations of or revisions of the audio edition, and all drafts, notes, scripts, voice recordings and musical recordings related thereto, **but not the verbatim text of the Work**.

(c) The Publisher shall print in each copy of each edition of the Work published by it any notice required to comply with the applicable copyright laws of the United States and the provisions of the Universal Copyright Convention and the Berne Copyright Convention.

(d) Any agreements made by the Proprietor or by the Publisher to dispose of any rights in the Work shall require the licensee or grantee to take all necessary and appropriate steps to protect the copyright in the Work. Whichever party controls first serial rights in the Work will use best efforts to require any licensee of such rights to include an acknowledgement accompanying the published excerpt stating that the excerpt is from an upcoming work to be

published by the Publisher and setting forth the title of the Work, Proprietor and Publisher by name.

(e) The Publisher may take such steps as it deems appropriate to copyright the Work in countries other than the United States, but the Publisher shall be under no obligation to procure copyright in any such countries, and shall not be liable to the Proprietor for any acts or omissions by it in connection therewith. The Proprietor may copyright the Work in any foreign country if the Publisher fails to take steps to obtain such a copyright within 30 days after receiving a written request from the Proprietor to do so.

(f) Proprietor hereby appoints Publisher to be Proprietor's attorney-in-fact to execute and to file any and all documents necessary to record in the Copyright Office the assignment of exclusive rights made to Publisher hereunder.

## No Obligation to Publish

18.    Notwithstanding anything contained herein to the contrary, the Publisher shall not be obligated to publish **Book 1 or Book 2** if, **in the reasonable judgment of its own or outside counsel**, whether before or after acceptance thereof, **said Book** contains libelous or obscene material, or its publication may violate the right of privacy, common law or statutory copyright, or any other right of any person or entity. In such event, **unless Author makes changes required by Publisher's legal counsel in such counsel's reasonable judgment**, Publisher shall be entitled on demand to the return of all monies advanced to the Author hereunder **with respect to said Book**, and to terminate this Agreement **with respect to said Book**. Notwithstanding any request by Publisher for change or substantiation, nothing in this Agreement shall be deemed to impose upon the Publisher any duty of independent investigation or to relieve the Author of any of the obligations assumed by Author hereunder, including, without limitation, the ongoing validity of Author's warranties and representations which shall apply to all material in the Work, whether or not changed at the request of Publisher's legal counsel.

## Delays in Publication

19.    (a) The Publisher, in its sole and absolute discretion, shall have the right to reschedule publication of **Book 1 and/or Book 2** beyond the time set forth in Paragraph 16(a) for a reasonable time. If publication of **Book 1 or Book 2** is delayed in the absence of excusable circumstances the Author's sole and exclusive remedy shall be to give the Publisher a notice in writing, stating that if the Publisher fails to publish **said Book** within **90** days after the date of such notice, then all of the Publisher's rights in and to **said Book** shall terminate at the end of such **90**-day period; and if, in such event, the Publisher shall fail to publish **said Book** within such **90**-day period, all of the Publisher's rights in and to **said Book** shall terminate and revert to the Author, and the Author shall be entitled, as liquidated damages and in lieu of all damages and remedies, legal or equitable, to retain all payments theretofore made to Author under this Agreement **with respect to said Book**.

(b) If publication is delayed beyond the time set forth in Paragraph 16(a) because of acts or conditions beyond the control of the Publisher or its suppliers or contractors, including (by way of illustration and not by way of limitation) war, shortages of material, strikes, riots, civil commotions, fire or flood, the publication date shall be extended to a date **following removal of the cause of the delay but in no event longer than** six months following removal of the cause of the delay.

## Out of Print Termination

20.    If, at any time after the expiration of **one year** from the publication date **of Book 1 or Book 2**, the Publisher allows all of its **United States** editions of **said Book** to go out of print and such status continues in effect for six months after the Proprietor has given Publisher written notice ("Reversion Notice") to put **said Book** back into print, and if there is no English language reprint edition Proprietorized by Publisher available or contracted for within such six-month

period, then the Proprietor may by a notice in writing terminate this Agreement **with respect to said Book** subject to any licenses previously granted by Publisher (and any renewals or extensions thereof) and Publisher's right to continue to share in the proceeds therefrom. In the event of such termination the Proprietor shall have the right to purchase any available plates or film of **said Book** at cost, and/or any remaining copies or sheets of **said Book** at cost. If the Proprietor does not purchase such plates, film, copies or sheets, then the Publisher may dispose of them at any price and retain the proceeds of such sale, **subject to payment to the Proprietor of appropriate royalties**. The Publisher is under no obligation to retain any such plates, film, copies or sheets. **Neither Book hereunder** shall be deemed out of print as long as it is available from the Publisher in any edition, including electronic text editions. If, however, six months after Proprietor's Reversion Notice **for Book 1 or Book 2, said Book** is only available from the Publisher in an electronic text edition or by means of print-on-demand technology, **the Proprietor may by notice in writing terminate this Agreement in the manner set forth above provided in the prior 12 months Publisher's revenue from its exercise or license of rights in Book 1 or Book 2 (excluding revenue derived from the license of book club rights) was $1,000 or less. Upon reversion of print publishing rights from the Publisher to the Proprietor under the provisions of this Paragraph 20, the Publisher also agrees to revert any audio rights in Book 1 or Book 2 (as the case may be) provided the Publisher's audio edition of such Book is out of print and with the exception of any licensed audio editions which shall be governed by the provisions of the first sentence of this Paragraph.**

## VI.   Other Rights, Undertakings and Obligations

### Proprietor's Rights

21.    All rights not expressly granted by the Proprietor to the Publisher are reserved to the Proprietor **for Proprietor's own use and disposition**. The Proprietor shall not exercise or dispose of any reserved rights in such a way as substantially to destroy, detract from, impair or frustrate the value of any rights granted herein to the Publisher, nor shall the Proprietor publish or permit to be published **for a period of two years after publication of each of Book 1 and Book 2 (or one year if it is a sequel or prequel)** any book or other writing novel based substantially on subject matter, material, characters or incidents in the Work without the written consent of the Publisher **which consent shall not be unreasonably withheld**.

### Proprietor's Agent

22.    If the Author has an agent, as indicated by the inclusion of an agent's name and address on page 1, until receipt by the Publisher of notice signed by the Author canceling the agent's authority hereunder, all payments accruing to the Author under this Agreement shall be made to such Author's agent, and the receipt by the Author's agent shall constitute a full and valid discharge of the Publisher's obligations for such payments under this Agreement. Author's agent is fully authorized to do and perform all acts on behalf of the Author in all matters arising out of or under this Agreement, and the Publisher may conclusively rely upon such authority until actual receipt by Publisher of written notice, signed by the Author, canceling or limiting such authority. No such revocation or limitation shall affect the validity of any act of the agent prior to receipt of such notice by the Publisher to the extent that the Publisher has relied thereon.

### Representation by Single Proprietor

23.    **Deleted.**

### Proprietor's Warranties

24.    Proprietor warrants and represents that:

(a) Proprietor is the **sole proprietor of rights in each of Book 1 and Book 2 granted herein and has valid and subsisting written agreements with contributors to each Book (the**

"Contributors"), including but not limited to the Proprietor and any Writer, enabling the Proprietor to grant the rights to the Publisher granted under this Agreement. The Proprietor shall be solely responsible for performing the agreements with Contributors, shall do everything necessary to keep said agreements in effect, and shall not permit any alterations or termination thereof which would affect the Publisher's rights in each of Book 1 and Book 2;

(b) Proprietor has full power and authority to make this Agreement and to grant the rights granted herein, and Proprietor has not previously assigned, transferred or otherwise encumbered the same; and neither the Proprietor nor the Proprietor has any prior agreement, commitment or other arrangement, oral or written, to write or participate in writing any other book-length work and will enter into no such agreement, commitment or other arrangement until after delivery and acceptance of the Work;

(c) **each of Book 1 and Book 2 has been previously published;**

(d) the Work is not in the public domain;

(e) the Work does not infringe any statutory or common law copyright or any proprietary right of any third party;

(f) the Work does not invade the right of privacy of any third person, or contain any matter libelous or otherwise in contravention of the rights of any third person; and, if the Work is not a work of fiction, all statements in the Work asserted as facts are true or based upon reasonable research for accuracy;

(g) the Work is not, **to the best of the Proprietor's knowledge,** obscene and contains no matter the publication or sale whereof otherwise violates any federal or state statute or regulation thereunder, nor is it in any other manner unlawful, and nothing contained in the Work shall be injurious to the health of the user;

(h) neither this Agreement nor payments under this Agreement are subject any to so-called "Son of Sam" statute or any other federal, state or local victim compensation statutes;

(i) the Work will be the Author's next work (whether under the Author's name or otherwise), and that Proprietor will not publish or authorize publication of (**but may contract for**) any other full-length work of which the Author is an author or co-author until six months after publication of each of Book 1 and Book 2.

Each of the foregoing warranties and representations shall survive the termination of this Agreement.

Each of the foregoing warranties and representations is true on the date of the execution of this Agreement and shall be true on the date of publication of the Work, and at all intervening times. The Publisher may rely on the truth of said warranties and representations in dealings with any third party in connection with the exercise or disposition of any rights in the Work. The Publisher shall be under no obligation to make an independent investigation to determine whether the foregoing warranties and representations are true and correct; and any independent investigation by or for the Publisher, or its failure to investigate, shall not constitute a defense to the Proprietor in any action based upon a breach of any of the foregoing warranties.

## Indemnity

25.   (a) The Proprietor shall indemnify and hold the Publisher harmless against any loss, liability, damage, cost or expense (including reasonable attorneys' fees **but excluding the cost of Publisher's in-house attorneys**) arising out of or for the purpose of avoiding any suit, proceeding, claim or demand or the settlement thereof, which may be brought or made against the Publisher by reason of the publication, sale, or distribution of, or disposition of rights in

respect to the Work, based on the contents of the Work, except in connection with matters involving solely controversies arising out of or based on commercial transactions between the Publisher and its customers. **The Publisher shall have the right, subject to the approval of the Proprietor, such approval not to be unreasonably withheld, to settle such suit, proceeding, claim or demand on such terms as it deems advisable. If within such time as the situation may allow, the Publisher shall request the Proprietor to consent to the proposed settlement, and the Proprietor shall neglect or decline to do so, the Proprietor shall upon written notice by the Publisher immediately undertake to continue the defense at Proprietor's sole expense and shall provide the Publisher with security in the form of a surety company bond in the amount as shall under all circumstances be in the Publisher's opinion adequate. In the event the Proprietor fails to so assume the defense, and to furnish such bond, the Publisher shall have the right to settle such matter upon terms Publisher thinks advisable or in its discretion to continue the defense thereof, and the Proprietor's indemnity shall be applicable in either such event, provided, however, that nothing herein contained shall prohibit the Publisher from settling any such claim, suit, action or proceeding against it at its own cost and expense.**

(b) Prompt notice of any suit, proceeding, claim or demand brought or made against the Publisher or Proprietor shall be given to the Proprietor or Publisher respectively.

(c) Whenever any suit, claim or demand as to which Proprietor's indemnity applies is instituted, the Publisher may withhold payments due to the Proprietor under this Agreement, or any other agreement between the Proprietor and the Publisher **and may apply the payments so withheld to Proprietor's indemnity obligations hereunder. If a claim or demand shall not result in a suit or proceeding within one year after it is first asserted, Publisher shall not continue to withhold funds based on such claim or demand, but may in the future should a suit or proceeding be commenced.**

(d) Proprietor shall be insured under **any** Publisher's liability policy which covers claims for libel and other forms of defamation, invasion of privacy or publicity and infringement of copyright or trademark arising from publication of the Work, to the extent such policy is valid and collectible. In connection with such coverage, with respect to all judgments, settlements and costs of defense, including **reasonable outside** attorneys' fees and other costs of claims covered by the policy, the Publisher and the Proprietor shall share equally **all costs not paid by the insurance company, provided however, that Proprietor's share of such costs will not exceed Proprietor's total earnings with respect to the Work. For purposes of this Paragraph, "Proprietor's total earnings" shall mean all advances paid or payable to the Proprietor with respect to the Work plus all further sums earned by Proprietor from Publisher's sales and licenses of the Work.** Publisher shall retain counsel to represent Publisher and Proprietor in any proceeding brought with respect to all such claims and shall control the defense of such claims, and Proprietor shall cooperate fully with Publisher and said counsel in such defense. Notwithstanding the foregoing, Proprietor shall be solely responsible for the cost of counsel separately retained by the Proprietor for any reason and for judgments, settlements and costs of defense, including all **reasonable outside** attorneys' fees, attributable to a willful or reckless breach of this Agreement by Proprietor, and for any **all costs not paid by the insurance company in any claim involving a finding of any copyright infringement or in the settlement of such a claim which Publisher in its good faith judgment determines is necessary to avoid such a finding. Nothing herein shall limit the Proprietor's liability with respect to claims which are not covered by insurance or with respect to costs which exceed the limits of the insurance policy.**

(e) If any suit, claim or demand is brought or made as to which Proprietor's indemnity applies which is not covered by Publisher's liability policy, the Publisher may elect (i) to undertake the defense thereof, or (ii) to notify the Proprietor to undertake the defense. If the Publisher does so notify the Proprietor, the Proprietor shall undertake such defense; and in such cases the Publisher may, at its option, join in the defense. In all the foregoing events the cost and expense of any defense shall be borne by the Proprietor.

<u>Revised Editions</u>

26.    **Deleted.**

**Tie-In Editions**

27.    Proprietor shall use **reasonable good faith** efforts to obtain for Publisher the right to publish tie-in editions in connection with any motion picture, television or other dramatic versions of the Work, and to use the title, artwork, photographs, and other material related to any such version and appropriate identification and credits therefrom in Publisher's editions of the Work.

**Care of Property**

28.    Publisher shall not be responsible for loss or damage to any property of Proprietor in Publisher's possession or that of its independent contractors or to anyone to whom delivery is made with Proprietor's consent. Proprietor shall retain copies of any such property and, in the case of photographs, the negative for each photograph furnished.

**Breach by Publisher**

29.    Except as otherwise specifically provided in this Agreement, if the Publisher shall commit a material breach of this Agreement and shall fail to remedy the breach within 60 days after receiving a written notice from the Proprietor requesting the Publisher to remedy such breach, the Proprietor may by a notice in writing (a) revoke the Publisher's right to publish the Work, if it has not been published at such time; (b) require the Publisher to cease further publication of the Work, if it has been published at such time; and (c) revoke the grant to the Publisher of such of the subsidiary rights as the Publisher has not already exercised or disposed of. In such event the Proprietor shall have the right to purchase any available plates or film of the Work at cost, and/or remaining copies or sheets of the Work already printed at the Publisher's manufacturing cost. If the Proprietor does not purchase such plates, film, copies or sheets, the Publisher may dispose of them at any price and retain the proceeds of such sale, **subject to the payment to the Proprietor of appropriate royalties**. The Publisher is under no obligation to retain any such plates, film, copies or sheets. Any right of the Proprietor pursuant to Paragraph 10 shall survive such termination.

**Free Copies for Proprietor, Purchases by Proprietor**

30.    (a) The Publisher shall present the Proprietor with 50 free copies of each edition of each of Book 1 and Book 2 published by the Publisher, upon publication, except as provided in (b) below. The Proprietor shall have the right to purchase additional copies for Proprietor's own use, and not for resale, at a 50% discount from the catalog retail price. If the Proprietor wishes to purchase copies of the Work for resale, Proprietor shall negotiate the terms of such purchase with Publisher's Special Sales Department, it being understood that any resale of the Work by Proprietor shall be outside regular trade channels.

       (b) The Publisher will at Proprietor's request present the Proprietor with two free copies of each of Book 1 and Book 2 produced by means of print-on-demand technology, and will at Proprietor's request present the Proprietor with one free copy of the e-book edition of each Book.

**Publisher's Trademarks**

31.    Nothing in this Agreement (including but not limited to the rights of Proprietor to purchase books and plates on termination) shall give Proprietor any right in or to any trademark, trade name, logo, imprint or other identification now or hereafter used by Publisher, nor shall Proprietor use any such identification during the term of this Agreement or thereafter, except that Proprietor may dispose of copies of the Work purchased hereunder notwithstanding that such identification may appear thereon when purchased.

**Third Party Copyright Infringement**

32.    If during the existence of this Agreement the copyright, or any other right in respect to the Work, is infringed upon or violated, the Publisher may, at its own cost and expense, take such legal action, in the Proprietor's and/or Proprietor's name if necessary, as may be required to restrain such infringement and to seek damages therefor. The Publisher shall not be liable to the Proprietor for the Publisher's failure to take such legal steps. If the Publisher does not bring such an action, the Proprietor may do so in Proprietor's own name and at Proprietor's own cost and expense. Money damages recovered for an infringement shall be applied first toward the repayment of the expense of bringing and maintaining the action, and thereafter the balance shall be divided equally between the Proprietor and Publisher.

**Execution of Documents**

33.    Each party hereto shall, upon request of the other, execute such documents as may be reasonably necessary to confirm the rights of the other party in respect of the Work or to carry out the intention of this Agreement.

# VII.   Definitions

**Definitions**

34.    As used in this Agreement:

(a)    (i) "Electronic text rights" shall mean the exclusive right to publish, and to authorize others to publish, the text of the Work (including any photographs and illustrations in the Work) in whole or in part, in visual form for reading **by the human eye**, by any **non-dramatic** electronic, electromagnetic or other means of storage, retrieval, distribution or transmission now known or hereafter devised, but excluding any other text rights provided for herein (an "electronic edition"). In the exercise of the electronic text rights, the Publisher shall not add any textual, visual or other material to the Work, delete any material from or otherwise edit the Work, or couple any electronic edition of the Work with other works without the **written** approval of the Proprietor, such approval not unreasonably to be withheld or delayed. Any license of electronic text rights in the Work shall provide that any additions to, deletions from, or other editing of the text of the Work by the licensee, and the coupling of any electronic edition of the Work with other works, shall be subject to the **written** approval of the Proprietor, such approval not unreasonably to be withheld or delayed.

(ii) "Electronic adaptation rights" shall mean the exclusive right to adapt and publish, and to authorize others to adapt and publish, the Work or any portion thereof for one or more "electronic versions." As used herein, an "electronic version" shall mean an adaptation of the Work incorporating elements from sources other than the text of the Work including without limitation still photographs and illustrations, video footage, sound and other text, for publication by any electronic, electromagnetic or other means of storage, retrieval, distribution or transmission now known or hereafter devised, but excluding electronic text rights, audio rights, motion picture rights and television rights (provided that the exercise of any of the foregoing rights, if reserved by the Proprietor or licensed to a third party, shall not preclude the exercise of the electronic adaptation rights). **Electronic adaptation rights are reserved to the Proprietor. The Publisher shall have the first opportunity to acquire electronic adaptation rights on mutually satisfactory terms. If the Proprietor and Publisher are unable in good faith to agree on terms for Publisher's acquisition of such rights within 30 days after they commence negotiations with respect thereto, then the Proprietor shall be free thereafter to offer all or some of such rights to other parties, provided, however, that prior to entering into a commitment for such rights, the Proprietor will advise Publisher of all material terms of such proposed commitment and the Publisher shall have ten days to acquire such rights on terms no less favorable to the Proprietor than those offered by any other party. If**

the Publisher does not acquire such rights, Proprietor may proceed to sell or license them to another party, provided, however, that the Proprietor shall re-submit to Publisher, on the terms and conditions set forth herein, any offer Proprietor is prepared to accept that is less favorable to the Proprietor than the last offer rejected by the Publisher. If the Publisher does not license such rights, if the Proprietor or a licensee of the Proprietor wishes to use all or part of the text of the Work in an electronic version, the Publisher shall promptly authorize such use on reasonable terms and conditions, provided in the Publisher's reasonable judgment such text is not the predominant feature of such electronic version.

(b) "audio rights" shall mean the exclusive right to use or adapt, and to authorize others to use or adapt, the Work or any portion thereof as the basis for one or more non-dramatic audio recordings through any method of recording or transmission now known or hereafter devised, including, without limitation, copying or recording by phonographic, magnetic, laser, electronic or any other means and whether on phonograph records, audio cassettes, audio discs or any other human or machine-readable medium and the broadcast or transmission thereof, but excluding all uses encompassed in motion picture, dramatic, television, radio and allied rights. **If the Publisher publishes its own audio edition of the Work, the Proprietor will have the first opportunity to perform the voice recording services therefor, on terms and at a time and place which will be mutually agreed in good faith. If for any reason the parties are unable to agree, or if the Publisher in its sole discretion determines to engage an alternate reader, the Publisher will consult with the Proprietor on such decision and on the person to be engaged. The Publisher will use its best efforts to cause the foregoing provision to be included in any sublicense of the audio rights made by the Publisher.**

(c) a "sale", "disposition" or "grant" of rights shall include an assignment, transfer or license of the rights referred to or of any interest or option relating to such rights.

(d) "special discount sales" shall mean sales made in the United States outside regular trade channels or direct-to-the-consumer through Publisher's websites at a discount of more than 50% from the catalog retail price, except that for audio editions of the Work "special discount sales" shall mean sales at a discount of more than 55% from the catalog retail price. With respect to special discount sales to organizations, Publisher may imprint the trade name, trademark, logo, imprint and/or other identification of such organization on such copies in addition to or in lieu of Publisher's trade name, trademark, logo, imprint and/or other identification;

(e) "remainder-in-place sales" shall mean sales made in the United States in regular trade channels at regular trade discounts, for which a 50% credit to the bookseller is subsequently given by Publisher.

(f) as used herein, **"net amount actually received" shall mean Publisher's gross receipts less (i) returns, (ii) shipping and handling charges, (iii) postage, (iv) distribution fees, (v) sales commissions and (vi) excise, sales, use or similar taxes.**

## VIII.  Miscellaneous Provisions

### Assignment

35.    This Agreement shall be binding upon and inure to the benefit of the executors, administrators and assigns of the Proprietor, and upon and to the successors and assigns of the Publisher. The Proprietor shall not assign this Agreement without the prior written consent of the Publisher, except that Proprietor may assign sums due and payable to the Proprietor hereunder, provided that such assignment shall not be binding upon Publisher unless and until Publisher shall have given written acknowledgement of its receipt thereof and such assignment shall not in any event affect Publisher's rights or Proprietor's obligations hereunder. **The Publisher shall not assign this agreement without the written consent of the Proprietor, such consent not unreasonably to be withheld, except that the Publisher may assign this agreement without the consent of the Proprietor to a parent, affiliate or subsidiary company or to a purchaser**

**of all or substantially all of its assets or in connection with a reorganization.** Any purported assignment **by Proprietor or Publisher** in violation of this provision shall be void.

## Effectiveness

36.    This Agreement shall be binding upon the Publisher only when it has been signed by the Proprietor and by an authorized officer of the Publisher.

## Jurisdiction

37.    Exclusive jurisdiction for the determination of any dispute solely between or among parties to this Agreement is hereby vested in the federal and state courts sitting in New York County, New York, to which each party irrevocably submits. In addition to service of process by any other means provided at the time by law, each party consents to service of process on him, her or it, as the case may be, by certified mail, first class postage prepaid, return receipt requested, or by overnight courier service provided a signed receipt is obtained, in each case addressed (i) to the party to be served at the address to which notices may be given pursuant to Paragraph 38 of this Agreement or (ii) to that party's actual residence or place of business, **such service of process not to be addressed in care of the Proprietor's agent.** The refusal to accept process so served, including the failure to claim certified mail in the custody of the Postal Service, shall not invalidate such service if a separate copy of the process is sent by first class mail, postage paid, to the same address.

## Notices

38.    All notices to be given hereunder by either party shall be in writing and shall be sent to the other party at the respective addresses as they are given on page 1 of this Agreement, unless said addresses are changed by either party by a notice in writing to the other party. All notices shall be sent by registered or certified mail or other form of receipted or acknowledged delivery including a fax transmission acknowledged as received by the party to which it is sent. Notices to the Publisher shall be sent to the President **with a copy to the** General Counsel of Publisher **by first class mail with postage paid.**

## Applicable Law

39.    THIS AGREEMENT AND ITS INTERPRETATION SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND ENTIRELY TO BE PERFORMED THEREIN.

## Waivers

40.    No waiver **by either party** of any term or condition of this Agreement, or of any breach of this Agreement or of any part thereof, shall be deemed a waiver of any other term or condition of this Agreement or of any later breach of this Agreement or of any part thereof, nor shall publication or continued publication or payment by the Publisher **or acceptance of payment by the Proprietor** following notice or claim of facts which, if true, would constitute a breach of **this agreement by either party,** constitute or imply any waiver by **such party** of any defenses, rights or remedies of the **other party.** No failure by either party to assert any right under this Agreement shall preclude any later assertion of such right.

## Validity and Enforceability

41.    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions hereof, and any such invalid or unenforceable provision shall be deemed to be severable.

**Singular Shall Include Plural**

42.    Wherever required by the context in this Agreement, the singular shall include the plural, and the term "Proprietor" shall include the "Proprietors" if there are more than one.

**Entire Agreement**

43.    This Agreement constitutes the entire understanding of the parties concerning the subject matter hereof, and may not be modified except by an instrument in writing signed by the party to be charged.

**Captions**

44.    Captions are for convenience only, and are not to be deemed part of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first set forth above.

TRIPLE CROWN PUBLICATIONS                    SIMON & SCHUSTER, INC.

By _____          _____
        AUTHORIZED SIGNATURE                 Judith Curr
                                             Executive Vice President & Publisher
                                             Atria Books
_____             Simon & Schuster, Inc.
        PRINT NAME


Editor: Malaika Adero

# Exhibit G



February 18, 2014


Vickie M. Stringer
3124 Genevieve Drive
Columbus, OH 43219

Dear Ms. Stringer:

This letter (the "Amendment"), when signed by you (for yourself and on behalf of Triple Crown Publications) and by Simon & Schuster, Inc. ("Publisher") will constitute our agreement with respect to the following agreements:

      Agreement dated October 20, 2003 for publication of two works entitled
      IMAGINE THIS and DIRTY RED;

      Agreement dated July 12, 2007 for publication of a work entitled
      LET THAT BE THE REASON;

      Agreement dated July 17, 2007 for publication of a work entitled
      STILL DIRTY;

      Agreement dated April 1, 2009 for publication of two works entitled
      THE REASON WHY and DIRTIER THAN EVER;

      Agreement dated May 10, 2011 for publication of a work entitled
      LOW DOWN AND DIRTY; and

      Agreement dated May 16, 2011 for publication of two works entitled
      CRACKHEAD I and CRACKHEAD II.

1.      The Publisher agrees to clear all royalty account debit balances in connection with the nine works which are the subjects of the above Agreements, beginning with the royalty statements due therefor in February 2015 for the preceding royalty period April 1, 2014 to September 30, 2014. For the avoidance of doubt, commencing with the royalty payment due in February 2015, any advance royalties or other sums previously paid to or on behalf of you under the above Agreements shall be annulled and shall not be applied to reduce or "zero out" any amounts (i.e., royalties) payable to you.

2.      In consideration of the releases and mutual promises contained herein, and for other good and valuable consideration exchanged between the parties, the receipt and sufficiency of which are hereby acknowledged, Publisher shall pay you the sum of $25,000 (the "Settlement Amount"), made by check payable to you, for which you shall receive a Form 1099 within 10 days of your delivery of the executed Amendment, provided you have provided Publisher with a completed W-9 at the same time as you deliver to Publisher the executed Amendment. You agree to pay any federal, state, or local taxes,



judgments and/or liens which you may be obligated to pay with respect to the Settlement Amount. You further agree to indemnify and hold Publisher harmless from any liability it may incur with respect to any and all taxes, imposts, judgments, liens or other withholdings that should have been paid on your behalf with respect to, or withheld from, the Settlement Amount, and to reimburse Publisher for all attorneys' fees and costs incurred in connection with same.

3.    You, on behalf of yourself and on behalf of Triple Crown Publications, and each of their present, future, and former heirs, executors, administrators, representatives, predecessors, successors, agents, affiliates, divisions, subsidiaries, officers, directors, shareholders, employees, attorneys, relatives, related companies, successors and assigns, and all of those claiming by, through, under, or in concert with any of them (collectively, the "Stringer Entities"), fully and unconditionally waive, release and forever discharge Publisher and its present, future, and former heirs, executors, administrators, representatives, predecessors, successors, relatives, assigns, parents, subsidiaries, related corporations and business entities, affiliates, partners, joint venturers, transferees, customers, licensees, sub-licensees, vendors, and contractors, and all of each of their present and former agents, employees, officers, directors, shareholders, representatives, insurers, and attorneys (collectively, the "Publisher Entities") from any and all claims, demands, actions, causes of action, suits, rights, losses, debts and expenses, including attorneys' fees and costs actually incurred, of any kind or nature whatsoever, whether based upon contract, tort, statute, or any other legal or equitable theory of recovery under the laws of any state or the United States, whether known or unknown, suspected or unsuspected, fixed or contingent, matured or unmatured, arising from events from the beginning of time to the date of full execution of this Amendment, including without limitation any and all claims relating to the termination of the Sales & Distribution Services Agreement, dated as of December 20, 2011, by and between Publisher and Triple Crown Publications (the "Distribution Agreement") and/or Publisher's treatment of the Distribution Agreement as a nullity. You recognize that this release includes, but is not limited to, all rights, claims and causes of action against the Publisher Entities or their insurers or any of them, from the beginning of time through the to the date of full execution of this Amendment, including, but not limited to, any rights, claims and causes of action, known or unknown, which were, or could have been, asserted, related to the Distribution Agreement or otherwise, except to the extent that any such claim arises from a future breach of this Amendment.

4.    Each party signing this Amendment as an agent or representative of any party hereby covenants and warrants to the other Party that the agent or representative is fully authorized to sign the Amendment on behalf of the party represented and is fully authorized to bind the party to all of the terms of this Amendment and that the execution of this Amendment has been authorized by all necessary corporate action. Each party further represents and warrants to the other party that it has the full power and authority to make this agreement and has not assigned or transferred any of the claims being released hereunder to a third party. Neither this Amendment nor any of its terms shall constitute or be construed as an admission of wrongdoing or liability by any party. This Amendment shall not be used for any purpose, except in a proceeding to enforce its terms. Nothing contained herein is intended to prevent the parties from enforcing this Amendment.

5.    This Amendment may be executed in one or more counterparts, all of which taken together shall constitute one and the same Amendment. Signatures hereon sent by facsimile or e-mail will be deemed as binding as original signatures. This Amendment, along with the Agreements, set forth the entire agreement between the parties and fully supersedes any and all prior agreements and understandings between the parties pertaining to the subject matter of this Amendment.

Page 3

6.      Each party represents and warrants that, in negotiating and executing this Amendment, it has had ample opportunity to consult with competent counsel and/or other representatives of its choosing concerning the meaning and effect of each term and condition hereof, that it has so consulted, and that there are no representations, promises, or agreements other than those expressly set forth in writing herein. Each party has carefully read this Amendment in its entirety, fully understands and agrees to its terms and conditions, intends and agrees that it is final and binding, and understands that, in the event of a breach, any party may seek relief, including damages, restitution, and injunctive relief, all without any requirement to post in connection therewith, at law or in equity, as specified herein. It is expressly understood and agreed between the parties that the terms and conditions of this Amendment, including the Settlement Amount, shall be kept confidential and shall not be disclosed to any person or entity, other than the parties' employees, counsel, accountants or financial advisors, without the prior written consent of the other party or their duly authorized representatives, absent legal compulsion or in the event of breach of this Amendment.

Except as herein expressly modified, the Agreements shall remain in full force and effect.

If the foregoing terms are in accordance with your understanding, please sign below and return it to us for our countersignature.

Sincerely,

ACCEPTED AND AGREED:                    SIMON & SCHUSTER, INC.

_____         By _____
Vicki M. Stringer, for herself and on behalf          AUTHORIZED SIGNATURE
of Triple Crown Publications

Form **W-9**
(Rev. August 2013)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer**
**Identification Number and Certification**

Give Form to the
requester. Do not
send to the IRS.

Name (as shown on your income tax return)
**Vickie M. Stringer**

Business name/disregarded entity name, if different from above
**dba/Triple Crown Publications**

Check appropriate box for federal tax classification:

☑ Individual/sole proprietor    ☐ C Corporation    ☐ S Corporation    ☐ Partnership    ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ _____

☐ Other (see instructions) ▶

Exemptions (see instructions):

Exempt payee code (if any) _____

Exemption from FATCA reporting
code (if any) _____

Address (number, street, and apt. or suite no.)
**3124 Genevieve Drive**

City, state, and ZIP code
**Columbus, Ohio 43219**

Requester's name and address (optional)

List account number(s) here (optional)

**Print or type**
**See Specific Instructions on page 2.**

## Part I  Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number
3 6 7 – 6 4 – 2 0 7 0

Employer identification number

## Part II  Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below), and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here**    Signature of
U.S. person ▶ *VM Stringer*    Date ▶ *February 19, 2014*

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** The IRS has created a page on IRS.gov for information about Form W-9, at *www.irs.gov/w9*. Information about any future developments affecting Form W-9 (such as legislation enacted after we release it) will be posted on that page.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, payments made to you in settlement of payment card and third party network transactions, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the

withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct.

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

Cat. No. 10231X    Form **W-9** (Rev. 8-2013)